1  DANIEL L. WARSHAW (Bar No. 185365)
   dwarshaw@pswplaw.com
2  **PEARSON, SIMON, WARSHAW & PENNY, LLP**
   15165 Ventura Boulevard, Suite 400
3  Sherman Oaks, California 91403
   Telephone: (818) 788-8300
4  Facsimile:  (818) 788-8104

5  SCOTT J. FERRELL (Bar No. 202091)
   sferrell@trialnewport.com
6  **NEWPORT TRIAL GROUP**
   895 Dove Street, Suite 425
7  Newport Beach, CA 92660
   Telephone: (949) 706-6464
8  Facsimile: (949) 706-6469

9  Attorneys for Class Members Henry Gonzales,
   Monica Fernandez, Eleanor Lanigan, Michael
10 Martinez, Glenna O'Dell, and Gemis Rangel

11 *(Additional counsel appear on signature page)*

12         **UNITED STATES DISTRICT COURT**

13         **SOUTHERN DISTRICT OF CALIFORNIA**

14

15 SALVATORE GALLUCCI, AMY              CASE NO. 3:11-cv-02039-JAH-NLS
   ARONICA, KIM JONES, DORIS PETTY,
16 and JEANNE PRINZIVALLI, individually and   **CLASS ACTION**
   on behalf of all others similarly situated,
17                                          **OBJECTION OF CLASS MEMBERS**
                                           **HENRY GONZALES, MONICA**
18              Plaintiffs,                **FERNANDEZ, ELEANOR LANIGAN,**
                                           **MICHAEL MARTINEZ, GLENNA**
19              v.                         **O'DELL, AND GEMIS RANGEL TO**
                                           **FINAL APPROVAL OF CLASS ACTION**
20 BOIRON, INC., a foreign corporation; and  **SETTLEMENT**
   BOIRON USA, INC., a foreign corporation,
21                                          Date:    August 27, 2012
              Defendants.                   Time:    2:30 p.m.
22                                          Crtrm.:  11 (2nd Floor)

23                                          (Assigned to the Honorable John A. Houston)

24                                          Trial Date:          None

25

26

27

28

*Left margin vertical text:* PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ................................................................................................1

II.    CLASS MEMBER NAMES AND ADDRESSES ...........................................3

III.   BACKGROUND .................................................................................................3

IV.    LEGAL ARGUMENT .......................................................................................7

    A.   The Collusive Reverse Auction Settlement In This Case Raises A Presumption Of Unfairness Which Requires "Closer Scrutiny" By The Court .........................................................................................................7

    B.   The Common Fund Settlement Agreement Provides Insufficient Monetary Relief To The Class ...........................................................................................9

        1.   The Settlement's Common Fund Caps Boiron's Liability at Less Than 1% of Boiron's Revenues from the Sale of the Products ...................10

        2.   The Monetary Value of the Settlement Is Unfair, Unreasonable, and Inadequate in Light of the Strength of Plaintiffs' Case and the Previous Settlement Offers Made by Boiron .................................11

    C.   The Injunctive Relief Provided By The Settlement Agreement Is Similarly Inadequate .................................................................................................13

    D.   The Proposed Notice Plan Is Procedurally And Substantively Deficient And Fails To Comport With The Applicable Legal Standards ........................................14

        1.   The Notice Plan Fails to Provide the Best Notice Practicable and Does Not Comport with Due Process .........................................14

        2.   The Notice Plan Fails to Comply with the CLRA ......................................16

        3.   The Notice Plan's Failure to Disclose the Amount of Attorneys' Fees Sought by Plaintiffs' Counsel Prevents Class Members from Properly Evaluating the Settlement Agreement ...........................................17

    E.   The Class Release In The Settlement Agreement Is Overbroad And Unenforceable .................................................................................................18

        1.   The Class Release Improperly Releases Claims That Were Not Alleged or Litigated in *Gallucci* ................................................18

        2.   The Class Release Is Overbroad Because It Releases Claims After the Deadline for Class Members to File a Claim, Object to the Settlement, or Exclude Themselves from the Class ...................................20

    F.   The Settlement Class Does Not Satisfy All Of The Elements Of Rule 23(a) And Therefore Cannot Be Certified ................................................20

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1.    Plaintiffs Do Not Satisfy Typicality for Those Products Which They
Did Not Purchase ........................................................................................20

2.    Plaintiffs' Counsel Are Inadequate to Represent the Class..........................21

V.    CONCLUSION ..........................................................................................................24

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

OBJECTION TO FINAL APPROVAL OF CLASS ACTION SETTLEMENT

# Table of Authorities

**Page(s)**

**CASES**

*Amchem Prods., Inc. v. Windsor,*
    521 U.S. 591 (1997) ........................................................................................... 14, 20

*Bloyed v. General Motors Corp.,*
    881 S.W.2d 422 (S.D. Tex. 1994) ............................................................................ 17

*Churchill Vill., L.L.C. v. Gen. Elec.,*
    361 F.3d 566 (9th Cir. 2004) ................................................................................... 10

*Cohorst v. BRE Properties, Inc.,*
    No. 3:10-CV-2666, 2011 WL 3489781 (S.D. Cal. July 19, 2011) ........................... 8

*Delarosa v. Boiron, Inc.,*
    275 F.R.D. 582 (C.D. Cal. 2011) ........................................................................ 3, 11

*Delarosa v. Boiron, Inc.,*
    818 F. Supp. 2d 1177 (C.D. Cal. 2011) ............................................................... 3, 12

*Delarosa v. Boiron, Inc., et al.,*
    No. 8:10-cv-01569 (C.D. Cal.) ........................................................................ passim

*Eisen v. Carlisle and Jacquelin,*
    417 U.S. 156 (1974) ................................................................................................. 14

*Fernandez v. Boiron, Inc., et al.,*
    No. SACV 11-01867 (C.D. Cal.) ...................................................................... passim

*Gonzales v. Boiron, Inc., et al.,*
    No. 11-cv-02066-JAH (S.D. Cal.) .................................................................... passim

*In re Mercury Interactive Corp. Secs. Litig.,*
    618 F.3d 988 (9th Cir. 2010) ................................................................................... 17

*In re United Energy Corp. Solar Power Modules Tax Shelter Invs. Sec. Litig.,*
    122 F.R.D. 251 (C.D. Cal. 1988) ............................................................................ 21

*In re Wash. Public Power Supply Sys. Secs. Litig.,*
    19 F.3d 1291 (9th Cir. 1994) ................................................................................... 17

*Mejia v. Sears Roebuck & Co.,*
    No. 3:06-cv-00974 (S.D. Cal. July 24, 2006) ......................................................... 22

*Nat'l Super Spuds, Inc. v. New York Mercantile Exchange,*
    660 F.2d 9 (2d Cir. 1981) ................................................................................... 18, 19

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

*People ex rel. Dept. of Transp. v. Clauser/Wells Partnership*,
    95 Cal.App.4th 1066 (2002) .................................................................... 10

*Piambino v. Bailey*,
    610 F.2d 1306 (5th Cir. 1980) ................................................................ 17

*Red v. Kraft Foods*,
    No. 10-cv-1028 (C.D. Cal. Sep. 29, 2011 ............................................... 22

*Reynolds v. Beneficial Nat'l Bank*,
    288 F.3d 277 (7th Cir. 2002) ............................................................... 7, 8

*Trotsky v. L.A. Savings & Loan Ass'n*,
    48 Cal.App.3d 134 (1975) ...................................................................... 18

*Williams v. Gerber Products Co.*,
    552 F.3d 934 (9th Cir. 2008) ................................................................. 13

**RULES AND STATUTES**

21 U.S.C. § 379r ...................................................................................... 3, 12

Cal. Civ. Code § 1781 .................................................................................. 16

Fed. R. Civ. P. 23(a) ............................................................................ 2, 3, 20

Fed. R. Civ. P. 23(c) ............................................................................... 2, 14

Fed. R. Civ. P. 23(e) ............................................................................ 1, 7, 21

Fed. R. Civ. P. 23(h) ................................................................................... 17

**OTHER AUTHORITIES**

Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and*
    *Plain Language Guide* (2010) ............................................................... 14

Manual for Complex Litig. (4th ed. 2009) § 21.632 ...................................... 20

*Newberg on Class Actions*, § 12:15, at 312 ................................................. 18

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

I.      **INTRODUCTION**

Class Members Henry Gonzales, Monica Fernandez, Eleanor Lanigan, Michael Martinez, Glenna O'Dell, and Gemis Rangel (collectively "Objectors") hereby object to the Proposed Class Action Settlement Agreement ("Settlement Agreement") in this case. This Court is tasked with the responsibility of ensuring that a class action settlement is fair, reasonable, and adequate before granting final approval. Fed. R. Civ. P. 23(e). The Settlement Agreement in this case fails every possible measure of fairness, reasonableness, and adequacy. It is not only the product of a collusive reverse action, but more importantly, it provides class members with insufficient monetary relief, inadequate injunctive relief, and deficient notice. As detailed below, the Settlement Agreement has numerous substantive legal deficiencies that require that it be rejected by the Court.

*First*, the $5 million common fund proposed in the Settlement Agreement is woefully inadequate and stands in stark contrast to the "Stipulation for Settlement" filed by the parties in November 2011 and settlement offers made by Boiron in similar class action lawsuits involving its products. The Stipulation for Settlement in this case outlined the material terms of a settlement that provided, *inter alia*: (1) a full refund (with no limitation) to all class members who made a claim; and (2) a separate, nonrecapture $2 million fund from which attorneys' fees and costs and incentive awards would be paid. *See* Stipulation for Settlement (Dkt. 44-1), attached as Exhibit A to the Declaration of Scott J. Ferrell in Support of Objection to Final Approval of Class Action Settlement ("SJF Decl."). Similarly, in *Delarosa v. Boiron, Inc., et al.*, No. 8:10-cv-01569 (C.D. Cal.) ("*Delarosa*")—a certified class action involving claims that Boiron falsely advertises its homeopathic cold remedy Children's ColdCalm—Boiron made a Rule 68 Offer of Judgment (which it later hastily withdrew) offering a 100% refund to all class members and consent to an ongoing injunction monitored by the court. *See Delarosa* Rule 68 Offer, attached as Exhibit B to SJF Decl. Rather than provide class members with a full refund, however, the Settlement Agreement inexplicably limits Boiron's total liability to $5 million (including all class member refunds *and* settlement administration costs, taxes, attorneys' fees and costs, and incentive awards). This amount reflects *less than one percent (1%)* of Boiron's retail revenue from the sale

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  of its products during the class period, and  because Plaintiffs have asked the Court to approve an

2  award of attorneys' fees, costs, and incentive awards worth just over $1.5 million, class members

3  will be left to make claims against a settlement fund containing less than $3.5 million.  *See*

4  Plaintiffs' Motion for Approval of Attorney Fees, Costs, and Incentive Awards ("Fee Motion"), at

5  1 (Dkt. No. 93).  This undeniably constitutes a sweetheart deal for Boiron and Plaintiffs' counsel

6  and a horrible result for the class.

7       *Second*, the Settlement Agreement compounds the deficiencies in the proposed monetary

8  relief by providing inadequate injunctive relief to the class members.  The proposed injunctive

9  relief does not require Boiron to stop selling its deceptive products, to reformulate its products, or

10  to stop making false and misleading statements on the products' labels.  What is worse, the

11  injunctive relief does not go into effect until up to two years after the "Effective Date" of the

12  Settlement, defined as the date of final judgment after *all* appeals.  Such a long period of time is

13  unjustified and could result in class members being exposed to Boiron's false and misleading

14  representations until 2015 at the earliest.

15       *Third*, the notice plan adopted by the Settlement Agreement does not meet the

16  requirements of Rule 23(c) because it fails to comport with Due Process and the express

17  newspaper publication requirements of the California Consumers Legal Remedies Act ("CLRA").

18  The notice plan also fails to disclose the amount of attorneys' fees or incentive awards sought by

19  Plaintiffs' counsel and other information that is essential to class members' evaluation of the

20  Settlement Agreement.  In short, the notice plan suffers from significant flaws and could not have

21  reached  the vast majority of class members.

22       *Fourth*, the Class Release in the Settlement Agreement is impermissibly overbroad

23  because it improperly applies to claims against Boiron that do not arise out of the operative First

24  Amended Complaint ("FAC").  In addition, the "Effective Date" of the Class Release improperly

25  forecloses class members who make purchases after the Claims Period but before final judgment

26  from participating in, objecting to, or opting out of, the Settlement Agreement.

27       *Fifth*, the Settlement Class fails to satisfy all of the elements of Rule 23(a).  It fails to

28  satisfy the typicality element of Rule 23(a)(3) because it seeks to certify claims relating to a

number of Boiron's products that were not purchased by the class representatives and have no relationship to the allegations and products at issue in the FAC.  And it fails to satisfy the adequacy element of Rule 23(a)(4) because Plaintiffs and their counsel have proven themselves inadequate to represent the class.

For all of these reasons, and as discussed in greater detail below, the Settlement Agreement is unfair, unreasonable, and inadequate, and should be rejected by the Court.

## II.   CLASS MEMBER NAMES AND ADDRESSES[1]

**A.**   Mr. Henry Gonzales.  5511 Streamview Drive, San Diego, CA 92105.

**B.**   Ms. Monica Fernandez.  16308 Yucca Avenue, Victorville, CA 92395.

**C.**   Ms. Eleanor Lanigan.  20843 Waalew Road, #81, Apple Valley, CA 92307.

**D.**   Mr. Michael Martinez.  14409 Poplar Street, Hesperia, CA 92344.

**E.**   Ms. Glenna O'Dell.  22148 Sherman Way, #213, Canoga Park, CA 91303.

**F.**   Mr. Gemis Rangel.  11768 Nehmans Way, Adelanto, CA 92301.

## III.   BACKGROUND

This lawsuit is one of several class action lawsuits pending against Boiron that allege Boiron manufactures, markets, and sells homeopathic products that it falsely represents have the ability to treat various health maladies.  The line of cases against Boiron was initiated with the filing of *Delarosa* in the Central District of California on August 31, 2010.  The *Delarosa* action alleges that Boiron engaged in false advertising in connection with its homeopathic cold remedy, Children's ColdCalm.  After extensive motion practice, the *Delarosa* action was certified as a class action on August 24, 2011.  *Delarosa v. Boiron, Inc.*, 275 F.R.D. 582 (C.D. Cal. 2011).  The *Delarosa* court also denied Boiron's Motion for Judgment on the Pleadings, which claimed that, *inter alia*: (1) Plaintiff's claims were preempted by 21 U.S.C. § 379r of the Federal Food, Drug, and Cosmetic Act; (2) Court intervention should be deferred pursuant to the equitable doctrines of abstention and primary jurisdiction; and (3) Plaintiff failed to allege her claims with sufficient

---

[1] Information specific to each class member's purchase of a settlement product is set forth in their declarations submitted concurrently with this Objection.

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1    particularity.  *Delarosa v. Boiron, Inc.*, 818 F. Supp. 2d 1177 (C.D. Cal. 2011).

2         The second lawsuit filed against Boiron arising from misrepresentations on its products'

3    labels was filed by class member Henry Gonzales on August 4, 2011 in San Diego County

4    Superior Court.  Boiron removed the case to this judicial district on September 7, 2011.  *Gonzales*

5    *v. Boiron, Inc., et al.*, No. 11-cv-02066-JAH (S.D. Cal.) ("*Gonzales*").  The *Gonzales* action

6    alleges that Boiron engaged in false advertising in connection with its homeopathic flu remedy,

7    Oscillococcinum ("Oscillo").  Nearly a month after the *Gonzales* action was filed, on September 2,

8    2011, Plaintiff Salvatore Gallucci filed the instant case.  *Gallucci v. Boiron, Inc.*, No. 11-cv-

9    02039-JAH (S.D. Cal.) ("*Gallucci*").  The *Gallucci* action asserted the same claims arising from

10   the same misrepresentations on the label of Boiron's product, Oscillo, as the *Gonzales* action, and

11   copied and pasted—verbatim—over 20 paragraphs from the *Gonzales* complaint.  SJF Decl., ¶ 6.

12   Indeed, contrary to the Gallucci Plaintiffs' representations, it appears that Gallucci's counsel

13   conducted very little independent factual investigation prior to filing their complaint.

14        Shortly after the filing of the *Gallucci* action, Boiron's counsel advised Gonzales' counsel

15   that Boiron intended to settle all of the Oscillo litigation with whichever side gave Boiron the

16   broadest release for the least amount of money.  SJF Decl., ¶ 7.  On September 19, 2011 and

17   September 23, 2011, counsel in *Gonzales* and *Gallucci*, respectively, filed motions seeking

18   appointment as interim lead class counsel.  With these motions pending, Boiron kept its promise to

19   find the lowest bidder and attended concurrent mediations in both the *Gonzales* and *Gallucci*

20   actions.  SJF Decl., ¶ 8.  On November 4, 2011, Boiron and class member Gonzales, through their

21   counsel, attended mediation in front of retired California Supreme Court Justice Edward Panelli.

22   *Id.*  The parties were unable to reach a settlement agreement.  *Id.*  At the same time, Boiron and

23   Plaintiff Gallucci engaged in multiple settlement negotiations with retired Federal Court Judge

24   Leo S. Papas.  *See* Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, at 3,

25   14-15 (Dkt. No. 64-1) (stating that the settling parties engaged in a mediation session and

26   additional settlement negotiations with Judge Papas for a period of five months from September

27   2011 to January 2012).  Counsel for the settling parties never informed Gonzales' counsel or

28   Justice Panelli that they were concurrently negotiating a settlement in *Gallucci*.  SJF Decl., ¶ 9.

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1    Nor did they inform Judge Papas of the same with respect to *Gonzales*.  *Id.*

2         On November 18, 2011, counsel for Gallucci sent an e-mail to Gonzales' counsel stating

3    that Gallucci and Boiron had reached a settlement.  SJF Decl., ¶ 10.  On November 28, 2011,

4    Gallucci and Boiron filed a Stipulation for Settlement with this Court and indicated that they

5    would move for preliminary approval in December 2011.  They did not.  Meanwhile, on

6    December 2, 2011, class members Monica Fernandez, Eleanor Lanigan, Michael Martinez, Glenna

7    O'Dell, and Gemis Rangel filed a class action lawsuit against Boiron in the Central District of

8    California alleging that Boiron engaged in false advertising in connection with four more of its

9    homeopathic products: Arnicare Arthritis (a remedy for arthritis and muscle pain), Chestal (a

10   cough remedy), ColdCalm (a cold remedy), and Quietude (a remedy for sleeplessness).

11   *Fernandez v. Boiron, Inc., et al.*, No. SACV 11-01867 (C.D. Cal.) ("*Fernandez*").  Two months

12   later, on February 6, 2012, Gallucci filed an amended complaint asserting claims on behalf of the

13   products at issue in *Fernandez*.

14        When the settling parties filed their Stipulation for Settlement, they represented that they

15   had reached a settlement providing the following: (1) "a full refund to any member of the Settling

16   Class who makes a claim" with "no limitation on the relief available for class members making

17   such claims"; (2) separate and apart from this unlimited, full refund provision, Boiron would

18   establish a nonrecapture, $2 million settlement fund from which attorneys' fees and costs and

19   incentive awards would be paid, and any remainder would be donated *cy pres* to a charitable

20   organization; (3) Boiron would pay the costs of nationwide notice and settlement administration;

21   and (4) Boiron would provide injunctive relief modifying their product labels.  *See* Exhibit A to

22   SJF Decl.  The parties further represented that "[t]his document [the Stipulation for Settlement]

23   sets forth the essential points of the settlement terms and serves as a memorandum of

24   understanding which, when signed by the necessary parties, *is binding on the parties*."  *Id.*

25   (emphasis added).

26        However, rather than move for preliminary approval of this settlement in December 2011,

27   the parties inexplicably renegotiated their settlement for three additional months, waiting until

28   March 6, 2012 until they finally moved for preliminary approval of a settlement that was markedly

different than the Stipulation for Settlement.  The Settlement Agreement now includes the

products that were at issue in *Fernandez*.  More notably, it provides for the creation of a $5

million common fund from which all consumer refunds, settlement administration costs, taxes,

attorneys' fees and costs of over $1.5 million, and incentive awards will be paid.  This common

fund effectively caps Boiron's total exposure at $5 million, including attorneys' fees and costs,

regardless of the number of claims made by class members.  $5 million, which objectively appears

to be a large amount of money, represents *less than 1%* of Boiron's retail revenue from the sale of

its products during the class period.  Declaration of Ryan M. Ferrell in Support of Objection to

Final Approval of Class Action Settlement ("RMF Decl."), ¶¶ 3-16.[2]  In addition, the Settlement

Agreement provides: (1) a release to all purchasers of Boiron products, other than Children's

ColdCalm, which were sold in the United States between January 1, 2000 and the "Effective

Date"[3] (Settlement Agreement, § 6); (2) class members who make claims with a receipt will

receive up to $100 per household.  (*Id.*, § 4.3.2.1).  Class members who make claims without a

receipt will receive up to $10 per product, with a cap of $50 per household.  (*Id.*, § 4.3.2.2).  There

will be a pro rata reduction of the class members' recovery if the claims exceed the $5 million

settlement fund.  (*Id.*, § 4.3.4); and (3) Boiron will add a small print statement on its product labels

within two years after the "Effective Date" stating that their intended "'Uses' have not been

evaluated by the FDA" and referring class members to a website explaining the extreme dilution

of the active ingredients in their products (*id.*, § 4.1).

Unlike the Stipulation for Settlement and the Rule 68 Offer presented in *Delarosa*, the

---

[2] Boiron's financial statements reveal that between 2000 and 2011, its wholesale revenue from the sale of its products was approximately $351 million.  RMF Decl., ¶¶ 3-16.  Boiron itself represents that its markup from wholesale to retail is 107.57%.  *Id.* ¶ 16.  Thus, using Boiron's own markup, the value of its retail sales during the class period is over $700 million.

[3] The "'Effective Date' means the first date by which any Judgment entered pursuant to the Agreement becomes Final."  (Settlement Agreement, § 1.14.)  "'Final'" means (a) if no appeal from the Judgment is filed, the date of expiration of the time for the filing or noticing of any appeal from the Judgment; or (b) if an appeal from the Judgment is filed, and the Judgment is affirmed or the appeal dismissed, the date of such affirmance or dismissal . . . ."  (*Id.*, § 1.17.)

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

Settlement Agreement does not provide class members with full refunds with no limitation. Instead, the Settlement Agreement caps Boiron's total exposure at $5 million and limits the amount of recovery per class member to *up to* $100 per household for class members with a receipt and *up to* $50 per household for class members without a receipt.  The "up to" language is key, since class members' recovery will be reduced pro rata if their claims exceed the $5 million settlement fund.  And since the settlement fund is also intended to cover all of Boiron's settlement administration costs, taxes, attorneys' fees and costs, and incentive awards, there is a strong possibility that class members will receive substantially less than what they paid for the products. Indeed, Gallucci's counsel is seeking a $1.5 million attorneys' fee award, nearly $10,000 in costs, and $7,500 in incentive awards.  Fee Motion, at 1.  Thus, class members will be left to make claims against a fund containing less than $3.5 million, even before settlement administration costs and taxes are taken into account.

This Court granted preliminary approval of the Settlement Agreement on April 25, 2012. (Dkt. No. 89.)  However, if the Court fully considers the merits of the Settlement Agreement and the settling parties' conduct in reaching that agreement, the Court cannot grant final approval of this settlement in its current form.

IV.   **LEGAL ARGUMENT**

   A.   **The Collusive Reverse Auction Settlement In This Case Raises A Presumption Of Unfairness Which Requires "Closer Scrutiny" By The Court**

Rule 23(e) requires court approval of any settlement of claims brought on a class basis to determine whether the settlement is fair, reasonable and adequate.  Although Plaintiffs included boilerplate citations in their Motion for Preliminary Approval regarding the presumption of fairness that is afforded to "non-collusive" settlement agreements, this presumption is not afforded to a settlement that is obtained through a reverse auction or other circumstances indicating that the rights of the class members have been compromised.  *See Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 282 (7th Cir. 2002).

A reverse auction is described as "the practice whereby the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the

7

OBJECTION TO FINAL APPROVAL OF CLASS ACTION SETTLEMENT

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1 | district court will approve a weak settlement that will preclude other claims against the

2 | defendant." *Reynolds*, 288 F.3d at 282; *see also Cohorst v. BRE Properties, Inc.*, No. 3:10-CV-

3 | 2666, 2011 WL 3489781, at *8 (S.D. Cal. July 19, 2011).  In a reverse auction, "[t]he ineffectual

4 | lawyers are happy to sell out a class they anyway can't do much for in exchange for generous

5 | attorneys' fees, and the defendants are happy to pay generous attorneys' fees since all they care

6 | about is the bottom line—the sum of the settlement and the attorneys' fees—and not the allocation

7 | of money between the two categories of expense." *Reynolds*, 288 F.3d at 282.  Accordingly, the

8 | relevant law holds that when a settlement agreement raises even the specter of a reverse auction, it

9 | must be viewed by the Court with *closer scrutiny* than would otherwise be required.  *Id.* at 282-83

10 | (overturning a settlement approval order because the indices of a reverse auction "demanded

11 | closer scrutiny than the district judge gave [the settlement].  He painted with too broad a brush,

12 | substituting intuition for the evidence and careful analysis that a case of this magnitude, and a

13 | settlement proposal of such questionable antecedents and circumstances, required.").

14 | This case represents one of the clearest instances of a reverse auction on record.  Neither

15 | Gallucci's counsel nor Boiron's counsel have ever disputed that the *Gallucci* action was a copycat

16 | action that plagiarized substantial portions of the *Gonzales* complaint.  In light of this fact and the

17 | previous experience that counsel for Gonzales had in successfully litigating the *Delarosa* action,

18 | counsel for Gallucci were undoubtedly in the least favored position to be appointed lead counsel in

19 | these related actions.  Therefore, Gallucci's counsel were more likely to provide Boiron with the

20 | most favorable terms that limited Boiron's exposure in this case.  Recognizing this fact, Boiron

21 | conducted a reverse auction during the pendency of lead counsel motions in this case, by secretly

22 | attending dueling mediations and settling the case with the attorneys who were willing to provide

23 | the broadest release possible for the least amount of money.  *See* SJF Decl. ¶¶ 7-9.  The only

24 | reason for Boiron to go through the expense of conducting these dueling mediations was to obtain

25 | the best deal possible for itself and the worst deal possible for the class.  Therefore, the *Gallucci*

26 | settlement is the classic example of a reverse auction which raises the likelihood that the rights of

27 | class members have been compromised and requires closer scrutiny by the Court.  *Reynolds*, 288

28 | F.3d at 282-83.

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1      Closer scrutiny of the Settlement Agreement is also required in this case due to the

2  circumstances surrounding, and representations made by counsel regarding, the Stipulation for

3  Settlement.  Namely, it now appears that the representations by counsel that the Stipulation for

4  Settlement was a "binding" document that would be reflected in a final Settlement Agreement

5  were false and misleading.  In reality, the Settlement Agreement bears little resemblance to the

6  Stipulation for Settlement and provides substantially less relief to the class.  There are only two

7  possible explanations for this.  Either counsel for Boiron and Gallucci collusively entered into the

8  Stipulation for Settlement in order to delay the lead counsel motions with no intent to comply with

9  its terms; or counsel for Gallucci has unjustifiably negotiated against the class after entering into

10  the Stipulation for Settlement and then entering into a final Settlement Agreement that provides

11  class members with substantially less relief.  As Judge Josephine Staton Tucker, the presiding

12  judge over the *Delarosa* and *Fernandez* actions, stated after reviewing the facts of this case:

13           At best, the procedural history set forth above evidences forum
              shopping, as the *Gallucci* Plaintiffs and Defendants waited several
14           months before executing a final Settlement Agreement to permit the
              *Gallucci* Plaintiffs to amend their complaint to assert claims on
15           behalf of a putative class that would render moot the *Fernandez*
              Action already pending in this Court.  At worst, the timing of the
16           parties' Settlement Agreement in the *Gallucci* Action evidences bad
              faith in the form of a collusive settlement aimed at settling all
17           consumer claims in the United States against Boiron arising from
              misrepresentations as to the efficacy of any of its homeopathic
18           products sold over the past twelve years for $5 million, less
              deductions for administrator costs, taxes, attorneys' fees' and costs,
19           and incentive awards.

20  *Fernandez*, Order Granting Defendants' Motion to Stay, at 4 (Dkt. No. 66).  When the Settlement

21  Agreement is viewed in conjunction with the suspicious circumstances surrounding its adoption, it

22  is obvious that the Settlement Agreement fails to provide sufficient monetary relief to the class.

23      **B.      The Common Fund Settlement Agreement Provides Insufficient Monetary**

24              **Relief To The Class**

25      In evaluating the reasonableness of a settlement agreement, courts generally must weigh:

26  (1) the strength of the plaintiff's case; (2) the risk, expense, complexity, and likely duration of

27  further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount

28  offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6)

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

OBJECTION TO FINAL APPROVAL OF CLASS ACTION SETTLEMENT

1  the experience and views of counsel; (7) the presence of a governmental participant; and (8) the

2  reaction of the class members of the proposed settlement."  *Churchill Vill., L.L.C. v. Gen. Elec.*,

3  361 F.3d 566, 575 (9th Cir. 2004).  The application of these factors supports rejection of the

4  Settlement Agreement.

5              **1.**       **The Settlement's Common Fund Caps Boiron's Liability at Less Than**

6                     **1% of Boiron's Revenues from the Sale of the Products**

7         As set forth above, the Settlement Agreement is centered on the creation of a $5 million

8  common fund that is used to pay all claims, settlement administration costs, taxes, attorneys' fees

9  and costs, and incentive awards in this case.  While $5 million sounds like a large number in a

10  vacuum, determining the sufficiency of the common fund requires that the value of the Settlement

11  Agreement be compared to the amount of commerce involved in the case.  *See People ex rel.*

12  *Dept. of Transp. v. Clauser/Wells Partnership*, 95 Cal.App.4th 1066, 1080 (2002).

13         In an attempt to enhance the Court's perception of the Settlement Agreement, Boiron

14  submitted the Declaration of Mark Land (Boiron's Vice President of Operations and Regulatory

15  Affairs), which asserts that Boiron's sales to "*mass market retailers*" between January 1, 2007 and

16  September 30, 2011 generated $65,575,194.[4]  Land Decl., ¶ 8 (Dkt. No. 64-4).  The term "mass

17  market retailers" is not defined by Mr. Land and is nothing more than a self-serving fiction that is

18  designed to mislead the Court.  The Settlement Agreement applies to all sales of Boiron's products

19  during the period between January 1, 2000 and final judgment after appeal.  It is certainly not

20  limited to "mass market" sales between January 1, 2007 and September 30, 2011.  Therefore, the

21  Mark Land declaration fails to provide the Court with a proper basis for evaluating and analyzing

22  _____

23  [4] Mr. Land also attempts to bolster the value of the injunctive relief under the Settlement

24  Agreement by stating that "To modify the labels and/or packaging on Boiron's products pursuant to the Settlement Agreement, Boiron could incur costs of up to $7 million."  Land Decl., ¶ 8.  This conclusory assertion is devoid of any evidentiary foundation and is extremely difficult to believe.

25  The injunctive relief under the Settlement Agreement does not require Boiron to recall or

26  reformulate any products or undergo any substantial expense.  Rather, the labels for the product will be slightly modified to add a fine print statement in the next few years affirming its health

27  claims have not been evaluated by the FDA.  This is a simple and inexpensive process.

28

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1   the Settlement Agreement.

2         As set forth in the Declaration of Ryan M. Ferrell, the evaluation of the Settlement

3   Agreement under the proper criteria reveals that the retail revenue from the sale of Boiron's

4   products between 2000 and 2011 actually exceeds $700 million.  *See* RMF Decl. ¶¶ 2-16.

5   Objectors arrived at this calculation by examining the annual and half-yearly reports for

6   Laboratories Boiron, the French parent company of Defendants Boiron, Inc. and Boiron USA, Inc.

7   *See id.*  These financial reports demonstrate that Boiron's wholesale revenues from the sale of

8   homeopathic products between 2000 and 2011 was over $351 million.  *See id.* ¶ 16.  Furthermore,

9   Defendants represent that their own markup from wholesale to retail is 107.57%.  *See id.* Using

10   Defendants' own markup, the value of retail sales of their homeopathic products from 2000 to

11   2011 is $729,075,634.  *Id.*  The $5 million settlement fund pales in comparison to this amount and,

12   if approved by the Court, will allow Boiron to obtain a Class Release for over twelve years of

13   liability for less than 1% of its retail sales during the class period.

14         **2.      The Monetary Value of the Settlement Is Unfair, Unreasonable, and**

15   **Inadequate in Light of the Strength of Plaintiffs' Case and the Previous**

16   **Settlement Offers Made by Boiron**

17         While this type of discounted settlement would be difficult to justify in any case, it is

18   especially unreasonable in this case, where Plaintiffs' claims were primed for class certification,

19   unlikely to be dismissed, and already subject to a signed Stipulation for Settlement that provided

20   class members with "full recovery" with "no limitation."

21         As Plaintiffs admit in their Motion for Preliminary Approval, "[b]ased on extensive

22   investigation and discovery, Plaintiffs believe that they could obtain class certification, defeat all

23   dispositive motions filed by Defendants, and proceed to a trial on the merits," where "they could

24   meet their burden [of proof]."  Motion for Preliminary Approval, at 17.  This type of confidence

25   makes it all the more surprising that Plaintiffs agreed to settle the case on such astonishingly poor

26   terms.  The truth is that this case was ideally suited for class certification because the district court

27   in *Delarosa* had already certified a similar case against Boiron involving a similar product,

28   Children's ColdCalm.  *See Delarosa v. Boiron, Inc.*, 275 F.R.D. 582 (C.D. Cal. 2011).  The

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1    *Delarosa* court also rejected Boiron's Motion for Judgment on the Pleadings, which argued that,

2    *inter alia*: (1) Plaintiff's claims were preempted by 21 U.S.C. § 379r of the Federal Food, Drug,

3    and Cosmetic Act; (2) Court intervention should be differed pursuant to the equitable doctrines of

4    abstention and primary jurisdiction; and (3) Plaintiff failed to allege her claims with sufficient

5    particularity. *See Delarosa v. Boiron, Inc.*, 818 F. Supp. 2d 1177 (C.D. Cal. 2011).

6         Thus, despite Plaintiffs' boilerplate contentions in their preliminary approval papers that

7    this lawsuit carried "risk" and "uncertainty," the directly applicable decisions from *Delarosa*

8    establish that this case was primed for class certification and likely a successful outcome.  At the

9    very least, Plaintiffs were the favorites in this litigation.  It is for this reason that Boiron initiated a

10    reverse auction at the start of the litigation in order to obtain the cheapest settlement possible at the

11    earliest possible time.  It is also for this reason that the Stipulation for Settlement, signed by

12    Boiron's counsel in November 2011, provided a full refund (without limitation) to all class

13    members who made a claim and created a separate, nonrecapture $2 million settlement fund from

14    which all attorneys' fees and costs would be paid.  *See* Exhibit A to SJF Decl.  And it is for this

15    reason that Boiron's Rule 68 Offer in *Delarosa* offered all members of the *Delarosa* class "actual

16    damages" reflecting the full value of the product sales in addition to attorneys' fees and costs.  *See*

17    *id.*, Exhibit B.  Now, the Settlement Agreement provides less than $3.5 million to all class

18    members, who will certainly receive far less than they paid for Boiron's products.

19         *The Stipulation for Settlement and the Rule 68 Offer unequivocally demonstrate that*

20    *Boiron was willing to settle this case by providing class members with a "full refund" with "no*

21    *limitation."*  In light of this fact, it is inexcusable that the Settlement Agreement negotiated by

22    Plaintiffs fails to provide this relief to the class members.  Given the strength of Plaintiffs' case;

23    the low risk of continuing the litigation; the even lower risk of maintaining class action status

24    throughout the trial; the amount offered in settlement; and the experience and views of counsel,

25    the monetary component of the Settlement Agreement is not fair, reasonable, or adequate, and

26    cannot be approved by the Court.

27    / / /

28    / / /

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1

### C.   <u>The Injunctive Relief Provided By The Settlement Agreement Is Similarly</u>

2

<u>Inadequate</u>

3

In addition to insufficient monetary relief, the Settlement Agreement provides the class

4

with inadequate injunctive relief.  The proposed injunctive relief does not require Boiron to stop

5

selling its deceptive products, to reformulate its products, or to stop making unsupported health

6

claims on the products' labels.  Rather, it merely requires Boiron to supplement its false and

7

misleading representations with a statement that its products' "'Uses' have not been evaluated by

8

the FDA."  Settlement Agreement, § 4.1.2.  The products must also contain a reference to a

9

webpage that explains the extreme dilutions of their ingredients.  *Id.*, § 4.1.3.  This constitutes

10

nothing more than a mere slap on the wrist.  Allowing Boiron to continue making these

11

misrepresentations and simply adding (1) a fine-print disclaimer that the FDA has not approved its

12

statements, and (2) a vague reference to a webpage, does not constitute adequate injunctive relief

13

under the applicable legal standard in the Ninth Circuit.  *See Williams v. Gerber Products Co.*, 552

14

F.3d 934, 939 (9th Cir. 2008) ("We disagree with the district court that reasonable consumers

15

should be expected to look beyond misleading representations on the front of the box to discover

16

the truth from the ingredient list in small print on the side of the box.").

17

Worse yet, this minimal injunctive relief does not even go into effect until up to two years

18

after the "Effective Date," which could be years from now following all of the appeals that will

19

surely come.  In the meantime, Boiron can continue to sell its products without making any

20

modifications to their labels as long as it provides customers with a refund pursuant to the "Boiron

21

Promise"—a farce which does not have to be disclosed to consumers or advertised by Boiron.  *See*

22

Settlement Agreement, § 4.1.6 .  This delay in instituting the minimal labeling changes required by

23

the Settlement Agreement has no rhyme, reason, or justification.  Labeling changes can and should

24

be implemented quickly and certainly cannot take two years to complete.

25

As a result, the Settlement Agreement provides insufficient injunctive relief and should not

26

be granted final approval

27

/ / /

28

/ / /

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

D.   **The Proposed Notice Plan Is Procedurally And Substantively Deficient And Fails To Comport With The Applicable Legal Standards**

In classic cost-cutting fashion, the Settlement Agreement adopts an inadequate notice program which has extremely limited distribution, does not comply with the express newspaper publication requirements under the CLRA, and fails to provide the requisite notice to class members.  Because the costs of notice are inextricably tied to the class' recovery under the $5 million common fund, the Settlement Agreement cannot be repaired with the provision of additional notice that will leave even less money to the class.  The notice program under the Settlement Agreement fails to comport with Rule 23 and Due Process and requires that the Court deny final approval.

1.   **The Notice Plan Fails to Provide the Best Notice Practicable and Does Not Comport with Due Process**

Notice to the class must be "the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 617 (1997); Fed. R. Civ. P. 23(c)(2).  Although notice by publication is acceptable when class members cannot be personally identified, it is still incumbent upon the notice plan to comply with due process and provide adequate notice to the Class.  *See Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 173-74 (1974).  According to guidelines set forth by the Federal Judicial Center, class notice is reasonable if it reaches between 70–95% of class members.  *See* Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide* (2010), *available at http://www.fjc.gov*.  The notice plan provided by the Settlement Agreement does not come close to satisfying these criteria.

Rather than comply with due process, the stated goal of the notice plan is to "provide the best practicable cost-effective notice to the defined class."  Settlement Agreement, Exhibit F (Dkt. 64-2).  Put simply, the notice plan is designed to be the cheapest notice possible that will not draw the ire of the Court.  This cut-rate notice plan, which costs an astonishingly low $159,399 for nationwide class notice, is comprised of: (1) one 1/3 page advertisement in Natural Health Magazine; (2) one 1/3 page advertisement in Health Magazine; (3) Sponsored Google Link Ads;

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1  (4) Google Target Content Advertising; (4) Google banner ads; (5) a Facebook page; and (6) a

2  press release.  *See* Summary of Notice Plan, attached as Exhibit F to Settlement Agreement.

3      As set forth in the Declaration of Gina M. Intrepido-Bowden,[5] this minimal notice plan "is

4  <u>not</u> consistent with other effective settlement notice programs, is <u>not</u> the best notice practicable

5  under the circumstances of this case and does <u>not</u> meet the 'desiring to actually inform' due

6  process communications standard."  Intrepido-Bowden Decl., ¶ 35 (emphasis in original).

7  Significantly, the print publication aspect of the notice plan is extremely limited for a case of this

8  magnitude.  One way it attempts to mask this deficiency is with internet-based notice, which

9  conflates the *reach* of the notice with the number of *impressions* it generates (*i.e.,* the number of

10 times the notice appears on a webpage).  As Ms. Intrepido-Bowden explains:

11      Unlike reach, total impressions are a gross or cumulative number
        that may include the same individual repeatedly. In fact, impressions
12      can, and often do, exceed a target's population size. Impressions are
        typically large in number and are often used to impress lay people.
13      Although impressions are impressive, they do not describe the most
        significant measurement of a media plan's effectiveness, which is
14      reach.

15      The FJC cautions that inflated audience data via Internet ads is
        common and to watch for programs that suggest that Internet ads and
16      social networks can replace all other methods of communication,
        because reach, awareness, and claims will likely be very low for such
17      programs.  For instance, please note the very low estimated click
        through rates in the Proposed Notice Plan—an estimated 0.06% click
18      thru rate for the Google Sponsored Links and an even lower 0.01%
        click thru rate for the Google Display Network.

19

20 *See* Intrepido-Bowden Decl., ¶¶ 17-18.  Furthermore, two of the proposed internet notice

21 components in this case—sponsored links of major search engines (*i.e.,* Google Sponsored Links)

22 and the Facebook Settlement Page—are not considered notice and do not measurably contribute to

23 reach, because they require a class member to know what he or she is looking for via a search of

24 _____

25 [5] Gina M. Intrepido-Bowden is a Director of Legal Notice Services at Kurtzman Carson
    Consultants LLC (KCC).  She specializes in the design and implementation of legal notification
26 campaigns supported by evidence based reach calculations relating to the adequacy of notice
    distribution to the Class.  *See* Intrepido-Bowden Decl., ¶¶ 1, 6-12.

27

28

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1   relevant terms.  *See id.*, ¶ 19.

2   In light of these deficiencies, it is not surprising that the notice provider, Gilardi & Co,

3   LLC, did not submit a declaration regarding the reach and frequency of the notice plan.  Nor is

4   there a declaration stating that the plan comports with due process and Rule 23.  The fact that the

5   notice provider is unwilling to attest to the reach and frequency of the notice plan is a telling sign

6   that it does not provide adequate notice to the class.  *See* Intrepido Decl., ¶ 15 ("In my experience,

7   when a notice plan fails to state reach it is typically an indication that the program falls below the

8   70% minimum reach goal.").

9   By failing to provide adequate notice to the Class, the settling parties have ensured that the

10   number of claims, objectors, and opt-outs in this case will be extremely low.  Boiron undoubtedly

11   hopes that this will allow it to insulate itself from liability for less than 1% of its retail sales of the

12   products during the class period.  And Gallucci's counsel undoubtedly hopes that this will allow

13   them to collect substantial attorneys' fees without having to defend their weak settlement.  This

14   manipulation of class action procedures must not be tolerated by the Court.

15   **2.      The Notice Plan Fails to Comply with the CLRA**

16   The notice plan also cannot be approved because it fails to comply with the express

17   requirements of the CLRA.  The CLRA requires that if personal notice is unreasonably expensive

18   or impossible, the parties must "give notice as prescribed herein by publication in accordance with

19   Section 6064 of the Government Code in a newspaper of general circulation in the county in

20   which the transaction occurred."  Cal. Civ. Code § 1781.  Government Code Section 6064 requires

21   that this newspaper publication occur at least once a week for four consecutive weeks.  *See id.*

22   These requirements are specific to the CLRA and must be complied with irrespective of the notice

23   requirements of Rule 23.

24   Plaintiffs in this case alleged and settled claims under the CLRA.  *See* FAC, ¶¶ 72-79 (Dkt.

25   No. 57) (asserting the CLRA as Plaintiffs' first cause of action); Motion for Preliminary Approval,

26   at 17.  However, in an obvious attempt to skirt the costs of publication, the notice plan is

27   completely devoid of any newspaper publication.  This constitutes a patent violation of the CLRA

28   and requires that the notice plan be rejected as a matter of law.

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

3.      **The Notice Plan's Failure to Disclose the Amount of Attorneys' Fees Sought by Plaintiffs' Counsel Prevents Class Members from Properly Evaluating the Settlement Agreement**

In common fund settlements, "the relationship between plaintiffs and their attorneys turns adversarial at the fee-setting stage." *In re Wash. Public Power Supply Sys. Secs. Litig.,* 19 F.3d 1291, 1302 (9th Cir. 1994).  At this stage, "[p]laintiffs' counsel, otherwise a fiduciary for the class, has become a claimant against the fund created for the benefit of the class.  It is obligatory, therefore, for the trial court judge to act with 'a jealous regard to the rights of those who are interested in the fund . . . ." *Id.* (internal quotations omitted).  Under these circumstances, the members of the class must be notified of the amount of attorneys' fees sought by class counsel in order to determine the value of the settlement and make "better-informed choice[s]," including whether to opt out or object to a proposed settlement. *See* Intrepido Decl., ¶ 21; Fed. R. Civ. Proc. 23(h) (requiring that class members be provided with "reasonable notice" of the attorneys' fees sought in a class action lawsuit); *Bloyed v. General Motors Corp.*, 881 S.W.2d 422, 435-36 (S.D. Tex. 1994) ("We find that the notice is deficient and that it should have disclosed to the class members in clear and certain terms the amount of the attorneys' fees agreed to or proposed as a part of the settlement."); *Piambino v. Bailey*, 610 F.2d 1306, 1328 (5th Cir. 1980) (holding that even when attorneys' fees are not fixed, the Court "must require that notice be given to the class of the proposed attorneys' fees as well as the rest of the settlement agreement and afford anyone who objects an opportunity to be heard."); *In re Mercury Interactive Corp. Secs. Litig.*, 618 F.3d 988, 993 (9th Cir. 2010).

In this case, the settlement has morphed significantly from the Stipulation for Settlement—which provided for "full relief" with "no limitation" and a *separate* fund for the payment of attorneys' fees and costs—to a common fund settlement that pits the attorneys' fees award against the class' recovery.  Whereas Plaintiffs' counsel once touted the fact that the attorneys' fees were uncertain as evidence that their settlement was non-collusive, it is now an error of law which deprives the class members of adequate notice and prevents them from knowledgeably evaluating their desire to participate in the settlement.  Gallucci's counsel filed their motion for attorneys'

1   fees, costs, and incentive awards a mere seven days before the deadline to object to or opt out of

2   the settlement.  By this time, the majority of class members had already chosen whether to

3   participate in the settlement without having adequate information regarding how much monetary

4   relief was really available to them.  Therefore, the failure to disclosure the amount of attorneys'

5   fees sought by Gallucci's counsel in the class notice constitutes reversible error.

**E.      The Class Release In The Settlement Agreement Is Overbroad And Unenforceable**

8   The Class Release in the Settlement Agreement warrants rejection of the settlement for two

9   reasons.  First, the Class Release improperly releases claims that fall outside the factual predicate

10  of the FAC.  Second, the Class Release unjustifiably dismisses claims relating to purchases

11  occurring between the close of the claims period and final judgment after appeal.  Consumers who

12  made these post-claims period purchases cannot be subject to the Class Release because they are

13  not eligible to make a claim for monetary relief, opt-out, or object to the Settlement Agreement.

**1.      The Class Release Improperly Releases Claims That Were Not Alleged or Litigated in *Gallucci***

16  The scope of a release in a class action lawsuit is governed by the factual predicate

17  doctrine, which holds that it is improper for a settlement agreement to settle claims that were not

18  alleged in the operative complaint.  *Nat'l Super Spuds, Inc. v. New York Mercantile Exchange,*

19  660 F.2d 9, 16-18 (2d Cir. 1981) (denying approval of a settlement agreement because it would

20  "bar [class members] from asserting claims, distinct from those represented by the class action

21  plaintiffs, which depend not only upon a different legal theory but upon proof of further facts.");

22  *see also Newberg on Class Actions*, § 12:15, at 312 ("The scope of a judgment is limited to the

23  claims that were asserted or that may arise out of the transactions or events pleaded in the

24  complaint."); *Trotsky v. L.A. Savings & Loan Ass'n*, 48 Cal.App.3d 134, 148 (1975) ("Any

25  attempt to include in a class settlement terms which are outside the scope of the operative

26  complaint should be closely scrutinized by the trial court to determine if the plaintiff genuinely

27  contests those issues and adequately represents the class.").  The rationale behind this rule is that a

28  class action cannot be certified or litigated unless the representative parties' damages arise out of

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1   the very same set of facts as the entire class.  *Nat'l Super Spuds,* 660 F.2d at 16-17 (stating that

2   "the most fundamental principles underlying class actions limit the powers of the representative

3   parties to the claims they possess in common with other members of the class.").

4          In this case, the Class Release is not tied to the allegations of the FAC, which challenges

5   representations specifically relating to the efficacy of Boiron's products.  Rather, the Settlement

6   Agreement provides an all-encompassing general release, which states in relevant part:

> Upon the Effective Date, the Representative Plaintiffs and each of
> the Class Members will be deemed to have, and by operation of the
> Judgment will have, fully, finally, and forever released,
> relinquished, and discharged the Released Persons from all Released
> Claims, meaning, with the exception of claims for personal injury,
> *any and all claims,* demands, rights, suits, liabilities, and causes of
> action of every nature and description whatsoever, known or
> unknown, matured or unmatured, at law or in equity, existing under
> federal and/or state law, that any Representative Plaintiff and/or
> Class Member has or may have against the Released Persons arising
> out of or related in any way to statements made in or in connection
> with Defendants' advertising, marketing, packaging, labeling,
> promotion, manufacture, sale and distribution of the Products*, that
> have been brought, could have been brought, or are currently
> pending, up to the date of the Effective Date, by any Class Member
> against Released Persons, in any forum in the United States
> (including their territories and Puerto Rico).*

16  Settlement Agreement, § 6.1 (emphasis added).  In other words, the release in this case is not

17  applicable only to this litigation, but any non-personal injury litigation that has been brought

18  against Boiron between the year 2000 and final judgment after appeal in this case.  This is a

19  prototypical example of a release that should never appear in a class action involving a limited set

20  of claims, because it applies to claims that have nothing to do with the allegations of the lawsuit.

21  By way of example, this would include: (1) claims relating to labeling representations that do not

22  arise out of the efficacy of the Products; (2) non-personal injury claims arising from the chemicals

23  or contaminants in the Products; and (3) claims arising from the improper packaging or inclusion

24  of foreign substances in the Products.

25          Simply put, the Court cannot allow the settlement of this class action lawsuit to settle all

26  conceivable claims alleged by "any class member against [Boiron] in any forum in the United

27  States (including their territories and Puerto Rico)."  To do so would be an abuse of justice that

28  will result in Boiron receiving an unjustified windfall by being insulated from claims that have

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1   nothing to do with this litigation.

2   **2.   The Class Release Is Overbroad Because It Releases Claims After the**

3   **Deadline for Class Members to File a Claim, Object to the Settlement,**

4   **or Exclude Themselves from the Class**

5   As set forth above, the release in this case applies to all claims that could have been

6   brought by class members at any time between January 1, 2000 and the "Effective Date" of the

7   Settlement Agreement.  According to the Settlement Agreement's definition of the "Effective

8   Date," the Class Release can apply to purchases which occur not only after final approval, but

9   through disposition of any appeal, which could be several years from now.  *See* Settlement

10   Agreement, §§ 1.14, 1.17.  This outcome is unacceptable and cannot be enforced by the Court.

11   The duration of the release in a class action cannot extend beyond the last day for class members

12   to submit claims, exclude themselves from the class, or object to the settlement.  A release such as

13   this deprives class members of the ability to make an informed decision on whether to participate

14   in the settlement.  Furthermore, the release improperly applies to purchases after the deadline for

15   which class members are not being provided with any monetary relief through the settlement.  The

16   Court must not grant final approval of the Settlement Agreement for these reasons.

17   **F.   The Settlement Class Does Not Satisfy All Of The Elements Of Rule 23(a) And**

18   **Therefore Cannot Be Certified**

19   Before granting final approval, the Court must determine that the proposed settlement

20   presents a proper class for settlement purposes and satisfies the requirements of Rule 23.  *See*

21   Manual for Complex Litig. (4th ed. 2009) § 21.632; *Amchem Prods.*, 521 U.S. at 620.  Pursuant to

22   this requirement, the proposed settlement must satisfy, *inter alia*, the typicality and adequacy

23   requirements of Rule 23(a).  It does not.

24   **1.   Plaintiffs Do Not Satisfy Typicality for Those Products Which They**

25   **Did Not Purchase**

26   Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical

27   of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  This case began as a class action

28   alleging claims against Boiron's homeopathic flu remedy, Oscillo.  However, after entering into

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

the Stipulation for Settlement with Boiron, counsel for Gallucci scoured the internet for additional class representatives who had purchased products that were already the subject of the *Fernandez* action, and other products.  The addition of these new class representatives was undoubtedly for the purpose of establishing standing and typicality for classes relating to these products.  But the Settlement Agreement and Class Release go too far in seeking the conditional certification and release of claims relating to the purchase of *any* Boiron product in the United States—except for Children's ColdCalm in the State of California since August 31, 2006—between January 1, 2000 and the "Effective Date."

As set forth in Exhibit D of the Settlement Agreement, the settlement includes more than 23 independent products, which are claimed to treat a variety of health maladies, such as: (1) Acidil, which is marketed to treat symptoms of indigestion such as "Sour Stomach" or "Heartburn"; (2) Gasalia, which is marketed to treat "Bloating," "Pressure," and "Pain" associated with gas; (3) Calendula, which is marketed as a first aid product which can be used to treat "Burns," "Scrapes," and "Skin Irritation"; (4) Yeastaway, which is marketed to treat yeast infections and relieve "Vaginal Itching," "Burning," and "Discomfort"; and others.  Each of Boiron's products contains a distinct formulation, is sold utilizing distinct representations, and is marketed to treat distinct medical issues.  Plaintiffs do not purport to have purchased all of Boiron's products; however, they are attempting to settle claims on behalf of purchasers of all of those products.  As a result, Plaintiffs are not typical of the purchasers of those products which Plaintiffs themselves did not purchase.

### 2.   Plaintiffs' Counsel Are Inadequate to Represent the Class

The "adequacy of representation" requirement of Rule 23(a)(4) has two elements: "1) that the representative party's attorney be qualified, experienced and generally able to conduct the litigation; and 2) that the suit not be collusive and plaintiff's interests not be antagonistic to those of the remainder of the class."  *In re United Energy Corp. Solar Power Modules Tax Shelter Invs. Sec. Litig.*, 122 F.R.D. 251, 257 (C.D. Cal. 1988).  Plaintiffs fail both of these elements.

First, class counsel have demonstrated that they are not qualified, experienced, or generally able to conduct this litigation.  Class counsel have been criticized by numerous courts for their

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

OBJECTION TO FINAL APPROVAL OF CLASS ACTION SETTLEMENT

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1    inability to adequately represent class members.  *See, e.g., Red v. Kraft Foods*, No. 10-cv-1028

2    (C.D. Cal. Sep. 29, 2011) (Dkt. No. 145-1) ("There is, moreover, an issue as to whether Plaintiffs'

3    counsel is 'qualified, experienced, and able to vigorously conduct the proposed litigation. . . .

4    Judge Patel recently denied The Weston Firm's request to be appointed class counsel in light of

5    'concern[s] about their relative lack of experience with class certification motions and subsequent

6    litigation.' *Levitt v. Yelp! Inc.*, No. 10-1321, Doc. No. 39 at 2 (N.D. Cal. Aug. 24, 2010).  Another

7    federal judge denied a proposed settlement, expressing 'concern' that The Weston Firm had not

8    'done all that they can do in the interest of the class.' *Red v. Unilever PLC*, No. 10-387, Doc. No.

9    133 at 14:2-14 (N.D. Cal. Nov. 23, 2010) (Ware, J.) . . . In addition, Defendants refer to The

10   Weston Firm's having been reprimanded by three different federal judges in 2010."); *Mejia v.*

11   *Sears Roebuck & Co.*, No. 3:06-cv-00974 (S.D. Cal. July 24, 2006) ("Mr. Marron has been sued

12   and has settled a case where former clients sued him for malpractice and breach of fiduciary duty.

13   Intervening counsel is informed and believes that Mr. Marron paid a financial settlement to his

14   clients for his breach of fiduciary duty/malpractice towards them.  Must intervenor(s) wait until it

15   is too late to protect not only their interest but those of other class members?").

16          Second, as detailed above, there is considerable evidence of collusion in the settlement.

17   Judge Tucker, who has been privy to the conduct of the settling parties' counsel in *Delarosa* and

18   *Fernandez*, even suggested that the Settlement Agreement may evidence bad faith in the form of a

19   collusive settlement.  *See supra*, Part II.  Moreover, the Gallucci Plaintiffs and their counsel spent

20   several months between November 2011 and March 2012 effectively negotiating against the

21   interests of the class, and accepted this horrible settlement after signing a Stipulation for

22   Settlement that provided class members full refunds with no limitation.  This shows that both

23   Plaintiffs and their counsel are inadequate to protect the interests of the class and is evidence that

24   Plaintiffs' class cannot be conditionally certified under Rule 23.

25          Finally, Plaintiffs' request for attorneys' fees, costs, and incentive awards further

26   highlights that Plaintiffs and their counsel are inadequate to represent the class.  In light of the

27   facts surrounding the Settlement Agreement detailed above, Plaintiffs' fee request is unreasonable

28   and antagonistic to the interests of the class.  Plaintiffs seek an attorneys' fee award of $1.5

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403

1 | million.  They attempt to justify this award by emphasizing, *inter alia*: the "exceptional" results

2 | obtained for the class; the value of the injunctive relief; and the effort, skill, and experience of

3 | their counsel.  *See* Fee Motion, at 9, 11-13.  But as demonstrated in this Objection, none of these

4 | factors are present.  Going from a signed Stipulation for Settlement in November 2011 that offered

5 | class members full refunds with no limitation to a common fund settlement that offers less than

6 | $3.5 million *total* for all class members is anything but an exceptional result.  The estimated $7

7 | million value of the injunctive relief is imaginary as it is based on absolutely no evidence and

8 | consists of trivial labeling changes that do not provide any substantive relief to the class.  Finally,

9 | Plaintiffs' assertion that their counsel's efforts in this case—more than 1,600 hours of work

10 | despite the fact that they entered into a Stipulation for Settlement *two months* after only filing their

11 | copycat complaint—entitles them to a greater award than the benchmark in the Ninth Circuit is

12 | baseless.[6]  Indeed, Plaintiffs' counsel has not provided the Court with any details regarding their

13 | billing, so there is no way to evaluate the reasonableness of their time spent on this case.  For these

14 | reasons, Plaintiffs' fee request is excessive and unreasonable, and is further evidence that they are

15 | inadequate to represent the class.

16 | / / /

17 | / / /

18 | / / /

19 | / / /

20 | / / /

21 | _____

22 | [6] Plaintiffs' counsel's mischaracterization of their work in this case is truly astounding.  Although

23 | they contend that they were "forced to address a slew of accusations and motions by a competing litigant [Class Member Henry Gonzales] intent on disrupting the Class's settlement," Fee Motion,

24 | at 13, they have never denied that their complaint literally copied and pasted over 20 paragraphs from the *Gonzales* complaint.  Moreover, Plaintiff Salvatore Gallucci's declaration in support of

25 | Plaintiffs' fee request states that he retained Mr. Marron as counsel on August 25, 2011.  (Dkt. No. 93-3, ¶ 2.)  Yet, Mr. Marron sent a CLRA notice letter to Boiron two weeks prior to that date—

26 | before he even had a client—on August 11, 2011.  *See* CLRA notice letters attached to FAC. Clearly, Plaintiffs' counsel has demonstrated a less than stellar track record in this case, and

27 | should not be allowed to benefit from their underhanded tactics.

28 |

1    V.      <u>CONCLUSION</u>

2          For all of the foregoing reasons, Objectors contend that the Settlement Agreement is not

3    fair, reasonable, or adequate, and respectfully request that the Court deny final approval of the

4    proposed settlement.

5

6    DATED: July 27, 2012

7

8                                            By:  _____/s/ *Daniel L. Warshaw*_____
                                                        Daniel L. Warshaw
9
                                             CLIFFORD H. PEARSON (Bar No. 108523)
10                                           cpearson@pswplaw.com
                                             DANIEL L. WARSHAW (Bar No. 185365)
11                                           dwarshaw@pswplaw.com
                                             **PEARSON, SIMON, WARSHAW & PENNY, LLP**
12                                           15165 Ventura Boulevard, Suite 400
                                             Sherman Oaks, California 91403
13                                           Telephone: (818) 788-8300
                                             Facsimile:  (818) 788-8104
14
                                             SCOTT J. FERRELL (Bar No. 202091)
15                                           sferrell@trialnewport.com
                                             JAMES B. HARDIN (Bar No. 205071)
16                                           jhardin@trialnewport.com
                                             STEVEN R. TELLES (Bar No. 246514)
17                                           stelles@trialnewport.com
                                             RYAN M. FERRELL (Bar No. 258037)
18                                           rferrell@trialnewport.com
                                             **NEWPORT TRIAL GROUP**
19                                           895 Dove Street, Suite 425
                                             Newport Beach, CA 92660
20                                           Telephone: (949) 706-6464
                                             Facsimile: (949) 706-6469
21
                                             Attorneys for Class Members Henry Gonzales, Monica
22                                           Fernandez, Eleanor Lanigan, Michael Martinez, Glenna
                                             O'Dell, and Gemis Rangel
23

24

25

26

27

28

PEARSON, SIMON, WARSHAW & PENNY, LLP
15165 VENTURA BOULEVARD, SUITE 400
SHERMAN OAKS, CALIFORNIA 91403