**LAW OFFICES OF**
**RONALD A. MARRON, APLC**
RONALD A. MARRON (175650)
*ron@consumersadvocates.com*
MAGGIE. K. REALIN (263639)
*maggie@consumersadvocates.com*
BEATRICE SKYE RESENDES (278511)
*skye@consumersadvocates.com*
3636 4th Avenue, Suite 202
San Diego, California 92103
Telephone:     (619) 696-9006
Facsimile:     (619) 564-6665

*Class Counsel*

**THE WESTON FIRM**
GREGORY S. WESTON (239944)
*greg@westonfirm.com*
JACK FITZGERALD (257370)
*jack@westonfirm.com*
COURTLAND CREEKMORE (182018)
*courtland@westonfirm.com*
MELANIE PERSINGER (275423)
*mel@westonfirm.com*
1405 Morena Blvd., Suite 201
San Diego, California 92110
Telephone:     (619) 798 2006
Facsimile:     (480) 247 4553

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SALVATORE GALLUCCI, AMY ARONICA, KIM JONES, DORIS PETTY, and JEANNE PRINZIVALLI, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>    v.<br><br>BOIRON, INC., a foreign corporation; and BOIRON USA, INC., a foreign corporation,<br><br>        Defendants.<br><br>_____<br><br>AND RELATED ACTIONS | Case No. 3:11-CV-2039 JAH NLS<br>Pleading Type: Class Action<br><br>**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT**<br><br>[FILED CONCURRENTLY WITH DECLARATIONS OF RONALD A. MARRON AND MARKHAM SHERWOOD IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT, AND FINAL JUDGMENT AND ORDER]<br><br>Date:       August 27, 2012<br>Judge:     Hon. John A. Houston<br>Time:      2:30 p.m.<br>Location:  Courtroom 11<br><br>[Motion date set by the Court in Preliminary Approval Order (Dkt. 89) and Order Rescheduling Final Approval Hearing (Dkt. 91)] |

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................................ i

INTRODUCTION ................................................................................................................... 1

FACTS ...................................................................................................................................... 1

   I.     HISTORY OF THE LITIGATION ............................................................... 1

       A.    The Parties and Pleadings ................................................................. 1

       B.    Rule 12 Motion Practice ................................................................... 2

       C.    Plaintiffs Engage Boiron in Substantial Discovery ................................. 2

       D.    The Parties' Negotiations Regarding Settlement .................................. 3

       E.    Motion for Preliminary Approval ..................................................... 5

       F.    The Related *Gonzales* and Other Actions ......................................... 5

       G.    The Surge in Homeopathic Litigation Following Settlement, and
           Voluntary Labeling Changes that Mirror *Gallucci*'s Injunctive Relief .................. 6

   II.    THE TERMS OF THE SETTLEMENT ......................................................... 7

       A.    Injunctive Relief .............................................................................. 7

           i.    Modification of Boiron Products' Packaging and Labeling .................... 7

               a.    The FDA Disclaimer ........................................................ 7

               b.    The Dilution Disclaimer .................................................... 8

           ii.    Modification of Boiron's Websites ........................................... 8

           iii.    Continuation of the "Boiron Promise" Program ............................ 8

       B.    Cash Refunds, Notice Costs and Settlement Administration ................... 9

       C.    Attorneys' Fees, Expenses and Incentive Awards ................................ 9

       D.    Funding Successful Objections .......................................................... 9

       E.    The Notice Program ..................................................................... 10

           i.    Print ............................................................................. 11

           ii.    Press Release .................................................................. 11

i

*Gallucci v. Boiron, Inc., et al.*, Case No. 11-CV-2039 JAH NLS
PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT

iii.    Electronic Notice ................................................................12

iv.    Dedicated Settlement Websites.........................................12

v.    Direct Notice to Class Members ......................................13

vi.    Additional Notice Efforts ................................................13

F.    Notice to State Attorneys General ..........................................13

G.    The Contents of the Notice Plan were Adequate......................13

REASONS THE SETTLEMENT WARRANTS FINAL APPROVAL ................................15

I.    STANDARD FOR GRANTING FINAL APPROVAL ...............................15

II.    THE COURT SHOULD GRANT THE SETTLEMENT FINAL
APPROVAL.........................................................................16

A.    The Strength of Plaintiffs' Case.............................................16

B.    The Risk, Expense, Complexity, and Likely Duration of Further
Litigation Favor Final Approval ...........................................18

C.    The Risk of Maintaining Class Action Status Through Trial Favors
Final Approval ....................................................................19

D.    The Amount Offered in Settlement Favors Final Approval.................20

E.    The Stage of the Pleadings and Extent of Discovery Favor Final
Approval.............................................................................22

F.    The View of Experienced Counsel Favors Final Approval .................22

G.    The Class's Reaction to the Proposed Settlement Favors Final
Approval.............................................................................24

H.    The Presence of a Governmental Participant ........................25

I.    The Balanced Factors Weigh in Favor of Final Approval ...................25

CONCLUSION.........................................................................25

ii

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Dennis v. Kellogg Co.*,
   2011 U.S. Dist. LEXIS 36651 (S.D. Cal. Apr. 5, 2011) ...................................................24

*Anderson v. Nextel Retail Stores, LLC*,
   2010 U.S. Dist. LEXIS 43377 (C.D. Cal. Apr. 12, 2010) .............................................20

*Boyd v. Bechtel Corp.*,
   485 F. Supp. 610 (N.D. Cal. 1979).................................................................................22

*Chacanaca v. Quaker Oats Co.*,
   752 F. Supp. 2d 1111 (N.D. Cal. 2010)........................................................................23

*Churchill Vill., LLC. v. Gen. Elec.*,
   361 F.3d 566 (9th Cir. 2004).................................................................................14, 15

*City of Detroit v. Ginnell Corp.*,
   495 F.2d 448 (2d Cir. 1974).........................................................................................20

*Class Plaintiffs v. City of Seattle*,
   955 F.2d 1268  (9th Cir. 1992)....................................................................................15

*Cotton v. Hinton*,
   559 F.2d 1326 (5th Cir. 1977)......................................................................................20

*Curtis- Bauer v. Morgan Stanley & Co., Inc.*,
   2008 U.S. Dist. LEXIS 85028 (N.D. Cal. Oct. 22, 2008) ............................................16

*Dennis v. Kellogg Co.*,
   2011 U.S. Dist. LEXIS 36651 (S.D. Cal. Apr. 5, 2011) ...............................................21

*Farinella v. Paypal, Inc.*,
   611 F. Supp. 2d 250 (E.D.N.Y. 2009)..........................................................................21

*Hanlon v. Chrysler Corp.*,
   150 F.3d 1011 (9th Cir. 1998)...............................................................................15, 21

*In re Cendant Corp. Derivative Action Litig.*,
   232 F. Supp. 2d 327 (D.N.J. 2002)..............................................................................21

*In re Chicken Antitrust Litig. Am. Poultry*,
   669 F.2d 228 (5th Cir. 1982)........................................................................................20

*In re Ferrero Litig.*,
   2012 WL 2802051 (S.D. Cal. July 9, 2012)..........................................................10, 21

iii

*In re Ferrero Litig.*,
   278 F.R.D. 552 (S.D. Cal. Nov. 15, 2011) ...................................................................11, 21

*In re Heritage Bond Litig.*,
   2005 U.S. Dist. LEXIS 13555 (C.D. Cal. June 10, 2005) ..............................................16

*In re Merrill Lynch Tyco Research Sec. Litig.*,
   249 F.R.D. 124 (S.D.N.Y. 2008) ....................................................................................21

*In re Omnivision Techs.*,
   559 F. Supp. 2d 1036 (N.D. Cal. 2007) ..........................................................................19

*In re Pac. Enter. Sec. Litig.*,
   47 F.3d 373 (9th Cir. 1995) ......................................................................................15, 22

*In re PaineWebber Ltd. P'ships Litig.*,
   171 F.R.D. 104 (S.D.N.Y. 1997) ....................................................................................14

*In re Portal Software Secs. Litig.*,
   2007 U.S. Dist. LEXIS 88886 (N.D. Cal. Nov. 26, 2007) ..............................................18

*In re Synthroid Mktg. Litig.*,
   110 F. Supp. 2d 676 (N.D.Ill.2000) ................................................................................14

*In re Vioxx Class Cases*,
   180 Cal. App. 4th 116 (2009) .........................................................................................19

*In re Warner Commc'ns Sec. Litig.*,
   618 F. Supp. 735 (S.D.N.Y. 1985) .................................................................................22

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
   396 F.3d 922 (8th Cir. 2005) ..........................................................................................19

*Jaffe v. Morgan Stanley & Co.*,
   2008 U.S. Dist. LEXIS 12208 (N.D. Cal. Feb. 7, 2008) ................................................21

*Knight v. Red Door Salons, Inc.*,
   2009 U.S. Dist. LEXIS 11149 (N.D. Cal. Feb. 2, 2009) ...........................................22, 23

*Linney v. Cellular Alaska P'ship*,
   151 F.3d 1234  (9th Cir. 1998) ............................................................................15, 16, 20

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ..........................................................................................19

*Mendoza v. Tucson Sch. Dist. No. 1*,
   623 F.2d 1338 (9th Cir.1980) .........................................................................................14

iv

*Milstein v. Huck,*
    600 F. Supp. 254 (E.D.N.Y. 1984) ...................................................................19

*Mullane v. Central Hanover Bank and Trust Co.,*
    339 U.S. 306 (1950) .........................................................................................10

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.,*
    221 F.R.D. 523 (C.D. Cal. 2004) ..........................................................16, 18, 20

*Officers for Justice v. Civil Serv. Comm'n,*
    688 F.2d 615 (9th Cir. 1982) .........................................15, 16, 19, 20, 25

*Ravens v. Iftikar,*
    174 F.R.D. 651 (N.D. Cal. 1997) .....................................................................13

*Rodriguez v. West Publ'g Corp.,*
    2007 U.S. Dist. LEXIS 74767 (C.D. Cal. Sept. 10, 2007) ..............................18

*Rodriguez v. West Publ'g Corp.,*
    563 F.3d 948 (9th Cir. 2009) ....................................................................14, 24

*Stevens v. Safeway, Inc.,*
    2008 U.S. Dist. LEXIS 17119 (C.D. Cal. Feb. 25, 2008) ...............................22

*Weeks v. Kellogg Co.,*
    2012 U.S. Dist. LEXIS 155472 (C.D. Cal. Nov. 23, 2011) .............................15

*White v. Experian Info Solutions, Inc.,*
    803 F. Supp. 2d 1086 (C.D. Cal. 2011) ...........................................................21

*Young v. Polo Retail, LLC,*
    2007 U.S. Dist. LEXIS 27269 (N.D. Cal. Mar. 28, 2007) ...............................22


**Statutes**

21 C.F.R. § 101.93 .................................................................................................7

21 U.S.C. § 343(r)(6) .............................................................................................7

Cal. Bus. & Prof. Code § 17200 ...........................................................................1

Cal. Bus. & Prof. Code § 17500 ...........................................................................1

Cal. Civ. Code § 1750 ............................................................................................1

Cal. Civ. Code § 1781 ..........................................................................................11

**Rules**

Fed. R. Civ. P. 23(e)(1) ................................................................................................10

Fed. R. Civ. P. 23(e)(2) ................................................................................................15

Fed. R. Civ. P. 23(g)(1) ................................................................................................23

Fed. R. Civ. P. 26(f) ....................................................................................................22

*Gallucci v. Boiron, Inc., et al.*, Case No. 11-CV-2039 JAH NLS
PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT

Pursuant to the Court's April 25, 2012 Order Granting Preliminary Approval ("PA Order," Dkt. 89), Plaintiffs Salvatore Gallucci, Amy Aronica, Kim Jones, Doris Petty, and Jeanne Prinzivalli respectfully submit this Memorandum in support of their Motion for Final Approval of the proposed classwide Settlement with Defendants Boiron, Inc. and Boiron USA, Inc.

## INTRODUCTION

This is a false and deceptive drug advertising case that presents a landmark settlement. Plaintiffs had alleged false and deceptive advertising of homeopathic drugs manufactured by Defendants Boiron, Inc. and Boiron USA, Inc. (collectively "Boiron").  As part of the settlement, Boiron has agreed to modify the labels and packaging of *all* of its homeopathic products, in a manner more onerous than that which several consumers advocacy groups have unsuccessfully petitioned the FDA to require.  And, the Settlement Agreement (Dkt. 64-2 at Ex. A), even before being finally approved, has had a ripple effect on the industry, with several competing homeopathic manufacturers making the decision to *voluntarily* modify their products' labeling in the same manner the Settlement Agreement requires of Boiron, and agreeing to provide their consumers other benefits, including refunds.

On top of the strong injunctive relief provided by the settlement, Boiron has established an impressive $5 million common fund in favor of the Class, to provide claimants full cash refunds with a generous cap, and several other benefits. The result is a Class settlement that is not just fair, reasonable and adequate, but strongly in the Class's and the public's interest. The Court should, respectfully, grant the Settlement Agreement final approval.

## FACTS

### I.    HISTORY OF THE LITIGATION

#### A.    The Parties and Pleadings

On September 2, 2011, Mr. Gallucci filed this class action against Boiron alleging that the labeling and advertising of its over-the-counter homeopathic flu remedy, Oscillococcinum (or "Oscillo") was false and misleading, in violation of California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq., False Advertising Law, *id.* §§ 17500, et seq., and Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.*  Mr. Gallucci also alleged Boiron's breach of express

1

and implied warranties.  (*See generally* Compl., Dkt. 1.)  Boiron filed its Answers on November 29, 2011. (Dkts. 45-46.)  Class Counsel consulted with Neil Rose, M.D., Ph.D., an immunologist with Johns Hopkins University, about Boiron's claims of the effectiveness of their Products, including Oscillo, for purposes of drafting the complaint.  (Declaration of Ronald A. Marron, filed concurrently herewith ["Marron Decl."] ¶ 2.)

On February 6, 2012, Mr. Gallucci, together with Mss. Aronica, Jones, Petty, and Prinzivalli, filed a First Amended Complaint ("FAC," Dkt. 57).  The FAC advanced the same claims against Boiron for a variety of over the counter ("OTC") homeopathic products including Oscillo, Arnicare, Chestal, Coldcalm, Quietude, Camilla, and others. (*See* FAC ¶¶ 2, 60-61.)  Specifically, on behalf of a nationwide class, Plaintiffs alleged that Boiron labeled its OTC homeopathic products in a manner that was deceptive or likely to deceive a reasonable consumer, in that the active ingredients in the Products are extensively diluted.  (*See*, *e.g.*, FAC ¶¶ 24-25, 62, 67, 78, 82-86, 91.)  Boiron filed its Answer to the FAC on February 24, 2012. (Dkts. 60-61.)

### B.  Rule 12 Motion Practice

On September 21, 2011, Boiron filed two Motions to Dismiss the Complaint, contending lack of personal jurisdiction over Boiron USA, Inc., a purported holding company for Boiron, Inc., and preemption, primary jurisdiction, abstention, lack of privity, particularity, and failure to state plausible claims as to both Defendants. (Dkts. 9, 11.)  On November 7, 2011, Mr. Gallucci filed his oppositions. (Dkts. 20-21.)  In drafting Plaintiff's oppositions, Class Counsel conducted, *inter alia*, a comprehensive review of federal drug labeling laws and their implementing regulations, as well as all other defenses asserted by Boiron in their motions.  (*See id.*; Marron Decl. ¶ 2.)  In an emergency motion, Boiron requested more time to respond to Plaintiff's oppositions due to "the weighty issues" Class Counsel raised in the briefing. (Dkt. 23.)  Before Boiron's motions could be heard, however, the Defendants withdrew them and did not re-notice them.  (*See* Dkt. 42.)

### C.  Plaintiffs Engage Boiron in Substantial Discovery

Prior to engaging in settlement discussions, Plaintiff insisted on receiving targeted discovery that would permit them to assess the merits of the claims asserted, Boiron's defenses, and an appropriate settlement amount and structure.  Thus, after the Court entered the parties' stipulated

2

*Gallucci v. Boiron, Inc., et al.,* Case No. 11-CV-2039 JAH NLS
PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT

Protective Order on September 28, 2011 (Dkt. 16), Boiron produced, and Class Counsel reviewed documents including scientific articles; marketing data; label and package mechanicals; sales figures and other detailed financial information; and statutory and regulatory authority for Boiron's reporting of contingent liabilities. Class Counsel also independently researched other important issues influencing the settlement negotiations, such as, take rate statistics. In total, Class Counsel reviewed over 400,000 pages of documents to adequately inform itself about the contours of a fair, reasonable and adequate settlement, and to represent the Class's best interest. (Marron Decl. ¶ 4.)

### D.    The Parties' Negotiations Regarding Settlement

The parties' negotiations were protracted and adversarial, and the Settlement Agreement the result of zealous advocacy, reached with the assistance of a former magistrate judge from this District. After Boiron received Mr. Gallucci's CLRA demand letter, its counsel contacted Class Counsel, suggesting formal mediation. Over the next several weeks, the parties discussed the parameters of a potential mediation and eventually agreed to ask the Honorable Leo S. Papas (Ret.), at Judicate West, to serve as the mediator.  On September 21, 2011, after providing confidential mediation briefs and relevant documents to the mediator, the parties held an initial mediation telephone conference with Judge Papas, which included discussions about what additional documents Boiron should produce. Over the next few months, the parties engaged in various separate mediation caucuses and joint in-person mediation sessions with Judge Papas.  In addition, counsel had dozens of telephone and email communications negotiating a potential settlement.  (Marron Decl. ¶ 3.)

After a day-long in person mediation session, building on months of calls and discussions between counsel, on November 16, 2011, the parties entered into a Stipulation for Settlement that generally outlined the material terms of the parties' settlement.  (Dkt. 44-1, Ex. 1, "Stipulation for Settlement.")  The Stipulation was binding, based on its provision that the document "sets forth the essential points of the settlement terms and serves as a memorandum of understanding which, when signed by the necessary parties, is binding on the parties ... and enforceable by motion of any party." (*Id.* at 1.)  The Stipulation contemplated that a formalized settlement agreement would be required, but would cover relief as to all of Boiron's products.  (*Id.* at 2.)  The Stipulation was signed by Judge Papas, in which he stated "[t]he proposed settlement . . . is the product of a mediation process which

3

*Gallucci v. Boiron, Inc., et al.,* Case No. 11-CV-2039 JAH NLS
PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT

the undersigned believes was conducted in an arm's length, freely and independently negotiated manner between the parties." (*Id.* at 3.)

Given that motions to dismiss were pending in both actions, discovery requests were outstanding, and the cases were about to start contentious litigation that could tie up the courts, on November 18, the parties sought leave to stay this and a related action, in order to focus on drafting the formalized settlement agreement. (Dkt. 28.)  On November 23, however, the Court deemed a stay inappropriate. (Dkt. 39.)

In the weeks after entering into the Stipulation for Settlement, the parties worked on reducing the Stipulation into a formal agreement.  Although the Stipulation was binding, it contained a condition subsequent: that "Defendants will have an option to withdraw from the settlement entirely if the formal settlement agreement is not approved by the Defendants' board of directors." (Stipulation for Settlement at 1.)  The board of directors of Boiron, a publicly-traded company, would not approve a formal settlement agreement with unknown exposure, due to its public accounting requirements.

Nevertheless, the parties continued to negotiate the settlement, to maintain its principal goal of full refunds to the class and injunctive relief (the general parameters of which had already been agreed to), but to quantify the amount Boiron would pay, based on the number of claims that might reasonably be made.  Through lengthy negotiations over the next several months, Class Counsel obtained the $5 million common fund for the Class.  Negotiations did not stop there, as the exact terms of the injunctive relief became the subject of intensive negotiation. This included hundreds of separate email and telephone communications, in which the parties sought to obtain the best position possible for their respective clients. They exchanged dozens of draft settlement agreements and revisions, including the Exhibits to the Settlement Agreement. They negotiated how notice should occur, the language and placement of the two disclaimers, and the language and placement of the new dilution explanation web page, among other provisions.  Class Counsel consulted with Plaintiffs on many occasions and insisted on the inclusion of certain provisions, absent which Class Counsel refused to recommend the settlements.  The Settlement Agreement was the result. (Marron Decl. ¶ 3.)  All told, the parties' settlement negotiations lasted more than six months and included at least 13 individual and

4

*Gallucci v. Boiron, Inc., et al.,* Case No. 11-CV-2039 JAH NLS
PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT

1    joint mediation sessions with Judge Papas in addition to hundreds of individual communications

2    between the parties.[1]  (*Id.*)

3    **E.    Motion for Preliminary Approval**

4        On March 6, 2012, Plaintiffs filed a motion seeking class certification for settlement purposes

5    and preliminary approval of the proposed Settlement. (Dkt. 64.) On April 25, 2012, the Court granted

6    the motion, directing that the Class be notified of the Settlement, setting a date for the Final Approval

7    Hearing, and setting a schedule for Plaintiffs to file motions for fees and final approval. (*See* PA

8    Order.[2]) The Court's Order found that the requirements of Rule 23 were met for the proposed

9    settlement Class, which it certified. (*Id.* ¶¶ 1-2.) It appointed Plaintiffs as Class Representatives and

10   their counsel as Class Counsel. (*Id.* ¶¶ 3-4.) As for the Settlement Agreement, the Court held it

11   "contains no obvious deficiencies and the parties have entered into the Agreement in good faith,

12   following arms-length negotiation between their respective counsel." (*Id.* ¶ 5.)  Finally, the Court

13   approved the parties' proposed Notice Plan and Settlement Administrator. (*Id.* ¶¶ 10, 12.)   This

14   Motion seeks affirmation of the Court's prior Rule 23 findings and orders.

15   **F.    The Related *Gonzales* and Other Actions**

16       Shortly after Mr. Gallucci filed his action, on September 7, 2011, Boiron removed to this

17   District an action from San Diego County Superior Court styled *Henry Gonzales v. Boiron, Inc. &*

18   *Boiron USA, Inc.* On September 22, 2011, this Court issued an Order of Transfer Pursuant to the "Low

19   Number" Rule, and *Gonzales* was therefore assigned to this Court under Case No. 3:11-cv-02066-

20   JAH-NLS. (*See Gonzales* Dkt. 11.) Like Mr. Gallucci, Mr. Gonzales alleged that Boiron's Oscillo

21   labeling and advertising was deceptive in light of the extreme dilutions used in preparing homeopathic

22

23   [1] Absent from *any* of these negotiations, however, was a discussion of Class Counsel's fees. Instead,
     Class Counsel insisted that the parties should negotiate the substance of the Class's relief and then

24   seek fees independently. Class Counsel did not even decide the exact amount of fees it would seek
     until shortly before filing the fee motion when Class Counsel evaluated the case, their lodestar, and the

25   applicable law to arrive at the requested figure. Boiron was not aware of the amount of Class
     Counsel's fee request until the fee motion (Dkt. 93) was publicly filed on July 20. (Marron Decl. ¶ 5.)

26   [2] Consistent with the PA Order, Plaintiffs filed their Motion for Approval of Attorneys' Fees, Costs,

27   and Incentive Awards on July 20, 2012 (Dkt. 93). A copy of the motion was made available to the
     public on the settlement website prior to the Objection/Opt-Out Deadline (Sherwood Decl. ¶ 26).

28

5

*Gallucci v. Boiron, Inc., et al.,* Case No. 11-CV-2039 JAH NLS
PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT

products. (*See generally Gonzales* Compl., Ex. 2 to Boiron's Not. of Removal, *Gonzales* Dkt. 1.) Mr. Gonzales, however, limited his claims to a putative class of "persons located within California who purchased Oscillo . . . ." (*Gonzales* Compl. ¶ 24.)

On September 19, 2011, without providing notice to Mr. Gallucci or his counsel or seeking to consolidate the cases, Mr. Gonzales filed a Motion for Appointment of Interim Lead Counsel requesting that his counsel, the Newport Trial Group, be appointed lead counsel over both cases. (Marron Decl. ¶ 6; *Gonzales* Dkt. 7.)   Boiron took no position as to the competing motions for appointment of lead counsel.  After the *Gallucci* parties announced a settlement, Mr. Gonzales and his counsel engaged in a frenzied campaign to derail the settlement through a series of filings, accusing the Gallucci Plaintiffs, Class Counsel, and Boiron of collusion and other wrongdoing.  (*See Gallucci* Dkt. Nos. 13, 30-34, 36, 38, 41, 72, 77, 87.)  Mr. Gonzales also filed an inappropriate "Opposition" to Plaintiffs' Preliminary Approval Motion (Dkt. 85), which the Court struck (Dkt. 90).

In addition to *Gonzales*, there were several actions filed after *Gallucci* that raised similar claims and issues concerning Boiron's homeopathic products. (*See* Dkt. 71.)  Each of these cases has been stayed pending the outcome of the proposed settlement here.  *Fernandez et al. v. Boiron, Inc. et al.*, No. 11-cv-01867-JST-CW (C.D. Cal.) (Dkt. 66); *Jovel et al. v. Boiron, Inc. et al.*, No. 11-cv-10803-SVW-SH (C.D. Cal.) (Dkt. 31); *Bohn v. Boiron, Inc. et al.*, No. 11-cv-08704 (N.D. Ill.) (Dkt. 29); *Farley et al. v. Boiron, Inc. et al.*, No. RIC 1202159 (Riverside Super. Ct.).

### G. The Surge in Homeopathic Litigation Following Settlement, and Voluntary Labeling Changes that Mirror *Gallucci*'s Injunctive Relief

Following the parties' announcement of the proposed settlement in this action, there has been a flurry of litigation against other homeopathic manufacturers, brought on substantially similar grounds as *Gallucci*.  (Marron Decl. ¶ 7.)  Further, an industry-wide influence from this Settlement Agreement has already become apparent.  Some homeopathic manufacturers have voluntarily changed their own packaging to include an FDA disclaimer, dilution disclaimer, and a dilution explanation for consumers on their own product web sites, thus mirroring the injunctive relief terms achieved by the *Gallucci* Settlement Agreement.  (*Id.*)

6

*Gallucci v. Boiron, Inc., et al.*, Case No. 11-CV-2039 JAH NLS
PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT

## II.     THE TERMS OF THE SETTLEMENT

### A.     Injunctive Relief

The Settlement Agreement provides the Class and the public with substantial and important injunctive relief that will help better inform consumers in deciding whether to purchase Boiron's products.   *See* Decl. of Laurie Demeritt, filed concurrently herewith ("Demeritt Decl.") ¶¶ 11-22. Plaintiffs had argued that (i) Boiron's drug labels were deceptive because the indications of use contained on them are not reviewed by the Food and Drug Agency ("FDA"), a fact which is not disclosed to consumers; and (ii) reasonable consumers could not understand the high level of dilution reflected by the homeopathic dilution designations of "C, K, CK, X."   To address these issues, the following injunctive relief was negotiated and agreed to:

### i.     *Modification of Boiron Products' Packaging and Labeling*

Boiron has agreed to modify the packaging for all of its homeopathic products by adding two statements, designed to provide consumers with additional material information.

### a.     The FDA Disclaimer

For each of its products, the Settlement Agreement requires Boiron to state, on the packaging panel on which the "Drug Facts" box appears, that "These 'Uses' have not been evaluated by the Food and Drug Administration." (Settlement Agreement ¶ 4.1.2.) This "FDA Disclaimer" is similar to the one Congress required in passing the Dietary Supplement Health and Education Act of 1994 when a dietary supplement manufacturer makes a structure/function claim, *see* 21 U.S.C. § 343(r)(6), and provided for under FDA regulations, *see* 21 C.F.R. § 101.93(b)-(c).[3] In Boiron's case, the FDA Disclaimer must be in a typeface no smaller than the smallest one used elsewhere on the label, and in a readable color. (Settlement Agreement ¶ 4.1.2.1.) Further, if the principal display panel—the portion of the packaging that consumers see when a product sits on the shelf—contains any Indications for Use, those "Uses" must be followed by an asterisk corresponding to an asterisk appearing before the FDA Disclaimer. (*Id.* ¶ 4.1.2.2.) These requirements apply equally to Boiron products in small

---

[3] E.g., "This statement has not been evaluated by the Food and Drug Administration." 21 C.F.R. § 101.93(c)(1).

7

*Gallucci v. Boiron, Inc., et al.*, Case No. 11-CV-2039 JAH NLS
PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT

packaging, and print, television, Internet or other advertising that depicts a readable version of a product's label. (*Id.* ¶¶ 4.1.2.3 - 4.1.2.4.)

### b.   The Dilution Disclaimer

The Settlement Agreement also requires Boiron to place a statement, located on the panel of each product's outer label or packaging that contains the FDA-required "Drug Facts" box, that reads: "C, K, CK, and X are homeopathic dilutions. See [URL] for details."[4] (*Id.* ¶¶ 4.1.3.[5])   As with the FDA Disclaimer, the Dilution Disclaimer must be in a font size no smaller than the smallest font used elsewhere on the packaging, and appear in a readable color. (*Id.* ¶ 4.1.3.1.)

### ii.     *Modification of Boiron's Websites*

In conjunction with the Dilution Disclaimer, Boiron must modify its general website (www.boironusa.com), and each individual product's website, to include a prominent link on each home page to a new web page that will provide an explanation of C, K, CK, and X homeopathic dilutions.  (*See id.* ¶ 4.1.4 & Ex. E [exemplar of new dilution web page].)   The new web page was required to be in a language understandable to an average consumer who lacks any knowledge of homeopathic principles, in a question and answer format.  *See id.*

### iii.     *Continuation of the "Boiron Promise" Program*

Finally, the Settlement Agreement requires Boiron, for two years after the claims period has expired or until a product's package is modified with the FDA and Dilution Disclaimers, to maintain its "Boiron Promise" program, which is a "money-back guarantee . . . under which Boiron commits to refunding the purchase price . . . if, within 14 days of purchase, a consumer . . . complies with [the] terms and conditions as described at http://www.boironusa.com/promise." (*Id.* ¶¶ 1.34, 4.1.6.) This ensures that dissatisfied customers can seek full refunds for their purchases for a time period minimally as long as that Boiron requires to effect the required labeling changes.

---

[4] The URL in the Dilution Disclaimer is product-specific. Thus on Oscillococcinum, for example, the statement would read, "C, K, CK, and X are homeopathic dilutions. See www.oscillo.com for details." *See id.* ¶ 4.1.4.

[5] The Dilution Disclaimer applies to Boiron products sold in small tubes that contain leaflets, pamphlets or other documents, in which case the Dilution Disclaimer must appear on those materials, but does not apply to products sold in small tubes without inserted literature. (*See id.* ¶ 4.1.3.2.)

8

*Gallucci v. Boiron, Inc., et al.*, Case No. 11-CV-2039 JAH NLS
PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT

**B.  Cash Refunds, Notice Costs and Settlement Administration**

Boiron has established a $5,000,000, non-recapture common fund from which it will pay class notice, claims expenses, and restitution to class members of $10 per Boiron product purchased, up to $50 per claimant without proof of purchase, or the actual amount spent, up to $100 with proof of purchase. (*Id.* ¶¶ 4.2.1, 4.3, 5.1.1, 5.1.2.3, 5.1.3.3, 5.1.4.3.)  Under no circumstances can any part of this fund revert back to defendants. Payments to class member claimants are subject to a *pro rata* reduction if the claims exceed the fund. (*Id.* ¶ 4.3.4.)  If the fund is not exhausted, however, half the remaining funds will be distributed to class claimants in a *supplemental* distribution, and half donated *cy pres* to a Court-approved non-profit organization dedicated to informing consumers of food and drug labeling concerns. (*Id.* ¶ 4.3.5.)  Here, after careful consideration, the parties have agreed that any *cy pres* distribution should be made to Consumers Union (Marron Decl. ¶ 8), an "expert, independent, nonprofit organization whose mission is to work for a fair, just and safe marketplace for all consumers and to empower consumers to protect themselves," including through its ubiquitous publication, *Consumer Reports*. *See* "About Consumers Union," *at* http://www.consumersunion.org/about.

**C.  Attorneys' Fees, Expenses and Incentive Awards**

The Settlement Agreement does not provide any particular attorneys' fees or incentive awards, as they were not discussed at mediation, or the drafting of the Settlement Agreement.  (Marron Decl. ¶ 5.) Rather, the Agreement provides that "Plaintiffs will apply to the Court for attorneys' fees, expenses, and incentive awards and Defendants shall have the option of responding to any such application, including by contesting any fees, expenses, or incentive award requested." (Settlement Agreement ¶ 9.1.)  Any fees, costs and incentive amounts awarded will be paid from the Settlement Fund. (*Id.* ¶¶ 9.2 – 9.3.)  Boiron, however, will bear its own attorneys' fees, costs and expenses. (*Id.* ¶ 9.1.)

**D.  Funding Successful Objections**

The Settlement Agreement requires Boiron to pay any additional attorneys' fees incurred as a result of a successful objection, if the parties revise the Settlement Agreement in a manner consistent

9

with a successful objection. (*Id.*, Addendum Section II.[6]) Although it is unlikely that this section will be invoked because of the strength of the settlement and the Class's overwhelmingly positive reaction, this provision—which is not routine—represents a real benefit for the Class, since any fees associated with a successful objection will not be assessed against the Class's Settlement Fund.

### E.    The Notice Program

Because the Products are sold over the counter at retail stores, Boiron does not have mailing addresses for all but a very small number of Class members.  (Dkt. 64-4 at ¶ 5.)  Therefore, the Notice Plan focuses on publishing the Notice in targeted periodicals and internet sites.  (Decl. of Markham Sherwood, filed concurrently herewith ["Sherwood Decl."] at ¶¶ 6-11.)

Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Bank and Trust Co.*, 339 U.S. 306, 314 (1950).  "When approving a settlement, a court must ensure that notice is made in a 'reasonable manner to all class members who would be bound by the proposal.'"  *In re Ferrero Litig.*, 2012 WL 2802051, at *3 (S.D. Cal. July 9, 2012) (citing Fed. R. Civ. P. 23(e)(1)).

In *Ferrero* (and its related case filed in the New Jersey District Court), the settlement established an approximate $3 million fund for a nationwide class of millions of purchasers of the Nutella hazelnut spread.  *Id.* The notice plan involved half-page print publications in four magazines, targeted to reach potential class members:  People Magazine, Woman's Day, Parents, and Ser Padre; online notice, through banner ads on 24/7 Real Media Network–Parenting Channel and Facebook; and a dedicated web site, where copies of relevant documents, such as the settlement agreement and claim forms in English and Spanish, could be obtained; with online and mail-in submission of claims; and a toll-free number for class members to call the settlement administrator to ask questions.  *In re Ferrero Litig.*, 11-CV-00205-H-CAB, Dkt. 107-1 at 14-16 (detailing Notice Plan); approved at Dkt. No. 108 at 4 (PA Order).

---

[6] The Addendum was initially filed temporarily under seal (*see* Dkts. 62 & 68), but was unsealed after the Opt-Out and Objection date. (Settlement Agreement ¶ 11.15; Dkts. 99 & 100.)

10

*Gallucci v. Boiron, Inc., et al.*, Case No. 11-CV-2039 JAH NLS
PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT

Here, the form of the approved Notice Plan was almost identical to that finally approved in *Ferrero*, even though the class at issue in this case involves far fewer potential class members.  *See In re Ferrero Litig.*, 278 F.R.D. 552, 558 (S.D. Cal.) (concerning food product with approximately $213 million in sales).  The Notice Plan was also based on the Class Administrator's research, to determine the most effective way to reach U.S. adults who purchase homeopathic remedies and thus may be potential Class members. (Settlement Agreement, Ex. F.) This included providing targeted Notice in the following manner: (1) one-third page advertisements in Natural Health Magazine and Health Magazine; (2) Google Sponsored Link Advertising and the Google Display Network; (3) banner display advertising targeting health and wellness websites such as HealthOnline, Medhealth, Healthgrades, Medicine Online, Mayo Clinic, CNN/Health, USA Today Health, Health Answers, Dr. Koop, Discover Health, Men's Health, Medicine News Today, and the health pages of 300 leading news sites; (4) a dedicated Facebook page; and (5) Businesswire and/or PR Newswire press releases. (*Id.*; *see also* Sherwood Decl. ¶¶ 5-29.)

The Court found that "the Notice Plan . . . constitutes the best notice practicable under the circumstances, and constitutes valid and sufficient notice to the Class in full compliance with the requirements of applicable law, including the Due Process Clause of the United States Constitution." (PA Order ¶ 10.)  Consistent with the Court's direction (*id.* ¶ 11), the Claims Administrator effected notice consistent with the Notice Plan, as follows:

### i. Print

The Claims Administrator published printed Notice of the Settlement in the July/August 2012 issues of Natural Health Magazine and Health Magazine, with circulations of 307,565 and 1,375,473, respectively. In addition, although not specifically contemplated in the Notice Plan, the parties agreed to publish Notice in the May 21, May 29, June 4, and June 11, 2012 nationwide editions of USA Today, which has a circulation of 1,728,413.[7] (Sherwood Decl. ¶ 17 & Ex. D.)

### ii. Press Release

---

[7] This publication satisfied the requirements of the CLRA because the parties gave notice "by publication in accordance with Section 6064 of the Government Code in a newspaper of general circulation in the county in which the transaction occurred." Cal. Civ. Code § 1781.

11

*Gallucci v. Boiron, Inc., et al.,* Case No. 11-CV-2039 JAH NLS
PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT

On May 25, the Claims Administrator issued a party-neutral press release over PR Newswire's US1 National Newsline, which provides the release to thousands of media outlets across the country, including national and local newspapers, websites, television and radio stations. (*Id.* ¶ 19 & Ex. E.) The press release was picked up by numerous sources.  (*Id.*, Ex. F.)

### iii.      Electronic Notice

The Claims Administrator also conducted a targeted online advertising campaign that included: (a) Google AdWords Sponsored Links generating 1,206,465 impressions as of July 19, 2012; (b) Google AdWords Display Network generating 8,507,199 impressions as of July 19, 2012; and (c) PulsePoint Contextual Banner Display Ads generating 22,514,056 impressions as of July 19, 2012. (*Id.* ¶ 22 & Ex. G.)

### iv.      Dedicated Settlement Websites

On approximately May 10, 2012, the Claims Administrator established an interactive Settlement Website to provide information to potential class members and others seeking information about the proposed settlement, and to facilitate the filing of online claims, appearing at www.gilardi.com/boironsettlement. (Sherwood Decl. ¶ 25.)  The Settlement Website provides: (a) a list of Boiron products addressed in the litigation; (b) an online claims filing feature which allows class members to file a claim online and upload supporting documentation where applicable; (c) answers to frequently-asked questions; (d) important dates; (e) contact information for the Claims Administrator, including a case-dedicated mailing address, toll-free telephone number, and email address; and (f) full and complete copies of the following documents: (1) Notice of Proposed Class Action Settlement (in English and Spanish); (2) Claim Form (in English and Spanish); (3) Settlement Agreement; (4) Preliminary Approval Order; (5) First Amended Complaint; (6) July 5, 2012 Order Rescheduling Final Approval Hearing; and, as of July 23, 2012 (7) Plaintiffs' Motion for Attorneys' Fees, Costs and Incentive Awards.  As of August 13, 2012, the settlement website had registered 422,915 total hits. (*Id.* ¶ 25.)

On approximately May 23, 2012, the Claims Administrator also established a dedicated Facebook page to provide information to potential class members and others seeking information about the proposed settlement. The Facebook page provides: (a) basic information about the

12

Settlement; (b) a link to the Settlement Website; (c) an abbreviated list of answers to frequently asked questions; (d) a copy of the Notice of Proposed Class Action Settlement (in English); and (e) contact information for the Claims Administrator, including a case-dedicated mailing address, toll free telephone number, and email address. (*Id.* ¶ 24.)

### v.   Direct Notice to Class Members

On May 25 and 31, 2012, the Class Administrator mailed Notice to 362 potential class members, whose information Boiron provided. (*Id.* ¶¶ 13-16.)

### vi.   Additional Notice Efforts

In addition to formal notice, the parties sought to increase awareness of the settlement through internet postings, email communications, and attempts to drive traffic to the dedicated Facebook webpage.  Specifically, Class Counsel posted information about the settlement at websites frequented by consumers.  (Marron Decl. ¶ 9.)  In addition, Class Counsel emailed directly all persons who had contacted counsel about the case since it was filed, about 150 total.  (*Id.*)  And, Boiron also posted information about the Settlement on the Boiron Promise Webpage.

### F.   Notice to State Attorneys General

The Settlement Agreement required Boiron, pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715, to effect service of notice of the settlement on the appropriate federal and state officials through the Claims Administrator. (Settlement Agreement ¶ 5.1.4.1.)  On March 16, 2012, on Boiron's behalf, the Administrator served 52 notice of settlement packages upon all States' Attorneys General and the United States Attorney General, containing all relevant documents. (Sherwood Decl. ¶ 12.)  The Texas Attorney General requested limited further information, and no officials objected. (*Id.*; Marron Decl. ¶ 10.)  The 90-day window between Attorney General Notice and when a final approval order may be entered has expired.  (*See* Sherwood Decl. ¶ 12.)  *See also* 28 U.S.C. § 1715(d).

### G.   The Contents of the Notice Plan were Adequate

The contents of the Notice Plan were also adequate, supporting final approval.  "Under FRCP 23(e), courts require parties to settlement agreements to notify the public of the claims asserted therein, which includes the nature of the pending action." *Ravens v. Iftikar*, 174 F.R.D. 651, 655 (N.D. Cal. 1997) (internal quotations and citations omitted).  "Settlement notices are supposed to present information about

13

a proposed settlement neutrally, simply, and understandably." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 962 (9th Cir. 2009) ("*Rodriguez II*") (rejecting argument that notice should have included "the expected value of fully litigating the case").  Notice need not, and indeed cannot, be highly specific. "Numerous decisions, no doubt recognizing that notices to class members can practicably contain only a limited amount of information, have approved 'very general description[s] of the proposed settlement.'" *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 124 (S.D.N.Y. 1997) *aff'd*, 117 F.3d 721 (2d Cir. 1997) (internal citation omitted).

Here, the Notice stated, *inter alia*, the subject matter of this litigation; that a settlement had been reached; the amount of the monetary fund; the amount each Class member could receive; how to file a claim; that each Class member had the right to exclude themselves from the Settlement Class or object and how to exclude themselves or object; Class Counsel's intent to apply for attorneys' fees, expenses and compensation for the named Plaintiffs and how to view those documents; the date of the Fairness Hearing and location of the Court; contact information for the Settlement Administrator; and instructions to view the Settlement Website for more details and to obtain a claim form.  (Sherwood Decl., Ex. D.)

The Website included copies of all relevant documents, a "Dates to Remember" page, the toll-free number specially obtained for Class members to call with questions; and the regular mail and e-mail address of the Administrator.  (*Id.* ¶¶ 25-26.)  This met the requirements of Rule 23 and due process.  *See*, *e.g.*, *Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004) ("Notice is satisfactory if it 'generally describes the terms of the settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come forward and be heard.'") (quoting *Mendoza v. Tucson Sch. Dist. No. 1*, 623 F.2d 1338, 1352 (9th Cir.1980)); *In re Synthroid Mktg. Litig.*, 110 F. Supp. 2d 676, 680 (N.D. Ill. 2000) ("direct mailings, toll-free 1-800 numbers, websites, and [a] call center are reasonable steps" to notify a class); *In re Ferrero Litig.*, 2012 WL 2802051, at *3 (S.D. Cal. July 9, 2012) (finding that notice was adequate when it contained the basic terms of the settlement agreement and means to read full agreement, the date of the fairness hearing, class counsel's intent to move for fees and incentive awards, and each class members' right to object or opt out).

The Notice also presented the relevant information in a neutral manner, in understandable terms. (*See* Sherwood Decl., Ex. D.)  *See also Weeks v. Kellogg Co.*, 2011 U.S. Dist. LEXIS 155472, at *59

14

(C.D. Cal. Nov. 23, 2011) (finding notice plan adequate for class of hundreds of thousands possible claimants based, in part, on administrator receiving 120 calls for information regarding the settlement; the settlement website was visited more than 129,000 times, and only two class members opted out, with three objections).

**REASONS THE SETTLEMENT WARRANTS FINAL APPROVAL**

**I.      STANDARD FOR GRANTING FINAL APPROVAL**

Approval of a class action settlement requires a "finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *see also Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982).[8] In assessing the fairness, adequacy, and reasonableness of a settlement, courts balance:

> (1) the strength of the plaintiffs' case; (2) the risk, expense, complexity, and likely duration of further litigation; (3) the risk of maintaining class action status throughout the trial; (4) the amount offered in settlement; (5) the extent of discovery completed and the stage of the proceedings; (6) the experience and views of counsel; (7) the presence of a governmental participant; and (8) the reaction of the class members to the proposed settlement.

*Churchill Vill., LLC.*, 361 F.3d at 575 (citing *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998)). "The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claims advanced, the types of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Justice*, 688 F.2d at 625.

Public policy strongly favors pretrial settlement of class actions. *See Churchill Vill.*, 361 F.3d at 576; *In re Pac. Enter. Sec. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995); *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1238 (9th Cir. 1998) ("[S]trong judicial policy [] favors settlements, particularly where complex class action litigation is concerned." (quoting *Officers for Justice*, 688 F.2d at 626)). Thus, while approval of the

---

[8] Considering the arguments made in Plaintiffs' Motion for Preliminary Approval (Dkt. 64), the Court found that the Settlement Class meets the requirements of Rule 23. (PA Order ¶ 2.) The *Gonzales* group of objectors filed an Objection seeking reconsideration of the typicality and adequacy requirements. (*See* Dkt. 96 at 20-23.)  Plaintiffs' rebuttal is in their Response to Objections, filed concurrently herewith.

15

*Gallucci v. Boiron, Inc., et al.*, Case No. 11-CV-2039 JAH NLS
PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT

settlement is committed to the sound discretion of the court, *Class Plaintiffs*, 955 F.2d at 1276, "the court must also be mindful of the Ninth Circuit's policy favoring settlement . . . ." *Curtis-Bauer v. Morgan Stanley & Co., Inc.*, 2008 U.S. Dist. LEXIS 85028, at *12 (N.D. Cal. Oct. 22, 2008) (internal citation omitted).

A district court's review of a proposed settlement is "limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice*, 688 F.2d at 625. A "presumption of fairness arises where: (1) counsel is experienced in similar litigation; (2) settlement was reached through arm's length negotiations; [and] (3) investigation and discovery are sufficient to allow counsel and the court to act intelligently." *In re Heritage Bond Litig.*, 2005 U.S. Dist. LEXIS 13555, at *11 (C.D. Cal. June 10, 2005); *Linney*, 151 F. 3d 1234; *see also Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004) ("A settlement following sufficient discovery and genuine arms-length negotiation is presumed fair.").

## II.   THE COURT SHOULD GRANT THE SETTLEMENT FINAL APPROVAL

The Settlement is fair, reasonable and adequate, and thus satisfies the standard for final approval. The parties reached the settlement after protracted negotiations, assisted in their mediation by a former federal magistrate judge. Counsel for both parties are experienced in litigation of consumer class actions and have zealously and competently litigated the issues in this case. (*See* Dkts. 64-2, 64-3, 93-1, 93-2.)  The Settlement was not motivated by any fraud or collusion.  All relevant factors favor settlement of this action and demonstrate that the proposed settlement is fair, reasonable, and adequate.

### A.   The Strength of Plaintiffs' Case

Plaintiffs believe they had a strong case that Defendants' advertising was false or deceptive to consumers, based on their arguments that the average consumer is unaware of the high level of dilution in the Products, and could not determine that dilution level merely from seeing a CK, K, C or X on the Products' labels.  Plaintiffs also alleged that the average consumer is unaware that homeopathic drugs are regulated differently than other over-the-counter medicines or that the FDA

16

*Gallucci v. Boiron, Inc., et al.*, Case No. 11-CV-2039 JAH NLS
PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT

does not even review, much less approve, the statements on Boiron's packaging.  Thus Plaintiffs believed they stood a reasonable chance of proving that the reasonable consumer test of the UCL, FAL and CLRA was met.  But getting to that point in the litigation was no sure thing.  Although Plaintiffs believe their claims are meritorious and strong, they acknowledge they faced obstacles to an ultimate recovery.

First, this case involves complicated questions of regulatory law and preemption for which there is little guiding precedent.  (*See* Dkts. 9, 11, 20-22.)  This is apparent in the parties' Rule 12 briefing on preemption, personal jurisdiction, abstention, lack of privity and other defenses, which would be revived if the case continues.  (*See*, *e.g.*, Dkt. 9-1 at 6-17; Dkt. 20 at 7-19.)  Boiron has continually maintained that Plaintiffs' claims were preempted and the issue has not yet been placed before the Court, thus presenting some risk that the case could be dismissed altogether.

Second, Boiron asserts it has clinical and other support for its claims, evidence that would be subject to expert analysis, dueling reports and testimony. Although Plaintiffs believe they would prevail, they acknowledge the inherent risk that reliance on expert testimony entails. (Marron Decl. ¶ 11.)

Third, Boiron asserts that it has independent consumer research demonstrating that most homeopathic purchasers are familiar with homeopathic principles and rely on information other than labeling to make purchasing decisions, which could fatally undermine Plaintiffs' deception claims.[9] (*Id.*)

Fourth, even if Plaintiffs established Boiron's liability, they would still be required to establish damages or entitlement to injunctive relief, an area that might also be subject to expert analysis, and at the very least detailed review of Boiron's records, and competent offers of proof sufficient to meet Plaintiffs' burden. This, too, presents some risk. (*Id.*)

Fifth, in each of their Answers, the Boiron entities asserted a Statute of Limitations Defense. (*See* Dkt. Nos. 60 at 19, 61 at 19.)  California's statute of limitations is four years for UCL claims and three years for FAL and CLRA claims.  Thus there is a possibility that Plaintiffs' case would be

---

[9] Some reference to this is made in the Demeritt Declaration.  (*See*, *e.g.*, Demeritt Decl. ¶ 16.)

17

*Gallucci v. Boiron, Inc., et al.*, Case No. 11-CV-2039 JAH NLS
PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT

1  limited to September 2, 2007 forward, while settling the case offers relief to Class Members who

2  purchased Boiron products as far back as January 2000.  Accordingly, this factor weighs in favor of

3  final approval. *See In re Portal Software Secs. Litig.*, 2007 U.S. Dist. LEXIS 88886, at *7-8 (N.D. Cal.

4  Nov. 26, 2007).  Also, if the parties proceeded to trial on the merits, a judgment could only take into

5  account Boiron's sales during the statutory period.

6      **B.      The Risk, Expense, Complexity, and Likely Duration of Further Litigation Favor**

7              **Final Approval**

8          Plaintiff's claims involve numerous complex legal issues, and the costs and risks associated

9  with litigating this action would require extensive resources and Court time. "[A]voiding a trial and

10 inevitable appeals in this complex . . . suit strongly weigh in support of approval of the Settlement,

11 rather than prolonged and uncertain litigation." *Rodriguez v. West Publ'g Corp.*, 2007 U.S. Dist.

12 LEXIS 74767, at *28 (C.D. Cal. Sept. 10, 2007). Indeed, "unless the settlement is clearly inadequate,

13 its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results."

14 *Nat'l Rural Telecomms. Coop*, 221 F.R.D. at 526.

15         In this litigation, the path to a final judgment is likely to be long. The case has already been

16 pending for a year, but due to the parties' settlement negotiations, there has been no completed motion

17 practice addressing Plaintiffs' substantive claims. And because the settlement occurred before any

18 substantive motion practice, Plaintiffs still had four dispositive obstacles to overcome: Rule 12, Rule

19 23, Rule 56 and Trial. In addition, both sides would seek party and non-party discovery, requiring

20 time-consuming review and preparation. Moreover, a complex case such as this, involving scientific,

21 regulatory and consumer perception analysis requires costly expert testimony from both sides. As a

22 putative nationwide class action, complex legal and factual issues would be the subject of pretrial

23 motions, including class certification and choice of law issues. The class certification decision would

24 likely result in a petition for interlocutory appeal under Rule 23(f), and possible appellate review,

25 which could add years of delay. In sum, absent settlement, litigation would likely continue for years

26 before Class Members would see any recovery, which would not be guaranteed.

27         By contrast, the proposed settlement provides a real benefit to Class Members who purchased

28 Boiron products in packaging bearing allegedly false and deceptive claims, as well as the general

18

*Gallucci v. Boiron, Inc., et al.,* Case No. 11-CV-2039 JAH NLS
PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT

public, without the challenges and risks of trial. Courts have acknowledged that settlements of class actions are favored when they provide an immediate benefit to the class without the risk and expense involved in continued litigation. *See In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 933 (8th Cir. 2005). Given the prospect of protracted litigation, engendering enormous time and monetary expenditure, this factor weighs in favor of final approval. *See Officers for Justice*, 688 F.2d at 626; *Milstein v. Huck*, 600 F. Supp. 254, 267 (E.D.N.Y. 1984) ("The expense and possible duration of the litigation should be considered in evaluating the reasonableness of this settlement").

### C.    The Risk of Maintaining Class Action Status Through Trial Favors Final Approval

Given this case's procedural posture, before even facing the risk that a certified class might not maintain its status, Plaintiffs first would have had to obtain certification, which is far from certain especially in light of the recent case law, like *Dukes v. Wal-Mart Stores*, making certification more difficult. For example, Boiron would likely argue that many potential class members make their purchasing decisions based on doctor recommendations, rather than labeling.  If Boiron is able to prove this contention, it could threaten certification.  *See In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 134 (2009) (affirming denial of class certification in part because where "all of these patient-specific factors are a part of the prescribing decision, the materiality of any statements made by Merck to any particular prescribing decision cannot be presumed").

Even if Plaintiffs obtained certification, there is no guarantee it would survive through trial. This risk was distinctly highlighted by the Ninth Circuit's recent decision in *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012), which reversed a class certification order and served as the impetus for a number of decertification motions.  *See*, *e.g.*, *Gianino v. Alacer*, 2012 U.S. Dist. LEXIS 32261 (C.D. Cal. Feb. 27, 2012).  This is especially true here, where the Settlement Class is comprised of nationwide purchasers, but Plaintiffs would have a much more difficult time on a contested certification motion in establishing the prerequisites now necessary for application of California law to a nationwide class.

By contrast, in settling the action, Boiron effectively accedes to certification and "there is much less risk of anyone who may have actually been injured going away empty-handed." *In re Omnivision Techs.*, 559 F. Supp. 2d 1036, 1042 (N.D. Cal. 2007). Accordingly, this factor weighs in favor of final

19

1  approval. *See id.*; *Anderson v. Nextel Retail Stores, LLC*, 2010 U.S. Dist. LEXIS 43377, at \*46 (C.D.

2  Cal. Apr. 12, 2010).

3      **D.**    **The Amount Offered in Settlement Favors Final Approval**

4      "[I]t is the very uncertainty of outcome in litigation and avoidance of wasteful and expensive

5  litigation that induce consensual settlements. The proposed settlement is [thus] not to be judged

6  against a hypothetical or speculative measure of what *might* have been achieved by the negotiators."

7  *Officers for Justice*, 688 F.2d at 625. Rather, "the very essence of a settlement is compromise, 'a

8  yielding of absolutes and an abandoning of highest hopes.'" *Id.* at 624 (quoting *Cotton v. Hinton*, 559

9  F.2d 1326, 1330 (5th Cir. 1977)). "The fact that a proposed settlement may only amount to a fraction

10  of the potential recovery does not, in and of itself, mean the proposed settlement is grossly inadequate

11  and should be disapproved." *City of Detroit v. Ginnell Corp.*, 495 F.2d 448, 455 (2d Cir. 1974); *see*

12  *also Linney*, 151 F.3d at 1242 (same); *Nat'l Rural Telecom. Coop.*, 221 F.R.D. at 526 ("it is well-

13  settled law that a proposed settlement may be acceptable even though it amounts to only a fraction of

14  the potential recovery that might be available to the class members at trial").

15      Instead, to assess the reasonableness of a proposed settlement seeking monetary relief, the

16  "inquiry into fairness should contrast settlement rewards with likely rewards if case goes to trial" and

17  consider that "costs of further litigation and risks of proof difficulties militate in favor of settlement

18  approval." *In re Chicken Antitrust Litig. Am. Poultry*, 669 F.2d 228, 239-40 (5th Cir. 1982)(citations

19  omitted).

20      Here, the $5 million common fund is substantial, and just a part of the overall Settlement

21  Agreement. Even subtracting the other costs from the Settlement Fund, the remainder will likely cover

22  all or most claims made and allow for both a supplemental distribution to claimants and a *cy pres*

23  contribution to Consumers Union.  Class Counsel also considered that sales outside the statutory

24  period were likely more than the $65.5 million that Boiron's CEO, Janick Boudazin, estimates for the

25  relevant time period, but that the chances of obtaining relief for them was significantly lower because

26  of the applicable three- and four-year statutes of limitations under the FAL, CLRA and UCL.  (*See*

27  Boudizan Decl. ¶ 5; Marron Decl. ¶ 13.d.)

28

20

*Gallucci v. Boiron, Inc., et al.*, Case No. 11-CV-2039 JAH NLS
PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT

"[P]articularly . . . in cases . . . where monetary relief is but one form of the relief requested by the plaintiffs," *Officers for Justice*, 688 F.2d at 628, courts have approved settlement funds in this range. *See In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124 (S.D.N.Y. 2008) (approving 4% recovery); *In re Cendant Corp. Derivative Action Litig.*, 232 F. Supp. 2d 327, 336 (D.N.J. 2002) (less than 2%); *Farinella v. Paypal, Inc.*, 611 F. Supp. 2d 250 (E.D.N.Y. 2009) (approving settlement fund of $3.5 million for a class of 2.2 million where damages could exceed $375 million covering a class period that started in 2000); *accord Jaffe v. Morgan Stanley & Co.*, 2008 U.S. Dist. LEXIS 12208, at *29 (N.D. Cal. Feb. 7, 2008) ("The settlement amount could undoubtedly be greater, but it is not obviously deficient, and a sizeable discount is to be expected in exchange for avoiding the uncertainties, risks, and costs that come with litigating a case to trial. Again, the issue is not whether the settlement 'could be better,' but whether it falls within the range of appropriate settlements.") (internal citation omitted); *White v. Experian Info Solutions, Inc.*, 803 F. Supp. 2d 1086, 1098 (C.D. Cal. 2011) ("courts long have recognized that even where the total settlement fund is small in comparison to the possible recovery available after trial, the settlement may not be unreasonable in light of the perils plaintiffs face in continuing to litigate their case") (internal quotations and citation omitted); *Dennis v. Kellogg Co.*, 2011 U.S. Dist. LEXIS 36651, at *6 (S.D. Cal. Apr. 5, 2011) ("'[S]ettlement is the offspring of compromise; the question we address is not whether the final product could be prettier, smarter or snazzier, but whether it is fair, adequate and free from collusion.' While some class members may not be made whole, complete recovery is not required for a settlement to be adequate.") (quoting *Hanlon*, 150 F.3d at 1027).

The $5 million settlement fund also falls within the range, and is indeed larger than, several recent settlements in false advertising cases involving the food and drug industry. In the two recent related cases against Ferrero concerning the false advertising of Nutella, for example, two federal judges approved two settlements that provided injunctive relief in the form of labeling changes, and a $3,050,000 total common fund to provide refunds to class members across the nation. *See In re Ferrero Litig.*, 2012 WL 2802051 (S.D. Cal. July 9, 2012) and *In re Nutella Mktg. & Sales Practices*

21

*Gallucci v. Boiron, Inc., et al.*, Case No. 11-CV-2039 JAH NLS
PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT

*Litig.*, No. 3:11-cv-01086 (D.N.J. July 31, 2012) (Dkt. 104[10]).  This fund was to address over $213 million in sales, *see In re Ferrero Litig.*, 278 F.R.D. 552, 558 (S.D. Cal. Nov. 15, 2011), representing about 1.4% of sales.  *See also In re Nucoa Margarine Litig.*, No. 10-cv-00927-MMM-AJW (C.D. Cal.) (Dkt. 156 at 26-27) (approving settlement fund of $522,000 for nationwide class of Nucoa purchasers from January 1, 2000 to January 4, 2012); *Weeks*, 2011 U.S. Dist. LEXIS 155472, at *9, 23, 52-55 (approving settlement comprised of $2.5 million cash, $2.5 million retail value of cereal donation to charity, and costs, for total of approximately $5.4 million for class of "hundreds of thousands" potential claimants).  (*See also* Marron Decl. ¶ 13.)

### E.   The Stage of the Pleadings and Extent of Discovery Favor Final Approval

The greater the amount of discovery taken and the more advanced the stage of the pleadings, the more likely it is the parties have "a clear view of the strengths and weaknesses of their cases." *Young v. Polo Retail, LLC*, 2007 U.S. Dist. LEXIS 27269, at *12 (N.D. Cal. Mar. 28, 2007) (quoting *In re Warner Commc'ns Sec. Litig.*, 618 F. Supp. 735, 745 (S.D.N.Y. 1985)).  Here, the parties conducted their Rule 26(f) conference, briefed thorough motions on the claims and Boiron's affirmative defenses, and engaged in extensive voluntary discovery.

Class Counsel is satisfied that the hundreds of thousands of pages produced by Boiron, the testimony of its employees who filed various declarations in the matter, and information learned during over a dozen confidential mediation sessions, fully informed Class Counsel and Plaintiffs of the issues affecting the case and potential settlement value.  Moreover, Judge Papas had offered the parties his learned assistance and input on the relative strength and weaknesses of their cases.  (Marron Decl. ¶¶ 3-4.) "As a result, the true value of the class' claims was well known." *Young*, 2007 U.S. Dist. LEXIS 27269, at *12.  Accordingly, this factor weighs in favor of final approval.

### F.   The View of Experienced Counsel Favors Final Approval

In contemplating the preliminary approval of a proposed settlement, "[t]he recommendations of plaintiffs' counsel should be given a presumption of reasonableness." *Knight v. Red Door Salons, Inc.*, 2009 U.S. Dist. LEXIS 11149, at *11 (N.D. Cal. Feb. 2, 2009) (citing *Boyd v. Bechtel Corp.*, 485

---

[10] Attached to the Marron Declaration as Exhibit 1.

22

*Gallucci v. Boiron, Inc., et al.*, Case No. 11-CV-2039 JAH NLS
PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT

F. Supp. 610, 622 (N.D. Cal. 1979)).   Indeed, "Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation." *Stevens v. Safeway, Inc.*, 2008 U.S. Dist. LEXIS 17119, at *25-26 (C.D. Cal. Feb. 25, 2008) (citing *In re Pac. Enter. Secs. Litig.*, 47 F.3d at 378). Thus, "the Court should not without good cause substitute its judgment for [counsel's]." *Boyd*, 485 F. Supp. at 622.  Class Counsel believes this settlement is very strong for the Class and the general public.  (*See* Marron Decl. ¶ 13.)  In addition to the considerable monetary relief given the Class, Boiron's agreement to effect the labeling changes and other injunctive relief represents a substantial benefit for homeopathic drug consumers. (*Id.*)

First, by this settlement Plaintiffs have achieved what various consumer advocacy groups have been unsuccessful in achieving by petitioning the FDA directly.   Beginning in 1994, various consumers groups have petitioned the FDA to require homeopathic drugs to meet the same standards as other drugs regulated by the agency. (Marron Decl., Ex. 2.)  Subsequently, the FDA was petitioned again in 2011, to require homeopathic drug manufacturers to warn consumers that the FDA does not consider homeopathic drugs effective.  (Dkt. 93-1 at Exs. 1-2.)  The injunctive relief in this action helps advance those consumer awareness goals, by informing consumers about the lack of FDA review or approval of homeopathic drug labeling, and providing them with an understandable description of the high levels of dilution in homeopathic drugs.  (*See id.*)

The strength of the FDA Disclaimer is further confirmed by the fact that the appropriate remedy for allegedly deceptive commercial speech is a disclaimer and not complete preclusion, which would be an unconstitutional infringement. *See Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1122, n.7 (N.D. Cal. 2010). (*See also* Demeritt Decl. ¶¶ 19-22 [opining that the FDA and Dilution Disclaimers will provide consumers with more information about Boiron's products].)

Second, as discussed above, the Settlement has had ripple effects on the whole homeopathic industry, stimulating a spat of putative class action lawsuits against other manufacturers for similar behavior.  (Marron Decl. ¶ 7.)  More impressive, however, is that some manufacturers have felt compelled to voluntarily modify their labeling, to add disclaimers almost identical to those that the Settlement Agreement requires of Boiron, *without* litigation.  (*Id.*)

23

*Gallucci v. Boiron, Inc., et al.*, Case No. 11-CV-2039 JAH NLS
PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT

Finally, in this case, there "is nothing to counter the presumption that counsel's recommendation is reasonable." *Knight*, 2009 U.S. Dist. LEXIS 11149, at \*11. "In addition to being familiar with the present dispute, Plaintiffs' counsel has considerable expertise in . . . consumer and class action litigation." *Id.* The Court appointed Class Counsel after considering the factors set forth in Rule 23(g)(1). (PA Order at ¶ 4.) Accordingly, this factor weighs in favor of final approval.

### G. The Class's Reaction to the Proposed Settlement Favors Final Approval

The Class's reaction to the Settlement is overwhelmingly positive. Only two class members have opted out, but each is a named plaintiff in one of the related cases filed after *Gallucci*.[11] And the Settlement only drew three objections. One was lodged on behalf of Henry Gonzales, Monica Fernandez, Eleanor Lanigan, Michael Martinez, Glenna O'Dell and Gemis Rangel. (Dkt. 96.) Mr. Gonzales is the named Plaintiff in the related matter pending before this Court, *Gonzales v. Boiron, Inc. et al.*, No. 3:11-cv-02066-JAH-NLS; and the remaining objectors are all named plaintiffs in the related action of *Fernandez et al. v. Boiron, Inc. et al.*, No. 8:11-cv-01867-JST-CW (C.D. Cal.). These objectors are all represented, both in their separate actions and for purposes of objecting, by the same counsel. The second objection was made by Israel Elizondo, who appears to be a class member without an interest in a related case, and is accompanied by a claim form. (Dkt. 102.) The third objection, filed on August 3, 2012 after the objection deadline, was made on behalf of Maria Carapia and David Johnson, who also appear to be class members without interests in a related case. (Dkt. 97.)

"The absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of the settlement are favorable to the Class Members." *Dennis*, 2011 U.S. Dist. LEXIS 36651, at \*5 (granting final approval in part because "[o]f the thousands who received the Class Notice, only two Class Members" objected). Here, only three objections were lodged, by nine class members. Compared to the class of tens of thousands of Boiron product purchasers, this is a small fraction, and even less so compared to the millions who received notice of the settlement. (*See* Dkt. 64-2, Ex. A at pp. 56-58 [Notice Plan].) This weighs in favor of final

---

[11] E.g., Leonidas Jovel, the named plaintiff in *Jovel et al. v. Boiron, Inc. et al.*, No. 11-cv-10803-SVW-SH (C.D. Cal.), and Rebecca Bohn, the named plaintiff in *Bohn v. Boiron, Inc. et al.*, No. 11-cv-08704 (N.D. Ill.). (*See* Dkt. 71.) (*See also* Sherwood Decl. ¶ 30 (only two opt-outs were received).)

24

*Gallucci v. Boiron, Inc., et al.*, Case No. 11-CV-2039 JAH NLS
PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT

approval. *See, e.g.*, *Rodriguez II*, 563 F.3d 948, 967 (9th Cir. 2009) (objection rate of 0.014 supported approval of the settlement); *Churchill Vill.*, 361 F.3d at 577 (affirming approval of a class action settlement where 90,000 class members received notice, and 45 objections were received).

### H.   The Presence of a Governmental Participant

No government entity participated in the Settlement. As noted above, however, each state's Attorney General was notified of the terms of the Settlement and none have objected.  (Sherwood Decl. ¶ 12.)   This provides assurance that consumer protection authorities across the nation believe the Settlement is fair. Consequently, this factor favors final approval.

### I.   The Balanced Factors Weigh in Favor of Final Approval

"Ultimately, the district court's determination [regarding the fairness and adequacy of a proposed settlement] is nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Officers for Justice*, 688 F.2d at 625 (citation omitted). "[I]t must not be overlooked that voluntary conciliation and settlement are the preferred means of dispute resolution. This is especially true in complex class action litigation." *Id.* Here, all relevant factors weigh in favor of final approval of the Settlement, especially when considered *in toto*.

### CONCLUSION

The Motion for Final Approval should, respectfully, be granted.

*Gallucci v. Boiron, Inc., et al.*, Case No. 11-CV-2039 JAH NLS
PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT

Dated: August 13, 2012                    Respectfully Submitted,

                                          /s/ Ronald A. Marron
                                          Ronald A. Marron

                                          **LAW OFFICES OF RONALD A.**
                                          **MARRON, APLC**
                                          RONALD A. MARRON
                                          MAGGIE REALIN
                                          B. SKYE RESENDES
                                          3636 4th Avenue, Suite 202
                                          San Diego, CA 92103
                                          Telephone:     (619) 696-9006
                                          Facsimile:     (619) 564-6665

                                          **THE WESTON FIRM**
                                          GREGORY S. WESTON
                                          JACK FITZGERALD
                                          MELANIE PERSINGER
                                          COURTLAND CREEKMORE
                                          1405 Morena Blvd., Suite 201
                                          San Diego, California 92110
                                          Telephone:     (619) 798-2006
                                          Facsimile:     (480) 247-4553

                                          ***Class Counsel***

26

*Gallucci v. Boiron, Inc., et al.*, Case No. 11-CV-2039 JAH NLS
PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT