| | |
|---|---|
| **LAW OFFICES OF** | **THE WESTON FIRM** |
| **RONALD A. MARRON, APLC** | GREGORY S. WESTON (239944) |
| RONALD A. MARRON (175650) | *greg@westonfirm.com* |
| *ron@consumersadvocates.com* | JACK FITZGERALD (257370) |
| MAGGIE. K. REALIN (263639) | *jack@westonfirm.com* |
| *maggie@consumersadvocates.com* | COURTLAND CREEKMORE (182018) |
| BEATRICE SKYE RESENDES (278511) | *courtland@westonfirm.com* |
| *skye@consumersadvocates.com* | MELANIE PERSINGER (275423) |
| 3636 4th Avenue, Suite 202 | *mel@westonfirm.com* |
| San Diego, California 92103 | 1405 Morena Blvd., Suite 201 |
| Telephone: (619) 696-9006 | San Diego, California 92110 |
| Facsimile: (619) 564-6665 | Telephone: (619) 798 2006 |
| | Facsimile: (480) 247 4553 |

*Class Counsel*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SALVATORE GALLUCCI, AMY ARONICA, KIM JONES, DORIS PETTY, and JEANNE PRINZIVALLI, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>BOIRON, INC., a foreign corporation; and BOIRON USA, INC., a foreign corporation,<br><br>Defendants.<br><br>AND RELATED ACTIONS | Case No. 3:11-CV-2039 JAH NLS<br>Pleading Type: Class Action<br><br>**DECLARATION OF RONALD A. MARRON IN SUPPORT OF PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR FINAL APPROVAL OF SETTLEMENT**<br><br>Date:       August 27, 2012<br>Judge:     Hon. John A. Houston<br>Time:      2:30 p.m.<br>Location: Courtroom 11<br><br>[Motion date set by the Court in Preliminary Approval Order (Dkt. 89) and Order Rescheduling Final Approval Hearing (Dkt. 91)] |

I, Ronald A. Marron, declare as follows:

1. I am counsel of record for Plaintiffs Salvatore Gallucci, Amy Aronica, Kim Jones, Doris Petty, and Jeanne Prinzivalli in this action. I am a member in good standing of the State Bar of California and the United States District Courts for the Northern, Central and Southern Districts of California. I submit this declaration in support of Plaintiffs' Motion for Final Approval of the proposed class-wide settlement with Defendants Boiron, Inc. and Boiron USA, Inc. ("Boiron"). I make this declaration based on my personal knowledge and if called to testify I could and would competently testify to the matters contained thereto.

2. In drafting Plaintiff's oppositions to Defendants' Motions to Dismiss, Class Counsel conducted a comprehensive review of federal drug labeling laws and their implementing regulations. Counsel also consulted with Neil Rose, M.D., Ph.D., an immunologist with Johns Hopkins University, in order to evaluate Boiron's claims of the effectiveness of their Products, including Oscillococcinum, and Dr. Rose reviewed Plaintiffs' Complaints in this matter to provide expert input.

3. The negotiations in this matter that ultimately resulted in the Settlement Agreement were hard-fought, protracted and adversarial. The parties' settlement negotiations lasted over six months and included at least 13 individual and joint mediation sessions with Magistrate Judge Papas. Judge Papas offered input on the relative strength and weaknesses of the parties' respective positions. In addition, the parties exchanged hundreds of separate email and telephone communications in which the parties sought to obtain the best position possible for their respective clients and, for Class Counsel, the putative Class. The parties exchanged numerous draft settlement agreements and revisions, including drafts of the Exhibits to the Settlement Agreement and extensively negotiated how notice should occur, the language and placement of the two disclaimers, and the language and placement of the new dilution explanation web page, among other provisions. At times, the parties negotiated for weeks, very deliberately, over a single sentence. During this time, Class Counsel consulted with Plaintiffs on several occasions to seek their input, and insisted on the inclusion of certain provisions, absent which Class Counsel assured Boiron it would not recommend the settlement to its clients.

4. Class Counsel insisted on receiving targeted discovery that would permit them to assess the merits of the claims asserted, Boiron's defenses, and an appropriate settlement amount and

structure prior to any settlement negotiations, including the initial mediation session. After the Court entered the parties' stipulated Protective Order on September 28, 2011 (Dkt. 15), Boiron produced, and Class Counsel reviewed, documents including scientific articles and studies; marketing data; label and package mechanicals; sales figures and other detailed financial information; and statutory and regulatory authority for Boiron's reporting of contingent liabilities. Class Counsel also independently researched other important issues influencing the settlement negotiations, such as, take rate statistics. In total, Class Counsel reviewed over 400,000 pages of documents to adequately inform itself about the contours of a fair, reasonable and adequate settlement, and to represent the Class's best interest.

5. At no time during these negotiations did the parties discuss Class Counsel's fees. Class Counsel insisted that the parties should negotiate the substance of the Class's relief and then seek fees independently. Class Counsel did not decide the exact amount of fees it would seek until shortly before filing the fee motion, when Class Counsel evaluated the case, their lodestar, and the applicable law to arrive at the requested figure. Boiron was not aware of the amount of Class Counsel's fee request until after the fee motion (Dkt. 93) was publicly filed on July 20, 2012.

6. On September 19, 2011, without providing notice to Plaintiff Gallucci or Class Counsel or seeking to consolidate the cases, the plaintiff in the related action of *Gonzales v. Boiron, Inc.* (removed to this District by Defendants, and related to this action by the Court under the low-number rule), filed a Motion for Appointment of Interim Lead Counsel requesting that his counsel, the Newport Trial Group, be appointed lead counsel over this action and *Gonzales*. *See Gonzales* Dkt. 7.

7. The Settlement Agreement in this action has had a ripple effect within the over the counter ("OTC") homeopathic drug industry. New litigation has been, or is about to be, commenced against OTC homeopathic drug manufacturers other than Boiron, in this state and other courts across the nation. Several of those manufacturers have decided to voluntarily modify their products' labeling in the same manner as the Settlement in this action by: including disclaimers similar, if not identical to, the FDA Disclaimer and Dilution Disclaimer as provided by the Settlement; to include a homeopathic dilution explanation for consumers on their own product web sites; and to provide their customers other benefits, such as refunds, thus mirroring the injunctive relief terms achieved by the Settlement.

8. Under the terms of the Settlement, if the Settlement Fund is not exhausted, half the remaining funds will be distributed to class claimants in a supplemental distribution, and half donated *cy pres* to a Court-approved non-profit organization dedicated to informing consumers of food and drug labeling concerns. (Settlement Agreement ¶ 4.3.5.) After careful consideration, the parties have agreed that any *cy pres* distribution should be made to Consumers Union because it is an "expert, independent, nonprofit organization whose mission is to work for a fair, just and safe marketplace for all consumers and to empower consumers to protect themselves," including through its widely-known publication, *Consumer Reports*. *See* "About Consumers Union," *at* http://www.consumersunion.org/about. According to Consumers Union's mission statement, part of their non-profit consumer education goal is specifically targeted to food, drug, and health-related products and their labeling (such as vitamins and dietary supplements). *See* www.consumersunion.org/pub/p/producthealth_recreation_fitness/ (linking to position statements on the FDA, need for reform, and FDA's labeling regulations regarding supplements); www.consumerreports.org/cro/magazine/2012/09/10-surprising-dangers-of-vitamins-and-supplements/index.htm (recent issue informing consumers about the true nature of vitamins, supplements, and other natural health products).

9. In addition to the approved Notice Plan, Class Counsel has sought to increase awareness of the Settlement through internet postings, email communications, and attempts to drive traffic to the dedicated Facebook webpage. Specifically, Class Counsel posted information about the settlement at websites frequented by consumers, including http://slickdeals.net/f/4865102-50-or-100-checks-for-Homeopathic-Class-Action-Settlement and www.fatwallet.com/forums/deal-discussion/1205242. In addition, I emailed directly all persons who had contacted my firm about the *Gallucci* case since it was filed, about 150 persons in total.

10. After the approved Claims Administrator, Gilardi & Co., sent notice of the settlement on federal and state officials, as required under the Class Action Fairness Act, I was contacted by telephone by only one Attorney General, from the State of Texas, who requested limited information regarding the Settlement. Class Counsel has not received any written response to the Settlement from any States' Attorneys General or the United States Attorney General.

11. Although Class Counsel believes that Plaintiffs' claims are meritorious and strong, we

4

acknowledge the presence of obstacles should the case be litigated on its merits. The case involves complicated questions of regulatory law and preemption for which there is little guiding precedent. Boiron has continually maintained that Plaintiffs' claims were preempted and the issue has not yet been placed before the Court, thus presenting some risk that the case could be dismissed altogether. Also, Boiron asserts that it has clinical and other support for its claims, evidence that would be subject to expert analysis, dueling reports and testimony. Reliance on expert testimony entails an inherent risk. The case also posed risk to the Class in that Boiron asserts it has independent consumer research demonstrating that most homeopathic purchasers are familiar with homeopathic principles and rely on information other than labeling to make purchasing decisions. This would fatally undermine Plaintiffs' deception claims. Further, even if Plaintiffs established Boiron's liability, they would still be required to establish damages or entitlement to injunctive relief, an area that might also be subject to expert analysis and competent offers of proof sufficient to meet Plaintiffs' burden. This also presents some risk.

12. Attached hereto as **Exhibit 1** is a true and correct copy of the Final Approval Order and Judgment in *In re Nutella Mktg. & Sales Practices Litig.*, No. 3:11-cv-01086 (D.N.J. July 31, 2012) (Dkt. 104).

13. Class Counsel believes the Settlement is fair, reasonable and adequate and achieves substantial and appropriate relief on behalf of the Class and recommends its final approval. In addition to the foregoing risk facts that would arise from continued litigation, the following factors also inform Counsel's decision in recommending final approval be granted:

a. By this Settlement, Plaintiffs have achieved what various consumer advocacy groups have been unable to achieve through directly petitioning the FDA over the course of almost two decades. In 1994, a consumer group petitioned the FDA to require homeopathic drugs to meet the same standards as other drugs regulated by the agency. Attached hereto as **Exhibit 2** is a true and correct copy of an abstract and page one of an October 19, 1994 JAMA article referencing that petition.

b. Subsequently, the FDA was petitioned again, in 2011, to require OTC homeopathic drug manufacturers to warn consumers that the FDA does not consider homeopathic

drugs effective, and to require these products to meet the same standards as other, non-homeopathic, OTC drugs. (Dkt. 93-1 at Exs. 1-2.)

   c. The injunctive relief in this action directly helps advance the above-noted consumer awareness goals, by informing consumers about the lack of FDA review or approval of homeopathic drug labeling (FDA Disclaimer). The injunctive relief goes beyond that, however, by also requiring Boiron to provide consumers with an understandable description of the high levels of dilution in homeopathic drugs on every Product web site it owns or operates, linkable from the homepage of those web sites, in a language understandable to an average consumer. Further, Boiron must include a Dilution Disclaimer on its Products that directs consumers to the new dilution web page, to learn about homeopathic drug dilution and the principles behind homeopathic dilution. Thus, the Settlement goes beyond what other consumer advocacy groups have recommended to the FDA as to the Products at issue in this case.

   d. The monetary relief on behalf of the Class is appropriate and within the range of settlements commonly approved in retail product deceptive advertising cases. Based on my 18 years of experience litigating complex class action cases, these types of cases typically settle in the range of 3% to 10% of product sales during the statutory time period, with most cases falling in the 5% to 6% range. Class Counsel considered that sales outside the statutory period were likely more than the $65.5 million that Boiron's CEO, Janick Boudazin, estimates for the relevant time period, but that the chances of obtaining relief for them was significantly lower because of the applicable three- and four-year statutes of limitations under the FAL, CLRA and UCL. Thus, in light of the risks of litigation, coupled with the excellent injunctive relief the Settlement provides to the Class, the $5 million monetary relief is fair, reasonable, and adequate.

  I declare, under penalty of perjury under the laws of the United States, that the foregoing is true and correct.

Dated this 13th day of August, 2012, in San Diego, California.

        /s/ Ronald A. Marron
        *ron@consumersadvocates.com*
        ***Class Counsel***

**TABLE OF EXHIBITS**

| EXHIBIT | DOCUMENT | PAGES |
|---|---|---|
| 1 | Final Approval Order and Judgment in *In re Nutella Mktg. & Sales Practices Litig.*, No. 3:11-cv-01086 (D.N.J. July 31, 2012) (Dkt. 104) | 1-7 |
| 2 | Abstract and page one of October 19, 1994 JAMA article | 8-9 |

**EXHIBIT 1**

James E. Cecchi
Lindsey H. Taylor
Donald E. Ecklund
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO
5 Becker Farm Rd.
Roseland, New Jersey 07068
(973) 994-1700

Christopher M. Burke
SCOTT+SCOTT LLP
707 Broadway, Suite 1000
San Diego, California 92101
(619) 233-4565

Joseph P. Guglielmo
SCOTT+SCOTT LLP
500 Fifth Avenue, 40th Floor
New York, New York 10110
(212) 223-6444

RECEIVED
JUL 31 2012
AT 8:30_____M
WILLIAM T. WALSH
CLERK

*Counsel for Plaintiffs and Class Counsel*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| IN RE:<br><br>NUTELLA MARKETING AND SALES PRACTICES LITIGATION | Civil Action No. 11-1086(FLW)(DEA)<br><br>**FINAL APPROVAL ORDER AND JUDGMENT** |

THIS MATTER having been opened to the Court by counsel for the Plaintiffs and the Class for final approval of the proposed class action settlement (the "Settlement"), in accordance with the Class Action Settlement Agreement dated January 10, 2012 (the "Agreement") and for an award of attorneys' fees and costs and approval of incentive awards; and

WHEREAS, the Court finds that is has jurisdiction over this action and each of the parties under 28 U.S.C. § 1331 and that venue is proper in this district; and

WHEREAS the Court finds as follows: The Settlement was entered into at arm's length by experienced counsel and only after extensive negotiations. The Settlement is not the result of collusion. The Class has received the best notice practicable under the circumstances. The Settlement is fair, reasonable, and adequate;

**EXHIBIT 1 PAGE 1**

WHEREAS the Court finds that the Gross Settlement Fund of $2,500,000 is fair and reasonable;

WHEREAS the Court finds: attorneys' fees in the amount of 25% of the Gross Settlement Fund of $2,500,000 and $500,000 in connection with the Injunctive Relief obtained and costs in the amount of $78,888 and the incentive award of $2,000 to each Class Representative is fair and reasonable; and

WHEREAS, this Court has fully considered the record of these proceedings, the representations, argument, and recommendation of counsel, and the requirements of the governing law; and for good cause shown;

IT IS THIS 30th day of July, 2012:

ORDERED that the Final Approval and Judgment is GRANTED, subject to the following terms and conditions:

1. For the purposes of this Order, the Court hereby adopts all defined terms as set forth in the Agreement.

2. The "Settlement Class" consists of and is hereinafter defined as:

[A]ll persons throughout the United States who purchased one or more of Defendant's Nutella brand hazelnut spread products ("Nutella") in any state other than California, at any time from January 1, 2008 through February 3, 2012 (the "Class Period"), other than for resale or distribution. Excluded from the Settlement Class Members are: Ferrero; Defense Counsel; any judge presiding over any of the actions that together comprise the Actions or Related Actions; and any immediate family member of any such person(s).

3. Attached hereto and incorporated into this Order as Appendix A is a schedule of all such persons who have timely and validly requested to be excluded from the Settlement Class.

**EXHIBIT 1 PAGE 2**

4. The Court finds that the proposed Settlement Class meets all the applicable requirements of Rule 23 of the Federal Rules of Civil Procedure ("Rule 23"), affirms certification of the Settlement Class, and approves the Settlement set forth in the Agreement as being fair, just, reasonable, and adequate.

5. Based upon the Court's familiarity with the claims and parties, the Court finds that Marnie Glover and Jayme Kaczmarek adequately represent the interests of the Settlement Class and hereby appoints them as Class Representatives for the Settlement Class.

6. The Court finds that the following firms fairly and adequately represent the interests of the Settlement Class and hereby confirms them as Class Counsel pursuant to Rule 23:

Counsel for the Class

James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Rd.
Roseland, New Jersey 07068
(973) 994-1700

Christopher M. Burke
SCOTT+SCOTT LLP
707 Broadway, Suite 1000
San Diego, CA 92101
(619) 233-4565

Joseph P. Guglielmo
SCOTT+SCOTT LLP
500 Fifth Avenue, 40th Floor
New York, NY 10110
(212) 223-6444

7. The Court finds, upon review of the Settlement and consideration of the nine factors enunciated in *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975), that the Settlement and

**EXHIBIT 1 PAGE 3**

the proposed reimbursement program available from the Settlement are fair, reasonable and adequate. Accordingly, the Settlement is finally approved by the Court.

8. The Final Approval Order and Judgment as provided under the Agreement should be entered. Such order and judgment shall be fully binding with respect to all members of the Class and shall have res judicata, collateral estoppel, and all other preclusive effect in any claims for relief, causes of action, suits, petitions, demands in law or equity, or any allegations of liability, damages, debts, contracts, agreements, obligations, promises, attorneys' fees, costs, interests, or expenses that are based on or in any way related to any of the claims for relief, causes of action, suits, damages, debts, contracts, petitions, demands in law or equity, or any allegations of liability, obligations, promises, attorneys' fees, costs, interests, or expenses that were asserted in the two complaints

9. The complaints in these two actions are dismissed with prejudice, and the claims against Defendant are released.

10. Settlement Class Members requesting exclusion from the Class shall not be entitled to receive any reimbursement as described in the Agreement, long form Settlement Notice, Claim Form, and Publication Notice.

11. The Settlement Administrator shall distribute the proceeds of the Settlement Fund, in accordance with the terms of the Agreement, to each Settlement Class Member who timely submitted a properly executed Claim Form.

12. Class Counsel may pay from the Cash Settlement Amount to the Claims Administrator, without further approval from Defendant or the Court, the reasonable costs and expenses up to the sum of $498,000 associated with the establishment of the Settlement Website and the Claims Administration Expenses, including without limitation, the actual costs of Class

**EXHIBIT 1 PAGE 4**

Notice, and any expenses incurred and fees charged by the Claims Administrator in connection with providing notice and processing the submitted claims.

13. Class Counsel is hereby awarded: (i) 25% of the Gross Settlement Fund of $2,500,000; (ii) costs in the amount of $78,888: (iii) and $500,000 in connection with the Injunctive Relief obtained.

14. Each Class Representative is awarded $2,000 for incentive awards.

15. The awarded attorneys' fees and costs, and Class Representative incentive awards are to be paid and distributed in accordance with the Settlement executed by counsel.

16. The Court authorizes Class Counsel to allocate the fee award among Plaintiffs' Counsel.

17. Each and every term and provision of the Agreement and Settlement shall be deemed incorporated into the Final Approval Order and Judgment as if expressly set forth and shall have the full force and effect of an Order of the Court.

18. The terms of this Final Approval Order and Judgment, and the Settlement are binding on the Plaintiffs and all other Settlement Class Members, as well as their heirs, executors and administrators, successors and assigns.

19. The parties and their counsel are ordered to implement and to consummate the Settlement according to its terms and provisions.

20. Other than as set forth in the accompanying Order Approving Fees and Incentive Award, the Parties shall bear their own costs and attorneys' fees.

21. The releases set forth in the Settlement and Agreement are incorporated by reference.

**EXHIBIT 1 PAGE 5**

22. The parties are authorized, without further approval from the Court, to agree to and to adopt such amendments, modifications, and expansions of the Settlement as are consistent with the Final Approval Order and Judgment.

23. No Settlement Class Member, either directly, representatively, or in any other capacity (other than a Settlement Class Member who validly and timely submitted a valid request for exclusion), shall commence, continue, or prosecute any action or proceeding against Defendant in any court or tribunal asserting any of the claims released by the Settlement or Agreement, and are hereby permanently enjoined from so proceeding.

24. Without affecting the finality of the Final Approval Order and Judgment, the Court shall retain continuing jurisdiction over these Actions, the parties and the Settlement Class, and the administration and enforcement of the Settlement. Any disputes or controversies arising with respect to the enforcement or implementation of the Settlement shall be presented by motion to the Court, provided, however, that nothing in this paragraph shall restrict the parties' ability to exercise their rights under Paragraph 16 above.

25. Neither this Order nor the Agreement, nor any documents or statements related thereto, shall constitute any evidence or admission of liability by Defendant, nor shall any such document or statement be offered in evidence in this or any other proceeding except to consummate or enforce the Settlement or the terms of this Order.

26. There being no just reason to delay, the Clerk is directed to enter this Final Approval Order and Judgment forthwith.

_____
FREDA L. WOLFSON, U.S.D.J.

**EXHIBIT 1 PAGE 6**

## EXHIBIT A

Lydia Hatfield, Milton, CA
Jason Frost, Cohutta, GA
Wendy Shook, Leesburg, GA
Victoria Nedospasova, Tuscaloosa, AL

**EXHIBIT 1 PAGE 7**

**EXHIBIT 2**


The Journal of the American Medical Association

| Home | Current Issue | All Issues | Online First | Specialties & Topics | CME | Multimedia | Quizzes | For Authors | Store |

October 19, 1994, Vol 272, No. 15 >

< Previous Article    Next Article >

**Full Content is available to subscribers**
Subscribe/Learn More >

Some tools below are only available to our subscribers or users with an online account.

Print | PDF
Email | Share
Get Citation | Get Permissions
Get Alerts | Submit a Letter

**ARTICLE** | October 19, 1994

# FDA Petitioned to 'Stop Homeopathy Scam'

Andrew A. Skolnick

*JAMA*. 1994;272(15):1154-1156.

Text Size: A A A

**Sign In to Access Full Content**

Username
Password

Sign In

Forgot Your Password?

Sign in via: Athens | Shibboleth

Register Now

Article

## ABSTRACT

FORTY-TWO physicians, pharmacologists, scientists, consumer advocates, and other prominent critics of quackery have asked the US Food and Drug Administration (FDA) to crack down on the marketing of homeopathic products.

In their petition filed August 29, the group formally asks the FDA to require all over-the-counter (OTC) homeopathic drugs to meet the same standards of safety and effectiveness as other OTC drugs. In the meantime, it asks the agency to issue a public warning that, although it permits the sale of these products, it does not recognize any of them as effective.

"State and federal laws ban the sale of medicines that have not been proven safe and effective for their intended purposes," says Stephen Barrett, MD, a retired psychiatrist, consumer advocate, and spokesman for the group. "These laws have not been applied to homeopathic remedies. It's time they were."

"Public fascination with 'alternative medicine' has boosted homeopathy from a

**First Page Preview**                                        View Large

**Related Content**
Customize your page view by dragging & repositioning the boxes below.

**Jobs**

**Outpatient Family Practice - Northern New Jersey**
Lawlor and Associates
Lincoln Park, NJ

**Physician - Surgery Advanced Laproscopic**
HCA - The Healthcare Company
Englewood, CO

More Listings at
**JAMACareerCenter.com >**

**EXHIBIT 1 PAGE 8**

it achieves is miraculous," says Coyne. "My son has had a port for more than 2 years, during which time he has been treated prophylactically. Conor's life is different. My life is different.

"Too vividly, I recall Conor's cries in the night because he couldn't move his arm and the times he'd limp when he walked, the anxiety-provoking visits to the emergency department . . . the difficulty finding a vein to infuse, the multiple sticks, the large hematomas, the struggles, the tears, and the inescapable fear that the same thing might happen again the next day.

"The port and prophylaxis have revolutionized and simplified our lives. Our son has not incurred a bleed in the 2-plus years since we began a prophylactic regimen. Conor is an active, inquisitive boy, who plays hard, gets dirty, and loads a normal life. My wife and I are becoming less overprotective and more carefree, and the fear of spontaneous intracranial hemorrhage or hemarthrosis has been significantly minimized."

### Cost-benefit Study Needed

The cost of prophylactic therapy is anything but low. Coyne says that a child weighing 10 kg requires 40 units of factor VIII per kilogram three times a week at a cost to the family of approximately $1 per unit, or a total of $1200 per week. Insurance companies generally will pay for these treatments only on a case by case basis.

These costs, however, must be balanced against the costs of not treating prophylactically, he says. Treating a child for a bleeding episode typically requires about $500 worth of factor VIII and children with severe hemophilia often have an episode every 1 to 2 weeks.

Also balanced against the cost of prevention should be the costs of orthopedic procedures, of caring for young adults with disabling arthritis, and of treating brain hemorrhages and their consequences, including seizure disorders, learning disabilities, and psychomotor deficits. Harder to calculate are the psychological benefits that patients and their families reap because the child has a better chance to develop normally physically and psychosocially, he says.

"I believe prophylaxis will therapeutically bridge the time gap between now and the year when successful gene therapy provides a cure for hemophilia," Coyne says. "It is my hope that today's children with bleeding disorders will not have to suffer the pains, disabilities, and stigmatism that their predecessors have endured and are still struggling to overcome. It is my dream that arthropathy and neurologic complications from hemophilia will become as rare as smallpox, and that a preventive approach to this disorder be not only the optimal therapy, but the standard."

—by Andrew A. Skolnick

## FDA Petitioned to 'Stop Homeopathy Scam'

FORTY-TWO physicians, pharmacologists, scientists, consumer advocates, and other prominent critics of quackery have asked the US Food and Drug Administration (FDA) to crack down on the marketing of homeopathic products.

In their petition filed August 29, the group formally asks the FDA to require all over-the-counter (OTC) homeopathic drugs to meet the same standards of safety and effectiveness as other OTC drugs. In the meantime, it asks the agency to issue a public warning that, although it permits the sale of these products, it does not recognize any of them as effective.

"State and federal laws ban the sale of medicines that have not been proven safe and effective for their intended purposes," says Stephen Barrett, MD, a retired psychiatrist, consumer advocate, and spokesman for the group. "These laws have not been applied to homeopathic remedies. It's time they were.

"Public fascination with 'alternative medicine' has boosted homeopathy from a historical curiosity into a $250-million-a-year scam. Its so-called remedies don't work. They are the equivalent of a car with no engine or a phony stock certificate. Yet they are marketed for everything from colds to cancer."

Homeopathy is based on the ideas of Samuel Hahnemann (1755-1843), a German physician who based his treatments on what he called the "law of similars." According to his theory, diseases can be cured by administering substances to patients that, in a healthy person, would cause symptoms similar to those of the disease. In practice, a substance is diluted down, often to the point where not a single molecule is likely to be found in an entire bottle of the remedy. Hahnemann maintained that the smaller the dose, the more powerful the effect—a principle that has long been rejected by virtually all chemists, physicians, pharmacologists, and biomedical researchers. Homeopathic healers, however, claim that the water or other solvent retains the "spirit" of the substance.

Because homeopathic drugs typically are nothing but water or alcohol, they normally pose no direct harm to anyone. In the days when medical practice relied mainly on bleeding, purging with mercury compounds, and other harmful as well as worthless treatments, patients of homeopaths usually suffered far less and often had higher survival rates than those those of allopaths.

As medical treatment became more scientific and effective, homeopathy declined in the United States to the point of being little more than a curiosity. It remained popular in Europe, however, and recently has been making a comeback here.

### Grandfathered In

Most homeopathies were on the market before passage of the Food, Drug, and Cosmetic Act of 1938, which exempted these remedies from regulations that required drugs to be proven safe, says Freddie Ann Hoffman, MD, deputy of medical staff for FDA's Office of Health Affairs, Bethesda, Md. (The author of this exemption was Sen Royal Copeland, a homeopathic physician and the chief congressional sponsor of the act.) In 1962, the law was amended to require drug manufacturers to prove that their products are also effective for treating indicated conditions. The amendment did not rescind the 1938 exemption for homeopathic drugs. However, says Hoffman, the FDA can require manufacturers to prove the efficacy of its products for any new indication, delivery route, or dosage marketed after 1962.

Because of its growing concern about the increased marketing of alternative health products under the homeopathic umbrella to avoid FDA regulation, the agency in 1988 issued its Compliance Guide 7132.15, which states that "Homeopathic drugs cannot be offered without prescription for such serious conditions as cancer, AIDS, or any other requiring diagnosis and treatment by a licensed practitioner. Nonprescription homeopathics may be sold only for self-limiting conditions recognizable by consumers. [Their] labeling must adequately instruct consumers in the product's safe use."

"Of course, if products don't work, there is no such thing as safe use," says Barrett. "While it is illegal to make unproven therapeutic claims for dietary supplements, the FDA tolerates most



Advertisement

**EXHIBIT 1 PAGE 9**