**LAW OFFICES OF**
**RONALD A. MARRON, APLC**
RONALD A. MARRON (175650)
*ron@consumersadvocates.com*
MAGGIE. K. REALIN (263639)
*maggie@consumersadvocates.com*
BEATRICE SKYE RESENDES (278511)
*skye@consumersadvocates.com*
3636 4th Avenue, Suite 202
San Diego, California 92103
Telephone: (619) 696-9006
Facsimile: (619) 564-6665

**THE WESTON FIRM**
GREGORY S. WESTON (239944)
*greg@westonfirm.com*
JACK FITZGERALD (257370)
*jack@westonfirm.com*
COURTLAND CREEKMORE (182018)
*courtland@westonfirm.com*
MELANIE PERSINGER (275423)
*mel@westonfirm.com*
1405 Morena Blvd., Suite 201
San Diego, California 92110
Telephone: (619) 798 2006
Facsimile: (480) 247 4553

*Class Counsel*

**WILSON TURNER KOSMO LLP**
VICKIE E. TURNER (106431)
*vturner@wilsonturnerkosmo.com*
550 West C Street, Suite 1050
San Diego, California 92101
Telephone: (619) 236-9600
Facsimile: (619) 236-9669

**PATTON BOGGS LLP**
CHRISTINA G. SARCHIO (*Pro Hac Vice*)
*csarchio@pattonboggs.com*
HAVEN G. WARD (*Pro Hac Vice*)
*hward@pattonboggs.com*
2550 M Street, N.W.
Washington, D.C. 20037
Telephone: (202) 457-6000
Facsimile: (202) 457-6315

*Counsel for Defendants*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

SALVATORE GALLUCCI, AMY ARONICA, KIM JONES, DORIS PETTY, and JEANNE PRINZIVALLI, individually and on behalf of all others similarly situated,

Plaintiff,

v.

BOIRON, INC., a foreign corporation; and BOIRON USA, INC., a foreign corporation,

Defendants.

_____

AND ALL RELATED ACTIONS

Case No. 3:11-CV-2039 JAH NLS
Pleading Type: Class Action

**JOINT RESPONSE TO OBJECTIONS TO FINAL APPROVAL OF SETTLEMENT**

Date:       August 27, 2012
Judge:      Hon. John A. Houston
Time:       2:30 p.m.
Location:   Courtroom 11

[Motion date set by the Court in Preliminary Approval Order (Dkt. 89) and Order Rescheduling Final Approval Hearing (Dkt. 91)]

1

## <u>**TABLE OF CONTENTS**</u>

2

TABLE OF AUTHORITIES ............................................................................................ iii

3

4

INTRODUCTION ...........................................................................................................1

5

PROCEDURAL AND FACTUAL BACKGROUND......................................................2

6

7

ARGUMENT ..................................................................................................................6

8

9

    I.      STANDARD OF REVIEW ...........................................................7

10

    II.     THE SETTLEMENT RESULTED FROM ARMS-LENGTH

11
             NEGOTIATION.................................................................................7

12

    III.    THE SETTLEMENT'S MONETARY RELIEF IS FAIR, REASONABLE,

13
            AND ADEQUATE .......................................................................... 11

14

         A.    Defendants' Revenue Is Not the Determining Factor for Adequacy ................. 11

15

16
         B.    The Amount of the Settlement is Adequate, Fair, and Reasonable.................... 13

17

    IV.    THE SETTLEMENT'S INJUNCTIVE RELIEF IS BENEFICIAL

18
            AND SUFFICIENT.......................................................................... 16

19

    V.     THE NOTICE PLAN COMPLIES WITH ALL APPLICABLE

20
            LEGAL STANDARDS.................................................................... 18

21

         A.    The Notice Plan Provided the Best Notice Practicable Under the

22
                Circumstances, Meeting Due Process.................................................. 18

23

24
         B.    The Notice Plan Complied with the CLRA....................................... 20

25

         C.    The Class Received Adequate Notice of Class Counsel's Attorney

26
                Fee Request ............................................................................ 20

27

28
         D.    The Time to Object was Sufficient ................................................. 21

E.      The Fee Application Was Sufficient.................................................. 21

F.      Federal *and* California Law Apply to the Fee Application ................................. 22

G.      The Fee Request is Reasonable ........................................................... 23

VI.     THE RELEASE IS APPROPRIATE AND ENFORCEABLE ...................................... 24

VII.    THE COURT SHOULD REAFFIRM ITS ORDER THAT
        RULE 23(A) IS SATISFIED .......................................................... 26

A.      Typicality ............................................................................ 26

B.      Adequacy............................................................................... 27

VIII.   THE REQUIREMENTS FOR OBJECTING DO NOT VIOLATE RULE 23 .............. 28

CONCLUSION.......................................................................................29

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Abiva v. Cache Inc.*,
No. 2:07-cv-00556, Dkt. 84, slip. op. (C.D. Cal. Oct. 19, 2009) ....................................19

*Acosta v. Trans Union, LLC*,
243 F.R.D. 377 (C.D. Cal. 2007) .......................................................................................8

*Adams v. Inter-Con Sec. Sys., Inc.*,
No. C-06-5428 MHP, 2007 WL 3225466 (N.D. Cal. Oct. 30, 2007) ...........................10

*Boyd v. Bechtel Corp.*,
485 F. Supp. 610 (N.D. Cal. 1979) ...........................................................................11, 29

*Brent v. Midland Funding, LLC*,
No. 3:11 CV 1332, 2011 WL 3862363 (N.D. Ohio Sept. 1, 2011)................................12

*Bruno v. Quten Research Ins., LLC*,
280 F.R.D. 524 (C.D. Cal. Nov. 14, 2011) ...................................................................24

*Burkhart v. Wash. Metro Area Transit Auth.*,
112 F.3d 1207 (D.C. Cir. 1997) .....................................................................................19

*Cabo Distrib. Co. v. Brady*,
821 F. Supp. 601 (N.D. Cal. 1992) ................................................................................16

*Carter v. Anderson Merch., LP*,
Nos. EDCV 08-0025-VAP (OPx), EDCV 09-0216-VAP (OPx),
2010 WL 1946784 (C.D. Cal. May 11, 2010) ...............................................................10

*Chacanaca v. Quaker Oats Co.*,
752 F. Supp. 2d 1111 (N.D. Cal. 2010) .........................................................................17

*Chavez v. Blue Sky Natural Beverage Co.*,
No. 3:06-cv-06609, Dkt. 151, slip. op. (N.D. Cal Sept. 24, 2010) ...............................19

*Class Plaintiffs v. City of Seattle*,
955 F.2d 1268 (9th Cir. 1992)........................................................................................24

*Clesceri v. Beach City Investigations & Protective Svcs., Inc.*,
No. CV-10-3873-JST (RZx), 2011 WL 320998 (C.D. Cal. Jan. 27, 2011) ..................10

*Cohorst v. BRE Props., Inc.*,
10cv2666 JM(BGS), 2011 WL 3475274, at *3 (S.D. Cal. Aug. 5, 2011) .....................12

*Cohorst v. BRE Props., Inc.*,
No. 10-CV-2666-JM-BGS, 2011 WL 3489781 (S.D. Cal. July 19, 2011) ....................7

*Delorosa v. Boiron, Inc.*,
275 F.R.D. 582 (C.D. Cal. 2011) .....................................................................................8

*Doe v. Los Angeles W. Travelodge*,
No. CV 08-8279 CBM (CTx), 2009 WL 5227898 (C.D. Cal. Nov. 19, 2009)...............9

*Dunk v. Ford Motor Co.*,
48 Cal. App. 4th 1794 (1996)..........................................................................................23

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
   967 F.2d 1280 (9th Cir. 1992) ...................................................................................16

*Farinella v. Paypal, Inc.*,
   611 F. Supp. 2d 250 (E.D.N.Y. 2009) ..................................................................13, 15

*Fisher v. Ciba Specialty Chems. Corp.*,
   238 F.R.D. 273 (S.D. Ala. 2006) ...............................................................................19

*Forcellati v. Hyland's, Inc.*,
   No. CV 12–1983–GHK (MEWx),
   2012 U.S. Dist. LEXIS 91393 (C.D. Cal. June 1, 2012) ...........................................24

*Frame v. Hillman*,
   No. 01-CV-2193 H(LAB), 2002 WL 34520817 (S.D. Cal. July 31, 2002) ..................11

*Gardner v. GC Servs., LP*,
   No. 10cv0997 - IEG (CAB), 2012 U.S. Dist. LEXIS 47034
   (S.D. Cal. Apr. 2, 2012) .............................................................................................21

*Gemelas v. The Dannon Co., Inc.*,
   No. 08-cv-00236-DAP, Dkt. 71, slip op. (N.D. Ohio June 24, 2010).........................25

*Gianino v. Alacer*,
   No. SACV 09-01247-CJC(RNBx), 2012 U.S. Dist. LEXIS 32261
   (C.D. Cal. Feb. 27, 2012) ...........................................................................................14

*Hainey v. Parrot*,
   617 F. Supp. 2d 668 (S.D. Ohio 2007).......................................................................10

*Hartless v. Clorox Co.*,
   273 F.R.D. 630 (S.D. Cal. Jan. 20, 2011) ..................................................................28

*Hartless v. Clorox Co.*,
   Nos. 11-55136, 11-55150, 11-55189, 2012 U.S. App. LEXIS 10539
   (9th Cir. May 24, 2012).................................................................................................1

*Hemphill v. San Diego Ass'n of Realtors, Inc.*,
   225 F.R.D. 616 (S.D. Cal. 2005)..................................................................................7

*Hershey v. ExxonMobil Oil Corp.*,
   07-1300-JTM, 2012 U.S. Dist. LEXIS 50469 (D. Kan. Apr. 11, 2012) .....................20

*Horvath v. LG Elecs. Mobilecomm U.S.A., Inc.*,
   No. 3:11-CV-01576-H-RBB, 2012 US. Dist. LEXIS 19215
   (S.D. Cal. Feb. 13, 2012)............................................................................................14

*In re Cendant Corp. Derivative Action Litig.*,
   232 F. Supp. 2d 327 (D.N.J. 2002) ............................................................................15

*In re Dry Max Pampers Litig.*, 10-cv-00301-TSB (S.D. Ohio Sept. 28, 2011)....................25

*In re Ferrero Litig.*,
   2012 U.S. Dist. LEXIS 94900 (S.D. Cal. July 9, 2012)...............................................15

*In re Ferrero Litig.*,
   278 F.R.D. 552 (S.D. Cal. 2011).................................................................................12

*In re Ferrero Litig.*,
   No. 11-CV-00205-H-KSC, 2012 U.S. Dist. LEXIS 94900
   (S.D. Cal. July 9, 2012)....................................................................................1, 12

*In re First Am. Corp. Erisa Ligi.*,
   No. SACV 07-01357-JVS (RNBx),CV 07-07602,CV 07-07585,SACV 08-00110,
   2009 U.S. Dist. LEXIS 49141 (C.D. Cal. Apr. 2, 2009)................................19

*In re HP Inkjet Printer Litig.*,
   No. 05-cv-3580 JF, Dkt. 286, slip op. (N.D. Cal. Mar. 29, 2011) .................25

*In re Indep. Energy Holdings PLC*,
   No. 00 Civ. 6689(SAS), 2003 WL 22244676 (S.D.N.Y. Sept. 29, 2003) ......................10

*In re Mercury Interactive Corp. Secs. Litig.*,
   618 F.3d 988 (9th Cir. 2010).........................................................................21

*In re Merrill Lynch Tyco Research Sec. Litig.*,
   249 F.R.D. 124 (S.D.N.Y. 2008) ...................................................................15

*In re Nutella Mktg. & Sales Practices Litig.*,
   No. 3:11-cv-01086 (D.N.J. July 31, 2012).................................................12, 15

*In re Nuvelo Sec. Litig.*,
   No. C 07-04056 CRB, 2011 U.S. Dist. LEXIS 72260 (N.D. Cal. July 6, 2011) ..........21

*In re TD Ameritrade Account Holder Litig.*,
   Nos. C 07-2852, 07-4903,, 2011 U.S. Dist. LEXIS 103222
   (N.D. Cal. Sept. 12, 2011)..............................................................................2

*IUE-CWA v. Gen. Motors Corp.*,
   238 F.R.D. 583 (E.D. Mich. Nov. 1, 2006)....................................................7

*Jaffe v. Morgan Stanley & Co.*,
   No. C 06-3903 TEH, 2008 WL 346417 (N.D. Cal. Feb. 7, 2008) ................12

*Kadner v. Shields*,
   20 Cal. App. 3d 251 (1971).............................................................................9

*Kowalsky v. Hewlett-Packard Co.*,
   No. 5:10-cv-02176-LHK, 2012 U.S. Dist. LEXIS 34597
   (N.D. Cal. Mar. 14, 2012)..............................................................................14

*Larson v. AT&T Mobility LLC*,
   ---F.3d---, Nos. 10–1285, 10–1477, 10–1486, 10–1587, 2012 WL 2478376
   (3d Cir. June 29, 2012)....................................................................................8

*Larson v. Sprint Nextel Corp.*,
   No. 07-5325 (JLL), 2010 WL 234934 (D.N.J. Jan. 15, 2010) ......................7

*Leallao v. Beneficial Cal., Inc.*,
   82 Cal. App. 4th 19 (2000).............................................................................23

*Lytle v. Carl*,
   382 F.3d 978 (9th Cir. 2004)..........................................................................22

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012)..........................................................................13

*Metabolic Research, Inc. v. Ferrell*,
   --- F.3d ---, No. 10–16209, 2012 WL 2215834 (9th Cir. June 18, 2012) .........................9

*Metabolic Research, Inc. v. Ferrell*,
   2009 WL 5227898 (C.D. Cal. Nov. 19, 2009) .................................................9

*Metabolic Research, Inc. v. Ferrell*,
   No. 2:09-cv-02453-JCM-PAL (D. Nev. removed on Dec. 30, 2009) .........9

*Nat'l Council Against Health Fraud, Inc. v. King Bio Pharms., Inc.*,
   107 Cal. App. 4th 1336 (2003) .................................................................17

*Nat'l Super Spuds, Inc. v. New York Mercantile Exch.*,
   660 F.2d 9 (2d Cir. 1981) .........................................................................25

*Negrete v. Allianz Life Ins. Co. of N. Am.*,
   523 F.3d 1091 (9th Cir. 2008) ....................................................................7

*O'Connell v. Superior Court*,
   141 Cal. App. 4th 1452 (2006) .................................................................16

*Officers for Justice v. Civil Serv. Comm'n*,
   688 F.2d 615 (9th Cir. 1982) ...............................................................11, 12

*Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*,
   636 F.3d 1150 (9th Cir. 2011) ..................................................................16

*People ex rel. Dept. of Transp. v. Clauser/Wells P'ship*,
   95 Cal. App. 4th 1066 (2002) ...................................................................12

*Red v. Kraft Foods, Inc.*,
   No. 10-cv-1028-GW (C.D. Cal.) ...............................................................27

*Rikos v. Procter & Gamble Co.*,
   No. 1:11-cv-226, 2012 U.S. Dist. LEXIS 25104 (S.D. Ohio Feb. 28, 2012) .................14

*Rodriguez v. W. Publ'g Corp.*,
   563 F.3d 948 (9th Cir. 2009) ...............................................................11, 13

*Rutter & Wilbanks Corp. v. Shell Oil Co.*,
   314 F.3d 1180 (10th Cir. 2002) ..................................................................7

*Serrano v. Priest*,
   20 Cal.3d 25 (1977) .................................................................................23

*TBK Partners, Ltd. v. W. Union Corp.*,
   675 F.2d 456 (2d Cir. 1982) .....................................................................24

*Vollmer v. Selden II*,
   350 F.3d 656 (7th Cir. 2003) .....................................................................28

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
   396 F.3d 96 (2d Cir. 2005) .......................................................................25

*Weeks v. Kellogg Co.*,
   2012 U.S. Dist. LEXIS 155472 (C.D. Cal. Nov. 23, 2011) .........................15

*Weeks v. Kellogg Co.*,
  No. CV 09-08102 (MMM) (RZx), 2011 U.S. Dist. LEXIS 155472
  (C.D. Cal. Nov. 23, 2011) ..............................................................................21

*White v. Experian Info. Solutions, Inc.*,
  803 F. Supp. 2d 1086 (C.D. Cal. 2011).......................................................7

*Williams v. Lockheed Martin Corp.*,
  No. 09cv1669 WQH (POR), 2011 U.S. Dist. LEXIS 58716
  (S.D. Cal. June 1, 2011) ...............................................................................19

**STATUTES**

21 U.S.C. § 321 .................................................................................................17

21 U.S.C. § 343(r)(6) .........................................................................................17

21 U.S.C. § 351 .................................................................................................17

Cal. Bus. & Prof. Code § 17208 .......................................................................13

Cal. Civ. Code § 1750.........................................................................................9

Cal. Civ. Code § 1781.......................................................................................20

Cal. Civ. Code § 1783.......................................................................................13

Cal. Code Civ. Proc. § 382 ...............................................................................23

**RULES**

Fed. R. Civ. P. 6(a) ............................................................................................2

Fed. R. Civ. P. 23 ...................................................................................2, 27, 28

Fed. R. Civ. P. 23(a)(3).....................................................................................26

Fed. R. Civ. P. 23(a)(4).....................................................................................26

Fed. R. Civ. P. 23(c)(2)(B) ...............................................................................19

Fed. R. Civ. P. 23(g)(4).......................................................................................8

Fed. R. Civ. P. 23(h) .........................................................................................23

**REGULATIONS**

21 C.F.R. § 101.93(c)(1)....................................................................................17

**TREATISES**

A. Conte and H. Newberg, NEWBERG ON CLASS ACTIONS (4th ed. 2002) .........7, 8

13 Richard A. Lord, WILLISTON ON CONTRACTS § 38:2 (4th ed. 2012) .............9

**OTHER AUTHORITIES**

Federal Judicial Center,
  MANUAL FOR COMPLEX LITIGATION FOURTH § 21.7 (2004)......................11, 20

Food & Drug Admin., Compliance Policy Guide § 400.400.............................17

1    Pursuant to the Court's April 25, 2012 Order Granting Preliminary Approval ("PA Order"),

2    Dkt. 89, Plaintiffs Salvatore Gallucci, Amy Aronica, Kim Jones, Doris Petty, and Jeanne Prinzivalli,

3    and Defendants Boiron, Inc. and Boiron USA, Inc. respectfully submit this Joint Response in

4    Opposition to Objections to Final Approval of the Proposed Settlement Agreement and to the

5    Motion for Attorney's Fees, Costs, and Incentive Awards.

6                                      **INTRODUCTION**

7          As further demonstration that the proposed Settlement Agreement is fair and reasonable, and

8    that all the other criteria for Final Approval have been satisfied, only <u>three</u> objections have been

9    submitted and only <u>two</u> class members have opted-out. *Compare In re Ferrero Litig.*, No. 11-CV-

10   00205-H-KSC, 2012 U.S. Dist. LEXIS 94900, at *12 (S.D. Cal. July 9, 2012) (granting settlement

11   approval where "only three class members have objections"). None of the objections raise

12   controversies or concerns sufficient to thwart final approval, but instead are based on inapposite

13   legal analysis, incorrect facts, and/or mistaken suppositions and conjecture. Thus, each should be

14   overruled.

15         First, individual class member Israel Elizondo, in addition to submitting a claim form,

16   objects that it is "unfair" that if the aggregate claims exceed the fund, payments to class members

17   will be reduced *pro rata*. Dkt. 102. A *pro rata* share, however, is a common and accepted manner of

18   dividing limited funds among claimants.[1] Mr. Elizondo also objects that any fee awarded is to come

19   from the settlement fund. As described in Plaintiffs' fee motion, however, there is ample authority

20   and precedent that fees may be awarded as a portion of a settlement fund created through the effort

21   of Class Counsel. *See, e.g.*, Dkt. 93 at 7-10. Accordingly, Mr. Elizondo's objections should be

22   summarily denied.[2]

23   ---

     [1]  *See, e.g.*, *Ferrero*, 2012 U.S. Dist. LEXIS 94900, at *12 (approving settlement where "[t]he

24   specific amount [class members can receive by making claims against a common fund] depends on a
     number of factors, including the number of claimants, the number of jars claimed by claimants, and

25   the cost of administering the settlement"); *Hartless v. Clorox Co.*, 273 F.R.D. 630, 635 (S.D. Cal.
     Jan. 20, 2011) (approving settlement providing that if claims exceeded $8 million settlement fund,

26   approved claims would be reduced pro rata), *aff'd* Nos. 11-55136, 11-55150, 11-55189, 2012 U.S.
     App. LEXIS 10539 (9th Cir. May 24, 2012).

27
     [2]  Because Mr. Elizondo's objections are minimal and conclusory, the parties do not further address

28   them herein. *See In re TD Ameritrade Account Holder Litig.*, Nos. C 07-2852, 07-4903, 2011 U.S.

1     Second, Maria Carapia and David Johnson (the "Carapia Objectors") filed an untimely

2  objection on August 3, 2012.[3] Dkt. No. 97. The Carapia Objectors challenge the Notice; Class

3  Counsel's fee motion; the timing of the injunctive relief; and the requirements for objecting set forth

4  in the Settlement Agreement and Preliminary Approval Order. *See* Dkt. 97 at 2. While the objection

5  should be denied as untimely, the parties respond below to the issues raised therein.

6     Third, a group of six class members[4] (the "NTG Objectors") filed an objection through their

7  common counsel, the Newport Trial Group ("NTG"). Dkt. 96. "Objections purportedly filed on

8  behalf of groups of persons are prohibited and will be deemed void." PA Order ¶ 20. The NTG

9  Objectors challenge the adequacy of the $5 million monetary fund and injunctive relief; the Notice

10  Plan; the Class Release; and the satisfaction of the Rule 23 elements for the Settlement Class. *See*

11  Dkt. 96 at 1-3. While this objection should be denied as an improper group objection, the issues it

12  raises are also meritless.

13     Accordingly, the Court should, respectfully, overrule each objection, grant Final Approval to

14  the Settlement Agreement, and grant Plaintiffs' fee motion.

15                   **PROCEDURAL AND FACTUAL BACKGROUND**

16     The issues raised by the three groups of objectors are not novel and indeed typical for these

17  types of class action settlements; however, the parties wish to present some history and background

18  that can hopefully shed some light on the unfortunate tone one group has adopted in its objection in

19  an effort to thwart the settlement. *See also* App. A, *infra*.

20     NTG has been pursuing litigation against Boiron since August 31, 2010, when it filed a

21  California-only class action suit against Boiron for Children's Coldcalm. *Delarosa v. Boiron, Inc.*,

22

23  Dist. LEXIS 103222, at *31-40 (N.D. Cal. Sept. 12, 2011) (overruling terms and conclusory
objections that provide "no substantive grounds for objecting").

24  [3] The Preliminary Approval Order provided that "[a]ll objections must be filed with the Clerk . . . no

25  later than [the] Opt Out and Objection Deadline" (PA Order ¶ 25), which was "thirty (30) days

26  before the Final Approval Hearing Date" (*id.* ¶ 18). Because the Final Approval Hearing was set for
August 27, 2012 (Dkt. No. 91), objections must have been filed by July 27. *See* Fed. R. Civ. P.

27  6(a)(1) & (5).

28  [4] Henry Gonzales, Monica Fernandez, Eleanor Lanigan, Michael Martinez, Glenna O'Dell, and
Gemis Rangel are all named plaintiffs in other actions pending against Boiron.

No. 10-cv-1569-JST-CW (C.D. Cal. removed Oct. 14, 2010). Unsuccessful in obtaining a settlement in that case, NTG has persisted in filing case after case against Boiron, in multiple jurisdictions, in order to obtain resolution. Indeed, on June 6, 2011, NTG e-mailed a settlement offer prior to the *Delarosa* court's decision on Boiron's pending motion for judgment on the pleadings, promising that, if Boiron lost the motion, "it [would] likely generate a veritable flood of similar claims against your client relating to other homeopathic products, both in California and in other states." Decl. of Christina Sarchio in Support of Defs.' Mem. in Support of Pls.' Mot. for Final Approval ("Sarchio Decl."), Ex. F. When Boiron did not accept NTG's settlement offer, NTG filed a California-only class action suit against Boiron for its flagship product, Oscillococcinum. *Gonzales v. Boiron, Inc.*, No. 11-cv-2066-JAH-NLS (S.D. Cal. removed Sept. 7, 2011), Dkt. 1 & Ex. 2.

On August 16, 2011, NTG offered to settle *Gonzales*, explaining that "we would be amenable to extending the settlement to cover all Boiron homeopathic remedies sold during the applicable class periods," and "[t]o the extent that Boiron wants to obtain a nationwide release instead of a California-only settlement, we would be amenable to that." Sarchio Decl., Ex. G. That same day, and again on August 18, 2011, NTG represented that it was "aware of several settlements that cover a range of products, so long as the products contain a common nucleus – which, in this case, would be labeling claims based upon homeopathic principals," and provided examples of such settlements. *Id.* at Ex. H.

On August 25, 2011, NTG followed up with Boiron's counsel regarding a potential settlement. *Id.* at Ex. I. That email did not discuss relief for the class, but requested $8 million in attorneys' fees:

> The fee figure that would ultimately be negotiated after the resolution of all other settlement items would likely be impacted by a few factors, including: (1) the additional work expected to get through any objections to final approval; (2) the scope and breath of the release provided; (3) the calculable benefit to the class; and (4) dealing with late "interloper" class counsel. With the caveat that those items could impact the final number, I think the fee/costs should come in around $8M.

*Id.* After Boiron's counsel balked at such a high attorneys' fee request, NTG responded:

> The $8M estimate was (and is) based upon a potential nationwide settlement of all Boiron homeopathic products, not just Children's Coldcalm (or Coldcalm). If we were to end up settling only the Children's Coldcalm or Coldcalm cases, I understand that the variable underlying that settlement would be different.

1    It might be productive if we try to wrap our hands around the key terms of any
     settlement and, if and when we can agree to the issues, to revisit this.

2    *Id.* at Ex. J.

3        On September 2, 2011, Plaintiff Salvatore Gallucci filed a nationwide class action suit

4    against Boiron in connection with its homeopathic drugs, Oscillococcinum and Children's

5    Oscillococcinum. Dkt. 1. The *Gallucci* parties subsequently engaged the Honorable Leo S. Papas

6    (Ret.) of Judicate West to conduct formal mediation, which began with the first settlement

7    conference on September 21, 2011. Dkt. 64-2 at ¶ 7.

8        Before the mediation, NTG was informed of the parties' settlement discussions and invited

9    to participate. Indeed, in an email from NTG's Scott Ferrell to Boiron's counsel, Christina Sarchio,

10   on September 16, 2011, Mr. Ferrell wrote:

11       "Ron Marron advised us yesterday that you guys have reached out to him about
         mediation and exchanged names of mediators at Judicate West in San Diego."
12

13   Sarchio Decl., Ex. K; *see also id.* at L (another email from S. Ferrell to C. Sarchio dated September

14   16, 2011) ("Ronald Marron advised us yesterday and again today that he has been in fairly detailed,

15   classwide mediation discussions with you, and that you have gone so far as to exchange a list of

16   proposed class mediators at Judicate West in San Diego.").

17       Although NTG was invited to participate, it declined until the issue of lead counsel—and

18   thus who would recover attorneys' fees—was decided. *Id.* ("[I]t may be premature to mediate until

19   we have a determination of lead counsel in the Oscillo case."). Nevertheless, on September 27,

20   2011, NTG proposed its own mediation in *Delarosa*, Dkts. 43-4 & 43-5, after which a formal

21   mediation session was held on November 4, 2011. Sarchio Decl. ¶ 15 & Ex. M. That session was

22   terminated after less than three hours when it became clear to Boiron that it was not being conducted

23   in good faith. *Id.* at ¶ 15. Boiron did not engage in mediation with NTG in *Delarosa*, *Gonzales*, or

24   any of the other cases NTG subsequently filed before the *Gallucci* parties reached the Settlement

25   Agreement. *Id.*.

26       In contrast, negotiations in *Gallucci* continued to progress. During this time, the parties

27   engaged in extensive discovery, with Boiron producing over 400,000 pages of documents. Sarchio

28   Decl. ¶ 27. On November 16, 2011, at an in-person mediation session with Judge Papas, the parties

1  reached an initial memorandum of understanding ("MOU"), subject to further negotiation on certain

2  key terms. Dkt. 44-1 at Ex. 1. In particular, the MOU contemplated a global settlement for all of

3  Boiron's products: "The parties agree to work in good faith to make all reasonable efforts necessary

4  for the inclusion in the settlement of additional products beyond those challenged in the Complaint."

5  *Id.* at 2. The MOU also was contingent upon the approval of Boiron's Board of Directors:

6  "Defendants will have an option to withdraw from the settlement entirely if the formal settlement

7  agreement is not approved by the Defendants' Board of Directors." *Id.* at 1. Judge Papas certified

8  that the MOU was not the result of collusion, stating that:

> The proposed settlement reflected in this Memorandum of Understanding (MOU)
> is the product of a mediation process which the undersigned believes was
> conducted in an arms length, freely and independently negotiated manner between
> the parties.

9

10

11

12  *Id.* at 3.

13       The parties made their MOU public on November 18, 2011. Dkt. 28. In response, NTG

14  threatened that, if the parties did not cooperate with NTG, this would "<u>damage</u>" their counsel. Dkt.

15  43-6 (emphasis added). NTG filed a motion to intervene in *Gallucci* to stop settlement proceedings,

16  which the Court denied. Dkts. 38, 88. Afterwards, NTG and affiliated counsel filed a series of

17  lawsuits against Boiron, some with dubious clients, *see* Sarchio Decl. ¶¶ 16-22 & Ex. N: (1)

18  *Fernandez v. Boiron, Inc.*, No. SACV 11-1867-JST (CWx) (C.D. Cal. filed Dec. 2, 2011); (2) *Bohn*

19  *v. Boiron, Inc.*, No. 1:11-cv-80704 (N.D. Ill. filed Dec. 7, 2011); (3) *Jovel v. Boiron, Inc.*, No.

20  CV11-10803 (SVW) (SHx) (C.D. Cal. filed Dec. 29, 2011); and (4) *Farley v. Boiron, Inc.*, No RIC

21  1202159 (Riverside Cnty. Sup. Ct. Cal. filed Feb. 14, 2012). Although some of these lawsuits list

22  other counsel of record, NTG is the driving force behind all of them. Sarchio Decl. ¶¶ 18-22.

23       While NTG was making good on its threat to make life difficult for Boiron, *Gallucci* counsel

24  continued to negotiate a settlement in good faith in the best interest of the Class. Although Boiron's

25  Board of Directors did not approve the settlement embodied in the MOU, the parties continued to

26  negotiate with the assistance of Judge Papas. Declaration of Mark Land in Support of Defs.' Mem.

27  in Support of Pls.' Mot. for Final Approval ("Land Decl.") ¶ 13. Under his guiding hand, over 13

28  joint and individual sessions, five after the MOU was signed in November, the parties reached a

1   Settlement Agreement providing significant monetary and injunctive relief. Sarchio Decl. ¶ 27.

2          On March 6, 2012, the parties fully executed the Settlement and moved for preliminary

3   approval. Dkts. 64, 64-2. <u>Just 37 minutes later</u>, NTG notified counsel that it would move to strike

4   the Settlement. Dkt. 72-10. On March 8, 2012, NTG filed, in Mr. Gonzales's name, an *ex parte*

5   motion to strike the Settlement. Dkt. 72. Later, on April 16, 2012, NTG filed, again in Mr.

6   Gonzales's name, an "opposition" to the motion for preliminary approval. Dkt. 85.

7          On April 25, 2012, this Court preliminarily approved the Settlement and scheduled the final

8   approval hearing.[5] Dkt. 89. At his April 27, 2012 deposition, however, NTG Objector Henry

9   Gonzales testified that he did not even know about the *Gallucci* Settlement, even though the motion

10  to strike and opposition to the motion for preliminary had been filed in his name.

11          Q. Are you aware that Boiron had entered into a settlement in another
12          lawsuit regarding the Oscillo product?

13          A: No.

14  Sarchio Decl., Ex. O, Dep. Tr. of Henry Gonzales at 78:10-13. Indeed, Mr. Gonzales testified that he

15  would be happy if he got his money back via the *Gallucci* Settlement—which he will if it is finally

16  approved:

17          Q:      Is there anything else you want from Boiron besides money?

18          A:      No.

19                          *              *              *

20          Q:      So  as  long  as  you're  getting  the  money  back  through  the

21  _____

22  [5] After this Court preliminarily approved the Settlement, Boiron moved to stay all pending cases
    impacted by the *Gallucci* Settlement, including *Fernandez*. *Fernandez* Dkt. 46. In opposition, NTG
23  made spurious and unfounded attacks upon Boiron and the Settlement. *See generally Fernandez*
    Dkt. 59. Because the propriety of the *Gallucci* Settlement was not properly before the *Fernandez*
24  court, Boiron elected not to respond in kind to those attacks. *See generally id.* Plaintiffs were not
    parties to the *Fernandez* action and could not file a response. Although all courts granted Boiron's
25  requests to stay (*Jovel* Dkts. 29, 31; *Bohn* Dkt. 29; *Farley* Dkts. 5, 10; *Gonzales* Dkt. 63), the
    *Fernandez* court, when doing so, assumed NTG's baseless accusations to be true and in *dicta* based
26  certain findings on those accusations. *Fernandez* Dkt. 66. As the *Fernandez* court correctly
    acknowledged, however, "the ultimate fairness of the Settlement Agreement is a question for [this
27  Court]." *Id.* at 4. And unlike the *Fernandez* court who did not have the benefit of the entire story,
    Boiron here takes the opportunity to set the record straight.
28

1    settlement, you're happy. Right? . . . .

2        A:    Yes.

3  *Id.* at 73:4-6, 89:9-14.

4                          **ARGUMENT**

5  **I.    STANDARD OF REVIEW**

6        "[I]n order to block a fairly negotiated settlement, the merits of the objections must be

7  substantial." *White v. Experian Info. Solutions, Inc.*, 803 F. Supp. 2d 1086, 1100 (C.D. Cal. 2011).

8  **II.    THE SETTLEMENT RESULTED FROM ARMS-LENGTH NEGOTIATION**

9        "[T]he courts respect the integrity of counsel and presume the absence of fraud or collusion

10 in negotiating the settlement, unless evidence to the contrary is offered." *Hemphill v. San Diego*

11 *Ass'n of Realtors, Inc.*, 225 F.R.D. 616, 621 (S.D. Cal. 2005) (quoting A. Conte and H. Newberg,

12 NEWBERG ON CLASS ACTIONS § 11:51 (4th ed. 2002)); *see also IUE-CWA v. Gen. Motors Corp.*, 238

13 F.R.D. 583, 598 (E.D. Mich. Nov. 1, 2006) ("Courts presume the absence of fraud or collusion

14 unless there is evidence to the contrary.").

15        The NTG Objectors' assertion that the Settlement resulted from a collusive reverse auction is

16 unsupported by any evidence and contradicted by the record. The record actually reflects that the

17 parties conducted more than six months of intense negotiations, and at least 13 mediation sessions,

18 with an experienced jurist, the Honorable Leo Papas. It is misplaced advocacy for any objector to

19 suggest that Judge Papas would tolerate, let alone participate in, collusive activity. Rather, the

20 Settlement was the result of extensive, arms-length, and non-collusive negotiations.

21        That this case settled while *Gonzales* was pending is insufficient evidence of a reverse

22 auction. *See Negrete v. Allianz Life Ins. Co. of N. Am.*, 523 F.3d 1091, 1099–1100 (9th Cir. 2008)

23 ("[I]f [plaintiff's] argument were accepted, the 'reverse auction argument would lead to the

24 conclusion that no settlement could ever occur in the circumstances of parallel or multiple class

25 actions-none of the competing cases could settle without being accused by another of participating

26 in a collusive reverse auction.'" (quoting *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180,

27 1189 (10th Cir. 2002))); *Cohorst v. BRE Props., Inc.*, No. 10-CV-2666-JM-BGS, 2011 WL

28 3489781, at *8 (S.D. Cal. July 19, 2011) ("The fact that a class action has settled while a parallel

1   class action is pending in of itself is insufficient to support a conclusion that a reverse auction took

2   place."); *Larson v. Sprint Nextel Corp.*, No. 07-5325 (JLL), 2010 WL 234934, at *13 (D.N.J. Jan.

3   15, 2010), *aff'd in relevant part sub nom. Larson v. AT&T Mobility LLC*, ---F.3d---, Nos. 10–1285,

4   10–1477, 10–1486, 10–1587, 2012 WL 2478376, at *6 n.18 (3d Cir. June 29, 2012). And NTG has

5   never explained how this case could be a reverse auction situation when it was invited to participate

6   in settlement discussions, but declined.[6] Moreover, the law does not consider as collusive the mere

7   fact that a defendant engages in discussions with distinct counsel at the same time. *See Larson*, 2010

8   WL 234934, at *13 (finding no collusion where, "[a]side from the mere overlap of time between

9   when counsel for [objector] and Class Counsel were apparently negotiating with [defendant], the

10  Court has been presented with no evidence of collusiveness").

11       Faced with these facts, the NTG Objectors respond with misrepresentations and unsupported

12  suppositions. For example, Boiron did not "secretly attend[] dueling mediations." Dkt. 96 at 8.

13  Rather—as NTG's own emails irrefutably demonstrate—NTG was well aware that Boiron was

14  ─────────────────────

15  [6] NTG also misstates that it was in a better position to represent the class than Class Counsel.
    Although NTG states that it was "successfully litigating the *Delarosa* action" at the time, Dkt. 96 at

16  8, NTG had not then—or now—actually obtained "success" in the two years it has been litigating
    *Delarosa*, and it may never. Boiron withdrew its offer of judgment made several months ago,

17  motions for summary judgment are currently pending, and the court has scheduled the case for trial
    at the end of October 2012. Sarchio Decl. ¶ 25. Moreover, the *Delarosa* court had expressed

18  concerns with NTG's abilities to manage the substantive legal issues involved there—a much
    smaller case:

19
        [T]he Court notes that this action concerns novel legal theories in a specialized
20      area of law, and some of Plaintiff's arguments suggest that counsel lacks either
        the expertise necessary to effectively litigate in this field or the resources to
21      research, learn, and present to this Court arguments in this area of law that will
        adequately represent the interest of the class.

22  *Delorosa v. Boiron, Inc.*, 275 F.R.D. 582, 590 n.4 (C.D. Cal. 2011). Further, although Rule 23(g)(4)

23  requires that "[c]lass counsel must fairly and adequately represent the interests of the class," NTG
    demonstrated that it was pursuing its own interests before and above the class. "Attorneys fees are

24  subsidiary to the issue of settlement and should be considered subsequent to reaching a tentative
    settlement by the parties." *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 398 (C.D. Cal. 2007)

25  (internal quotation marks omitted); *see also* Federal Judicial Center, MANUAL FOR COMPLEX

26  LITIGATION FOURTH § 21.7 (2004) ("[T]he simultaneous negotiation of class relief and attorney fees
    creates a potential conflict."); 5 NEWBERG ON CLASS ACTIONS § 15:34 ("To avoid unfortunate

27  appearances, fee agreements should not be discussed until the parties have agreed on the terms of the
    settlement."). NTG, however, expressly sought to negotiate the attorneys' fees it would obtain in a

28  settlement <u>before</u> even discussing the relief the class would obtain. Sarchio Decl., Exs I & J.

─────────────────────

1   engaging in mediation discussions with Mr. Gallucci's counsel. Sarchio Decl., Exs. K & L. Indeed,

2   NTG was invited to participate, but declined until the issue of lead counsel was resolved. *Id.* at Ex.

3   L. Similarly, NTG's representation that Boiron's counsel stated that "Boiron intended to settle all of

4   the Oscillo litigation with whichever plaintiff's lawyer gives them the broadest release for the least

5   money," Dkt. 96-1 at ¶ 7, is simply untrue. Sarchio Decl. ¶ 28. Albeit not surprising given NTG's

6   sharp tactics,[7] this representation is directly contradicted by NTG's assertions elsewhere that it

7   supposedly did not even know that Boiron was discussing settlement with *Gallucci*'s counsel. Dkt.

8   96-1 at ¶ 9.

9        The NTG Objectors further accuse the *Gallucci* parties of making "false and misleading"

10  representations because the Settlement differs from the MOU. Dkt. 96 at 9. It is well-established,

11  however, that "[t]he making of a contract may . . . be conditioned upon the act or agreement of a

12  third person so that the contract does not come into being or is unenforceable until the third party so

13  acts or consents." 13 Richard A. Lord, WILLISTON ON CONTRACTS § 38:2 (4th ed. 2012). Here, a

14  final settlement agreement embodying the terms of the MOU was conditioned upon the approval of

15  Boiron's Board of Directors, Dkt. 44-1 at 1, which did not occur. *See Kadner v. Shields*, 20 Cal.

16  App. 3d 251, 258 (1971) ("If the condition is not fulfilled, the right to enforce the contract does not

17  evolve."). That is why the *Gallucci* parties had to continue to negotiate until a final settlement could

18  be reached, which took several more months and culminated in the agreement before the Court.

19       Further, the NTG Objectors' assertion that, because the final Settlement Agreement did not

20  embody the exact terms of the initial MOU the parties must have colluded, is disingenuous. In

21  opposition to the parties' application to stay *Gonzales* based on the MOU, Mr. Gonzales argued:

---

[7] In *Doe v. Los Angeles W. Travelodge*, Judge Marshall, "having never before seen such deterioration in professional conduct," disciplined Scott Ferrell for acting in bad faith, sending inappropriate communications, and wasting the court's time and resources. No. CV 08-8279 CBM (CTx), 2009 WL 5227898, at *6-7 (C.D. Cal. Nov. 19, 2009). Mr. Ferrell is also the subject of an extortion and racketeering action stemming from his allegedly abusive use of demand letters under the California Consumer Legal Remedies Act, California Civil Code §§ 1750, *et seq. Metabolic Research, Inc. v. Ferrell*, No. 2:09-cv-02453-JCM-PAL (D. Nev. removed on Dec. 30, 2009); *see also Metabolic Research, Inc. v. Ferrell*, --- F.3d ---, No. 10–16209, 2012 WL 2215834, at *2 (9th Cir. June 18, 2012) (*aff'g Metabolic Research, Inc. v. Ferrell*, 2009 WL 5227898, at *6-7 (C.D. Cal. Nov. 19, 2009)). *See also generally* Dkt. No. 73 at 8-10 (collecting examples of NTG's misrepresentations to the Court and parties).

> If anything, the Application shows that the relief sought is premature because there is no executed settlement agreement. . . . <u>Indeed, it is not uncommon for parties in litigation to be near settlement and for no agreement to be actually reached.</u>

*Gonzales* Dkt. 31 at 14 (emphasis added). Thus, Mr. Gonzales and NTG recognize that the problem the *Gallucci* parties encountered following execution of the MOU is a common one.

Ultimately, the only actual, demonstrable **<u>fact</u>** before this Court is this: The parties reached the Settlement after six months of negotiations and with at least 13 mediation sessions with Judge Papas. This fact—the only established fact—demonstrates that this Settlement was not collusive. *See, e.g.*, *Clesceri v. Beach City Investigations & Protective Svcs., Inc.*, No. CV-10-3873-JST (RZx), 2011 WL 320998, at *10 (C.D. Cal. Jan. 27, 2011) ("The assistance of an experienced mediator in the settlement process confirms that the settlement is non-collusive." (quoting *Carter v. Anderson Merch., LP*, Nos. EDCV 08-0025-VAP (OPx), EDCV 09-0216-VAP (OPx), 2010 WL 1946784, at *3 (C.D. Cal. May 11, 2010))); *Adams v. Inter-Con Sec. Sys., Inc.*, No. C-06-5428 MHP, 2007 WL 3225466, at *3 (N.D. Cal. Oct. 30, 2007) (same); *Hainey v. Parrot*, 617 F. Supp. 2d 668, 673 (S.D. Ohio 2007) ("The participation of an independent mediator in the settlement negotiations virtually assures that the negotiations were conducted at arm's length and without collusion between the parties."); *In re Indep. Energy Holdings PLC*, No. 00 Civ. 6689(SAS), 2003 WL 22244676, at *4 (S.D.N.Y. Sept. 29, 2003) ("[T]he fact that the settlement was reached after exhaustive arm's length negotiations, with the assistance of a private mediator experienced in complex litigation, is further proof that it is fair and reasonable.").

As this Court is aware, Judge Papas is a highly respected mediator and former jurist, known for his integrity and thoroughness. Unlike NTG, he was privy to, and participated in, the parties' negotiations. And with his multiple years of experience on the bench and as a mediator in complex cases, Judge Papas certified that the parties negotiated at arms-length. Dkt. 44-1 at Ex. 1 at 3. After Boiron's Board did not approve all of the parties' initial terms, Judge Papas conducted an additional five mediation sessions to help craft the Settlement Agreement. The unsupported suggestion that the extensive and protracted mediation that Judge Papas conducted between the parties was somehow collusive thus is without merit.

III.    THE  SETTLEMENT'S  MONETARY  RELIEF  IS  FAIR,  REASONABLE,  AND
ADEQUATE

The NTG Objectors attack the $5 million settlement fund as providing insufficient relief to the Class in relation to the sales potentially at issue. Dkt. 96 at 10-12. It is inappropriate, however, to ask the Court "to determine whether a better settlement might have been negotiated." *Boyd v. Bechtel Corp.*, 485 F. Supp. 610, 617 (N.D. Cal. 1979). The issue "is not whether the settlement could be better, but whether it is fair, reasonable, adequate and free from collusion." *Frame v. Hillman*, No. 01-CV-2193 H(LAB), 2002 WL 34520817, at *5 (S.D. Cal. July 31, 2002). Ultimately, a settlement is a compromise and, as such, the fairness determination is "nothing more than an amalgam of delicate balancing, gross approximations and rough justice." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982) (citation and internal quotation marks omitted).

A.    Defendants' Revenue Is Not the Determining Factor for Adequacy

The NTG Objectors focus on Boiron's sales, ignoring the other factors that informed this Settlement. "In reality, parties, counsel, mediators, and district judges naturally arrive at a reasonable range for settlement by considering the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to present value." *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 965 (9th Cir. 2009) (citing MANUAL FOR COMPLEX LITIGATION § 21.62).

Considering the potential recovery apart from the other relevant factors not only fails to recognize that all circumstances must be considered together, but also ignores the fact that, as litigation progresses, the costs and expenses increase, thus decreasing funds available to compensate class members. Further, Class Counsel did consider the actual amount of Boiron's relevant sales during the period at issue in conjunction with the other relevant factors, such as risk, complexity, expense of additional litigation, and strength of each parties' claims/defenses.[8] Such balancing includes, for example, Class Counsel's consideration that, while there were sales outside the statutory period more than the $65.5 million that Boiron's CEO, Janick Boudazin, estimates for the relevant time period, the chances of obtaining relief for them was significantly lower because of the

---

[8] Factual support of those factors is contained in Plaintiffs' Motion for Final Approval, filed concurrently herewith, and will not be repeated in full here.

1  applicable three- and four-year statutes of limitations under the FAL, CLRA and UCL. The myopic

2  view that sales are the sole factor class counsel should consider when negotiating a settlement is not

3  the applicable legal standard. *See*, *e.g.*, *id.* at 965.[9]

4       Solely considering monetary relief, the $5 million fund is within the range of settlement of

5  similar cases involving similar numbers of class members, and will provide relief of up to $100.00

6  per class member household, well above the average monetary relief in most class action cases. In

7  the two recent related cases against Ferrero alleging the false advertising of Nutella, for example,

8  two federal courts approved settlements providing injunctive relief in the form of labeling changes,

9  and a $3,050,000 total common fund for claims by consumers nationwide. *See In re Ferrero Litig.*,

10  2012 U.S. Dist. LEXIS 94900; *In re Nutella Mktg. & Sales Practices Litig.*, No. 3:11-cv-01086, Dkt.

11  104, slip. op. (D.N.J. July 31, 2012) (attached as Dkt. 105-1 at Ex. 1). This fund was to address over

12  $213 million in sales, *see In re Ferrero Litig.*, 278 F.R.D. 552, 558 (S.D. Cal. 2011), representing

13  about 1.4% of sales. *See also, e.g.*, *Cohorst v. BRE Props., Inc.*, 10cv2666 JM(BGS), 2011 WL

14  3475274, at *3 (S.D. Cal. Aug. 5, 2011) (approving $5.5 million relief fund for 12-state class); *Brent

15  v. Midland Funding, LLC*, No. 3:11 CV 1332, 2011 WL 3862363, at *5-6 (N.D. Ohio Sept. 1, 2011)

16  (approving $5.2 million common fund to class of 1.4 million potential members). Claimants could

17  receive up to $20.

18       Even if it were true that the monetary relief is less than what most Class members could hope

19  to achieve at trial, which Plaintiffs believe is untrue since the Settlement provides up to $100 per

20  Class member household, "[i]t is well-settled law that a cash settlement amounting to only a fraction

21  of the potential recovery will not per se render the settlement inadequate or unfair." *Officers for

22  Justice*, 688 F .2d at 628 (internal citation omitted); *see also Jaffe v. Morgan Stanley & Co.*, No. C

23

---

24  [9] Citing *People ex rel. Dept. of Transp. v. Clauser/Wells P'ship*, 95 Cal. App. 4th 1066 (2002), the
     NTG Objectors assert that "determining the sufficiency of the common fund requires that the value

25  of the Settlement Agreement be compared to the amount of commerce involved in the case." Dkt. 96

26  at 10. But *Clauser/Wells* is an inapt eminent domain decision regarding just compensation for a
     taking, with no relation to determining the adequacy, reasonableness and fairness of a class action

27  settlement. *See id.* at 1069, 1072. Moreover, even if it were relevant, the *Clauser/Wells* decision
     speaks of the "value of the Settlement Agreement . . . compared to the amount of commerce," not

28  just the monetary component alone, which is the comparison the NTG Objectors advocate.

06-3903 TEH, 2008 WL 346417, at *9 (N.D. Cal. Feb. 7, 2008) ("[A] sizeable discount is to be expected in exchange for avoiding the uncertainties, risks, and costs that come with litigating a case to trial."). Moreover, it is "the settlement taken as a whole, rather than the individual component parts, that must be examined for overall fairness." *Rodriguez*, 563 F.3d at 964 (internal quotation marks omitted).

The injunctive relief consists of two package disclaimers (one relating to dilution, the second to lack of FDA review and approval), and mandatory web pages that describe the dilution levels of the ingredients in the Products, in a language understandable to ordinary consumers. This achieves what public interest groups have been unable to achieve since 1994 (Decl. of Ronald Marron in Supp. of Pls.' Mot. for Final Approval [Dkt. 105-1] ¶ 13(a) & Ex. 2; Dkt. 93-1, Exs. 1-2), and what Objectors' counsel, NTG, has been unable to achieve in its client's lawsuit pending in *Delarosa*.

**B.     The Court Should Only Consider the Amount Plaintiffs Could Have Recovered at Trial, not Boiron's Revenues During the Class Period**

First, considering all of Boiron's sales during the Class Period applies the wrong standard. Rather, the Court should only consider what Plaintiffs might have achieved <u>at trial</u>. *See* Cal. Civ. Code § 1783 (CLRA has a 3-year statute of limitations); Cal. Bus. & Prof. Code § 17208 (UCL/FAL have 4-year statute of limitations); *Rodriguez*, 563 F.3d at 965 (a reasonable settlement considers "the likelihood of a plaintiffs' or defense verdict, the potential recovery, and the chances of obtaining it, discounted to present value"); *Farinella v. Paypal, Inc.*, 611 F. Supp. 2d 250, 268 (E.D.N.Y. 2009). Second, in Boiron's Memorandum in Support of Plaintiffs' Motion for Final Approval ("Memorandum in Support," [Dkt. 106]), which is hereby incorporated by reference, Boiron demonstrates why this number may be substantially less than its total sales.

**C.     The Amount of the Settlement is Adequate, Fair, and Reasonable**

The NTG Objectors assert that the monetary component is inadequate in light of the strength of Plaintiffs' case because "Plaintiffs' claims were primed for class certification" and "unlikely to be dismissed." Dkt. 96 at 11. But this is speculation and, if final approval is not granted, Boiron will continue to pursue the two motions to dismiss it originally filed, but voluntarily withdrew, once it perceived that a non-litigious resolution was possible. Plaintiffs and Boiron would also likely move

for summary judgment. Further, since *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012), was decided, it has become difficult to achieve certification of a nationwide class outside of settlement classes. *See, e.g.*, *Kowalsky v. Hewlett-Packard Co.*, No. 5:10-cv-02176-LHK, 2012 U.S. Dist. LEXIS 34597, at *1 (N.D. Cal. Mar. 14, 2012) (applying *Mazza* and denying motion to certify nationwide class); *Gianino v. Alacer*, No. SACV 09-01247-CJC(RNBx), 2012 U.S. Dist. LEXIS 32261 (C.D. Cal. Feb. 27, 2012) (same); *Horvath v. LG Elecs. Mobilecomm U.S.A., Inc.*, No. 3:11-CV-01576-H-RBB, 2012 US. Dist. LEXIS 19215, at *10 (S.D. Cal. Feb. 13, 2012) (same and dismissing case); *Rikos v. Procter & Gamble Co.*, No. 1:11-cv-226, 2012 U.S. Dist. LEXIS 25104, at *3-4 (S.D. Ohio Feb. 28, 2012) (same). The NTG Objectors have no basis to claim that class certification, which exists now as to a nationwide class, would easily be met if this case were litigated; or that a motion to dismiss is unlikely to be granted. Rather, case law guides the parties to consider the risk of litigation, instead of airily presuming that litigation poses no risk whatsoever. *Rodriguez*, 563 F.3d at 965.

The NTG Objectors next assert that the $5 million fund is inadequate because it is purportedly less than the uncapped fund the parties originally contemplated. Dkt. 96 at 12. The MOU, however, contemplated a settlement as to all of Boiron's Products, full refunds for the Class, and injunctive relief, subject to Boiron's Board of Directors' approval, Dkt. 44-1, which was ultimately not forthcoming. Land Decl. ¶ 13. Thus, the parties renegotiated an agreement that achieves exactly what the original MOU sought: full refunds based on the same sales figures, but this time with a quantified fund sufficient to cover the expected number of claims that would arise. Further, the Settlement Agreement will provide up to $100 per class member household with proof of purchase, and up to $50 per household with a claim form signature under penalty of perjury. It is a misguided assertion that this does not provide full refunds for most class members, when the Products sell for approximately $10 each. This includes the NTG Objectors.[10]

---

[10] Gonzales attests to a single Oscillo purchase, Dkt. 96-4; Fernandez to a single Chestal purchase, Dkt. 96-5; Lanigan to a single ColdCalm purchase, Dkt. 96-6; Martinez to a single, $7 Arnicare Arthritis purchase, Dkt. 96-7; O'Dell to a single, $10 ColdCalm purchase, Dkt. 96-8; and Rangel to a single $10 Quietude purchase, Dkt. 96-9. Each class member that submits a claim will be refunded

1    In truth, the capped settlement fund may ultimately provide the class members who submit

2    claims more relief than the initial uncapped fund. If the total claims do not exceed the fund less any

3    deducted costs, the surplus is divided equally among claimants and the *cy pres* beneficiary.

4    Settlement Agreement ¶ 4.3.5. With an uncapped fund, these class members would receive the same

5    refund, but would not have had potential eligibility for a supplemental distribution, if necessary.

6    There is a substantial possibility that the claims will not exceed the fund such that the class will

7    ultimately benefit by a larger total Boiron payout than if it agreed to an uncapped fund. Subtracting

8    the costs of administration and notice, and assuming the requested attorney's fees, expenses, and

9    incentive are granted, over $3.2 million will remain in the fund. Since claims can range from $10 to

10   $100, the fund would therefore cover at least 32,000, and up to 320,000 class members. Since the

11   usual claims rate in consumer class action cases is low, this fund may not be exhausted and thus

12   claimants may receive a supplemental distribution.

13       Finally, the Settlement Agreement provides relief in proportion to class members' injury.

14   Thus, class members, like the NTG Objectors, who only purchased a Boiron product on one

15   occasion, will receive a full $10 refund, while even repeat purchasers will be reimbursed the same

16   amount for up to 10 purchases. The payments of up to $100 with proof of purchase, and up to $50

17   without proof of purchase are therefore an excellent return for the Class, and well above that

18   approved in recent settlements in other class action cases.[11]

19   *///*

20

21   the full amount of his or her claim, exactly what Mr. Gonzales testified would satisfy him. Sarchio
     Decl., Ex. O.

22   [11] *See*, *e.g.*, *In re Merrill Lynch Tyco Research Sec. Litig.*, 249 F.R.D. 124 (S.D.N.Y. 2008)

23   (approving 4% recovery); *In re Cendant Corp. Derivative Action Litig.*, 232 F. Supp. 2d 327, 336
     (D.N.J. 2002) (less than 2%); *Farinella v. Paypal, Inc.*, 611 F. Supp. 2d 250 (E.D.N.Y. 2009)

24   (approving settlement fund of $3.5 million for a class of 2.2 million where damages could exceed
     $375 million covering a class period that started in 2000) *In re Ferrero Litig.*, 2012 U.S. Dist.

25   LEXIS 94900 and *In re Nutella Mktg. & Sales Practices Litig.*, No. 3:11-cv-01086 (D.N.J. July 31,
     2012) (attached to Dkt. 105-1 as Ex. 1) (approving slightly more than $3 million in relief for class,

26   based on estimated $213 million in sales, or roughly 1.4% of sales); *Weeks v. Kellogg Co.*, 2012 U.S.

27   Dist. LEXIS 155472, at *52-55 (C.D. Cal. Nov. 23, 2011) (approving settlement providing $2.5
     million in cash refunds for class of hundreds of thousands of cereal purchasers, plus injunctive and

28   cy pres relief).

IV.    **THE SETTLEMENT'S INJUNCTIVE RELIEF IS BENEFICIAL AND SUFFICIENT[12]**

NTG Objectors also assert that the Settlement's injunctive relief is in adequate because (i) it does not require Boiron to reformulate or stop selling its products, (ii) it does not, supposedly, eliminate the alleged misrepresentations, and (iii) the Settlement only requires labeling modifications after all appeals exhausted and the judgment final. Dkt. 96 at 13.

A.    **The Appropriate Remedy for an Allegedly Misleading Label is a Disclaimer**

NTG Objectors argue that the Settlement provides the class with inadequate injunctive relief because it does not require Boiron to stop selling or reformulate its products. Dkt. 96 at 13. Yet no one has alleged that Boiron's products are unsafe or harmful. Therefore, such relief would not be available to the class even if it were successful on the merits at trial. Rather, "[i]njunctive relief . . . must be tailored to remedy the specific harm alleged. An overb[roa]d injunction is an abuse of discretion." *Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1160 (9th Cir. 2011); *see also E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1297 (9th Cir. 1992) ("[W]e must [e]nsure that [the injunction] is tailored to eliminate only the specific harm alleged."). When fashioning injunctive relief, "the [California] Supreme Court has stressed that . . . [a] court should always strive for the least disruptive remedy adequate to its legitimate task." *O'Connell v. Superior Court*, 141 Cal. App. 4th 1452, 1464 (2006) (internal quotations omitted).

The injunctive relief that NTG Objectors advocate, barring Boiron from selling its products, would not be narrowly tailored to the specific harm alleged, *i.e.* misleading labeling, which is typically addressed by labeling changes like those Boiron agreed to in the Settlement. Indeed, courts routinely recognize that, "[w]here commercial speech has a tendency to mislead, a disclaimer rather than outright prohibition is the appropriate remedy." *Cabo Distrib. Co. v. Brady*, 821 F. Supp. 601, 615 (N.D. Cal. 1992); *see also Chacanaca v. Quaker Oats Co.*, 752 F. Supp. 2d 1111, 1112 n.7

---

[12] Apparently based upon a misunderstanding of Plaintiff's Motion for Fees, the Carapia Objectors' state that they are concerned whether Boiron will implement the requirements in the Settlement regarding the Homeopathic Dilution Page because Boiron has not yet made this webpage available. *See* Dkt. 97 at 7. But just because Boiron has not satisfied the Settlement's requirements before it is approved and thus before Boiron has any obligation to do so, does not mean that Boiron will not comply upon approval. Notably, the new web page was available to the class as Exhibit E to the Settlement, and the Carapia Objectors do not take issue with its substance.

(N.D. Cal. 2010) (discussing the Food, Drug, and Cosmetic Act and the Nutrition Labeling and Education Act and stating: "The statutory framework generally requires that a 'disclaimer' accompany the content claim, rather than prohibit the content claim entirely.").

This is especially true here, as Congress and the FDA have (i) recognized that homeopathic drugs may be lawfully marketed and sold in the United States, and (ii) promulgated specific guidelines governing the labeling of homeopathic products. 21 U.S.C. §§ 321, 351; CPG § 400.400; *see also generally Nat'l Council Against Health Fraud, Inc. v. King Bio Pharms., Inc.*, 107 Cal. App. 4th 1336, 1341, 1348 (2003) ("The FDA guidelines permit a homeopathic remedy meeting the standards for strength, quality, and purity set forth in the Homeopathic Pharmacopoeia to be marketed."). Accordingly, there is no basis for an order barring Boiron from selling its products.

## B.     The FDA and Dilution Disclaimers Provide Adequate Injunctive Relief

As discussed in detail in Boiron's Memorandum in Support, the FDA and Dilution Disclaimers have been sanctioned by The Hartman Group's President and COO, Laurie Demerrit, a marketing expert well-versed in the needs, interests, and concerns of consumers of OTC remedies. Ms. Demerrit opines that these disclaimers are understandable and will provide consumers with information that they value in purchasing OTC products. Decl. of Laurie Demerrit in Defs.' Mem. in Support of Pls.' Mot. for Final Approval ¶¶ 19-22. Further, consumers are already familiar with the FDA Disclaimer because Congress and the FDA require that a similar disclaimer be used on certain dietary supplements. *See* 21 U.S.C. § 343(r)(6); 21 C.F.R. § 101.93(c)(1).

## C.     Boiron Agreed to Continue Its Money-Back Guarantee

NTG Objectors further assert that the Settlement's injunctive relief is insufficient because the Settlement does not require Boiron to finalize its labeling changes until two years after the "Effective Date." when any appeals are exhausted and the judgment final. *See* Dkt. 96 at 13.

Boiron, however, does not intend to take the full twenty-four months to revise the labels on all of its products. Land Decl. ¶ 12. It will begin phasing in changes to the product labels before the required date in the Settlement, focusing on its top-selling products available in the mass market distribution channel first, such as Oscillococcinum, Chestal, Arnicare, Coldcalm, and Quietude. Based on this schedule, Boiron estimates that it will be able to revise the labeling of its top-selling

mass market products, and 80% of its total products, at least eight months before the Settlement Agreement's twenty-four month deadline. *Id.*

Moreover, NTG Objectors' critique that labeling changes "certainly cannot take two years to complete" demonstrates their lack of understanding of the homeopathic drug industry, and product labeling generally. As explained in the Food and Drug Administration's Labeling Cost Model Report, as well as the Declaration of Mark Land, there are many steps to implement a product labeling change. Sarchio Decl., Ex. P ("FDA Label Cost Report"); Land Decl. ¶¶ 9-10. Indeed, as the FDA explains, "A compliance period of less than 1 year would be generally considered a very short compliance period by most food and dietary supplement manufacturers." FDA Label Cost Report at 3-12. Yet Boiron's products' labels will be mostly revised in just over a year.

Finally, the Settlement requires Boiron to continue the Boiron Promise, which provides unsatisfied consumers will a full refund, for each product until its label has been revised. Settlement Agreement ¶¶ 1.34, 4.1.6. Although NTG Objectors criticize the Boiron Promise as a "farce," Dkt. 96 at 13, the Boiron Promise is displayed on nearly all of Boiron's proprietary product labels sold in the mass market distribution. Land Decl. ¶ 14. Further, Boiron has an entire webpage dedicated to informing consumers about the Boiron Promise, www.boironusa.com/promise/ ("Boiron Promise Webpage"), which is easily accessible from Boiron's homepage. *Id*. In addition, Boiron's individual product websites[13] contain a direct link, under the heading "About Boiron," to the Boiron Promise Webpage. *Id.*

## V.   THE NOTICE PLAN COMPLIES WITH ALL APPLICABLE LEGAL STANDARDS

### A.   The Notice Plan Provided the Best Notice Practicable Under the Circumstances, Meeting Due Process

The objectors raise several challenges to the Class Notice. First, the NTG Objectors assert that the parties improperly sought to "provide the best practicable cost-effective notice" to the class, suggesting that cost-effective notice is somehow inherently inferior to expensive notice. But the fact that the chosen Administrator could effectuate notice in a manner widely approved for similar types

---

[13]   These websites are www.chestal.com, www.childrenschestal.com, www.oscillo.com, www.childrensoscillo.com, www.arnicare.com, and www.camiliateething.com.

of consumers classes whose members are unknown, for less than other, more expensive administrators, is a <u>benefit</u> to the Class, not objectionable. *See*, *e.g.*, *Abiva v. Cache Inc.*, No. 2:07-cv-00556, Dkt. 84, slip. op. at 4 (C.D. Cal. Oct. 19, 2009) (approving notice of settlement in USA Today and posted on settlement website as "best notice practicable" given that members' identities could not "be readily determined by the parties"); *Chavez v. Blue Sky Natural Beverage Co.*, No. 3:06-cv-06609, Dkt. 151, slip. op. at 3 (N.D. Cal Sept. 24, 2010) (approving class notice via USA Today, three local newspapers, and a dedicated website); *Ferrero*, 2012 U.S. Dist. LEXIS 94900, at *8 (granting final approval to settlement that had almost identical notice plan to that preliminarily approved in this case).

Relying on the Declaration of Gina Intrepido-Bowden, a competing claims administrator who renders a purported legal opinion as to whether the Notice satisfies Rule 23(c)(2)(B) and Due Process (the "Intrepido-Bowden Decl.," Dkt. 96-3),[14] the NTG Objectors complain about Class exposure to the Notice. Dkt. 96 at 15. While it should not be considered,[15] Intrepido-Bowden's Declaration does not contradict the evidence that broad and appropriate notice occurred here. Ms. Intrepido-Bowden asserts that the "reach," or exposure of the class to a notice plan, must be a minimum of 70%. Intrepido-Bowden Decl. ¶ 14. But neither she, nor the NTG Objectors, provide any authority for the proposition that 70% reach is a constitutional prerequisite for Notice.[16]

---

[14] *See* Intrepido-Bowden Decl. ¶ 2 ("we have been asked . . . to provide an opinion as to whether the proposed settlement notice program represents the best practicable notice under the circumstances [as required by Fed. R. Civ. P. 23(c)(2)(B)] and meets the standards widely accepted as necessary to ensure Class members' due process rights are met."). Intrepido-Bowden's background is in advertising, *id.* ¶ 12, not constitutional jurisprudence.

[15] "Each courtroom comes equipped with a 'legal expert,' called a judge . . . ." *Burkhart v. Wash. Metro Area Transit Auth.*, 112 F.3d 1207, 1213 (D.C. Cir. 1997). The Intrepido-Bowden Declaration is therefore entirely improper. *See Williams v. Lockheed Martin Corp.*, No. 09cv1669 WQH (POR), 2011 U.S. Dist. LEXIS 58716, at *44-46 (S.D. Cal. June 1, 2011) (when an expert "offers opinions on legal conclusions regarding issues to be decided by the Court," such testimony "amounts to written advocacy" and "[does] not assist the Court") (quoting *In re First Am. Corp. Erisa Ligi.*, No. SACV 07-01357-JVS (RNBx),CV 07-07602,CV 07-07585,SACV 08-00110, 2009 U.S. Dist. LEXIS 49141, at *3 (C.D. Cal. Apr. 2, 2009)). Because the Intrepid-Bowden Declaration improperly offers opinions on legal conclusions, the parties respectfully ask the Court to strike it. *See Fisher v. Ciba Specialty Chems. Corp.*, 238 F.R.D. 273, 281 (S.D. Ala. 2006) (striking expert report).

[16] Intrepido-Bowden makes other similarly unsupported assertions, for example that "internet components . . . are not considered notice." Intrepido-Bowden Decl. ¶ 19.

Moreover, while Intrepid-Bowden accurately recites the statement in the Federal Judicial Center's Checklist ("FJC Checklist")[17] that class exposure "can always be calculated by experts," this does not support her suggestion that expert analysis is required. Here, Gilardi & Company provided a detailed Notice Plan, setting forth its expert analysis of how to best reach the class, including the likely demographic of the class, and its plan to effectuate targeted notice of purchasers of homeopathic remedies. Settlement, Ex. F. Courts routinely approve notice plans that do not include conjecture as to the suspected reach of a notice plan. *See*, *e.g.*, *Abiva*, *Chavez*, and *Ferrero*, *supra*.

### B.      The Notice Plan Complied with the CLRA

The NTG Objectors assert that the requirements of California Civil Code § 1781 were unsatisfied. Dkt 96 at 16. This is wrong because Notice included statutory newspaper publication within the State of California. *See* Dkt. 105-2 ¶ 17 & Ex. D (notice was published in the nationwide edition of USA Today for four consecutive weeks).

### C.      The Class Received Adequate Notice of Class Counsel's Attorney Fee Request

Both the NTG and Carapia Objectors complain that the Notice did not identify the amount of fees Class Counsel eventually sought in its July 20 motion.[18] Dkt. 96 at 17-18; Dkt. 97 at 2-3.

---

[17] The NTG Objectors make no showing that the FJC Checklist is binding, or even intended to be cited by litigants. For example, the FJC also publishes the Manual for Complex Litigation ("MCL"), which is explicitly intended to be cited, as evidenced by the suggested citation format in the MCL's preface. No such suggested citation form appears in the Checklist. This is not the first court presented with an opposition to a class notice plan filed by a settlement administrator other than the one chosen by the parties, hoping to use the FJC Checklist against them, but other courts have rejected such tactics. In *Hershey v. ExxonMobil Oil Corp.*, 07-1300-JTM, 2012 U.S. Dist. LEXIS 50469, at *4 (D. Kan. Apr. 11, 2012), the court found that:

> Mr. Hilsee's affidavit, which in many instances simply repeats suggestions in a checklist published by the Federal Judicial Center, is of limited usefulness. The Hilsee affidavit does not reference any petroleum class action litigation, and many of Hilsee's criticisms of the plaintiff's proposed notice would apply equally to the notice proposed by ExxonMobil. And while the FJC checklist generally observes that "[a] high percentage (e.g., between 70-95%) can often reasonably be reached by a notice campaign," the defendant points to no case holding that such a response rate is a constitutional prerequisite in all class actions.

*Id.* at *4.

[18] The Notice did not identify the fee amount because it had not yet been determined. The Settlement Agreement did not set a specific amount of fees or include "clear sailing" provision, but rather left it to the Court to determine the appropriate attorneys' fees upon an application. Settlement Agreement

---

1  However, there is no such requirement. Rather, "the only clear requirement *In re Mercury*

2  poses is that class counsel file their application for fees, costs, and incentive awards before the

3  deadline for filing objections." *Weeks v. Kellogg Co.*, No. CV 09-08102 (MMM) (RZx), 2011 U.S.

4  Dist. LEXIS 155472, at *82 (C.D. Cal. Nov. 23, 2011) (citing *In re Mercury Interactive Corp. Secs.*

5  *Litig.*, 618 F.3d 988, 994 (9th Cir. 2010)).[19]  That happened here. (Dkt. 105-2 at ¶ 26.)  Additionally,

6  Class Counsel's fee request can come as little surprise, since "the request for attorneys' fees in the

7  amount of 30% of the common fund falls within the range of acceptable attorneys' fees in Ninth

8  Circuit cases." *Gardner v. GC Servs., LP*, No. 10cv0997 - IEG (CAB), 2012 U.S. Dist. LEXIS

9  47034, at *19 (S.D. Cal. Apr. 2, 2012) (citations omitted); *see also In re Nuvelo Sec. Litig.*, No. C

10  07-04056 CRB, 2011 U.S. Dist. LEXIS 72260, at *7-8 (N.D. Cal. July 6, 2011).

11  **D.      The Time to Object was Sufficient**

12  The NTG Objectors also argue that the one-week period between the deadline for filing

13  Class Counsel's fee motion and the Objection and Opt-Out Deadline was insufficient. Dkt. 96 at 17-

14  18. However, "the fact that the objectors were able to review the fee application and prepare rather

15  lengthy objections to both the settlement and the fee request indicates that they had sufficient time to

16  respond." *Weeks*, 2011 U.S. Dist. LEXIS 155472, at *82. Further, seven days is sufficient time to

17  opt-out. *Id.* at *81 (approving one-week time period and collecting authority).

18  **E.      The Fee Application Was Sufficient**

19  Class Counsel's fee application discussed the tasks counsel performed in bringing this case

20  to fruitful resolution, as well as the precise attorney and staff hours expended. Dkt. 93 at 13-23 &

21  n.2, 93-1, 93-2. Class Counsel also supported its Motion with detailed Appendices that

22  demonstrating the reasonableness of the fee request, and an itemized list of costs sought. *Id.*

23

24

25

---

26  ¶ 9.1. The Notice <u>did</u> state that (a) Class Counsel would seek fees, (b) which would come out of the

27  fund, and (c) the fee motion would be posted on the Settlement Website prior to the Fairness

Hearing.

28  [19] *Compare* Dkt. 96 at 17 (citing *In re Mercury*).

The Carapia Objectors nevertheless object to Class Counsel's fee application on the basis that Class Counsel did not include its detailed time records. This objection should be overruled.[20] *See Lytle v. Carl*, 382 F.3d 978, 989 (9th Cir. 2004) (detailed time records are not required); Dkt. 93 at 21 n.5 (collecting cases). This is especially true where, as here, Class Counsel makes a request based on the percentage-of-fund method, since the purpose of Class Counsel's lodestar is only to cross-check the reasonableness of the resulting fee. Even if Class Counsel's lodestar were significantly adjusted, the requested fee would still be within a reasonable multiplier range. Thus, the need for detailed scrutiny of time records to determine lodestar is not necessary. Class Counsel provided the Class and Court with sufficient information about the work it did, and its billing practices and rates, to determine an appropriate lodestar for the purposes of cross-checking its request for a percentage-of-the-fund fee.[21]

## F.    Federal *and* California Law Apply to the Fee Application

The Carapia Objectors object to Class Counsel's request for a percentage-of-the-fund fee arguing that California's fee-shifting statutes (only) apply,[22] and require a fee award calculated by the lodestar method. Dkt. 97 at 5-6. Even the authority they rely upon, however, contradicts their assertion. For example, in *Bluetooth*, the Ninth Circuit held that where, as here, "a settlement

---

[20] The Carapia Objectors' counsel appears to have been repeatedly overruled in making this objection. *See* Motion for Appeal Bond in *Embry v. Acer Am. Corp.*, No. 09-cv-1808-JW, Dkt. 232 at 10 (N.D. Cal., filed March 23, 2012) ("In the past approximately six years, Palmer has presented a variant of this objection in approximately a dozen cases in this District alone, including five cases in the past year. To the best of Plaintiff's knowledge, this objection has never been sustained." (collecting cases)).

[21] While Class Counsel did not file detailed time records because of their volume and potential privilege issues, its fee motion made clear that the records are (and remain) available for the Court's *in camera* review upon request. Dkt. 93 at 21 n.5. The Carapia Objectors provide no authority that Class Members, as opposed to the Court, are entitled to review Class Counsel's detailed, unredacted billing records.

[22] The Carapia Objectors apparently base this assertion on Class Counsel "admission" that California law applies because the fee motion "cites a fee-shifting statutes approving fees in CLRA cases." Dkt. 97 at 5. But Class Counsel also cited the equitable and federal case law authority for fee awards, which is the basis for the percentage-of-fund method. *See* Dkt. 93 at 6.

---

1   produces a common fund for the benefit of the entire class, courts have discretion to employ either

2   the lodestar or the percentage-of-recovery method." 654 F.3d at 942.[23]

3           The authority on which the Carapia Objectors rely, Dkt. 97 at 5, is not contrary. *Dunk v.*

4   *Ford Motor Co.* involved a coupon settlement, in which relief was difficult to quantify and

5   attorneys' fees not paid from a fund, but separately by defendants. 48 Cal. App. 4th 1794, 1809

6   (1996). *Dunk* noted, however, that the California Supreme Court held that percentage of the fund

7   method is appropriate when dealing with a common fund, from which the fees are paid, and the fund

8   is "certain or easily calculable." *Id.* (citing *Serrano v. Priest*, 20 Cal.3d 25, 35 (1977)). Further,

9   *Dunk* applied California statutory rules of class certification, Code Civil Proc. § 382, not the Federal

10  Rules. *Id.* at 1806. Under *Erie*, where a federal rule is on point, the federal, and not state, rule

11  applies even in a diversity case. Here, Rule 23(h) and California law apply to the fee application. *See*

12  Dkt. 93 at 1, 7 (noting Standard of Review under Rule 23(h), and citing case law that California

13  applies both percent of common fund and lodestar/multiplier method). Nor does *Leallao v.*

14  *Beneficial Cal., Inc.*, stand for the proposition, as the Carapia Objectors suggest, that "the lodestar

15  method is required in all cases." 82 Cal. App. 4th 19, 26, 48 (2000) ("Percentage fees have

16  traditionally been allowed in such common fund cases," and percentage of benefit method is result-

17  oriented rather than process-oriented). Moreover, *Lealao* did not concern a common fund from

18  which fees were sought.

19          Finally, even if the lodestar/multiplier method were applied here, the Fee Motion provides an

20  ample basis for awarding the lodestar expended, and the application of a modest 1.99 multiplier for

21  the exceptional results obtained. Thus, the Court should overrule the objection.

22          **G.      The Fee Request is Reasonable**

23          The Carapia Objectors challenge the fee amount requested on various grounds. First, they

24  object that the 30% request exceeds the Ninth Circuit's 25% benchmark, which they contend "is

25

26  [23] The Carapia Objectors' assertion that because the *Bluetooth* court said "[t]he lodestar method is
    appropriate in class actions brought under fee-shifting statutes . . . where the relief sought—and
27  obtained—is often primarily injunctive," this means the "Ninth Circuit . . . explicitly disapproves of
    a percentage award when there is a fee-shifting statue," Dkt. 97 at 6, is a reading of *Bluetooth*
28  without support.

1    likely sufficient compensation for this 7-month case." Dkt. 97 at 6. However, an adjustment from the

2    benchmark depends on the factors identified in the Fee Motion, *see* Dkt. 93 at 11-22, not on the

3    amount a class member believes, without further explanation, provides "sufficient compensation."

4    Next, the Carapia Objectors "take[] issue with the injunctive component being included for valuation

5    purposes." Dkt. 97 at 6. Although Class Counsel noted that <u>if</u> the injunctive relief were valued at the

6    cost to Boiron, its fee request would represent only 12.5% of the Settlement's total value, Dkt. 93 at

7    9, this was for illustrative purposes only. Class Counsel clearly advocated for a 30% share of the

8    common fund itself, <u>without</u> valuing the injunctive relief <u>at all</u> (though it undoubtedly has some

9    value to the Class). *See, e.g.*, *id.* at 11. Finally, the Carapia Objectors' criticism of the 1.99

10   multiplier, Dkt. 97 at 7, is misplaced, since the multiplier is identified here to demonstrate the

11   reasonableness of the requested percentage-of-fund fee, rather than Class Counsel asking the Court

12   to <u>apply</u> at 1.99 multiplier to its lodestar in order to <u>determine</u> the fee award.

13                    **VI.    THE RELEASE IS APPROPRIATE AND ENFORCEABLE**

14          The NTG Objectors contend that the Settlement's Release is overbroad because it releases

15   "claims that fall outside the factual predicate" of *Gallucci*, and dismisses claims relating to

16   purchases between the close of the claims period and final judgment after appeal. Dkt. 96 at 18.

17          The first objection should be overruled because the First Amended Complaint's allegations

18   are sufficiently broad to justify the Settlement Agreement. *See* Dkt. 57 ¶¶ 2, 11, 60-63. Moreover,

19   "where a particular type of relief potentially available to the class members is compromised in the

20   settlement process, it is mainly irrelevant whether or not that relief was specifically requested in the

21   complaint. The breadth of negotiations is not necessarily strictly contained by the pleadings."

22   *Officers for Justice*, 688 F.2d at 632 n.18; *see also Class Plaintiffs v. City of Seattle*, 955 F.2d 1268,

23   1287 (9th Cir. 1992) ("[A] federal court may release not only those claims alleged in the complaint,

24   but also a claim 'based on the identical factual predicate as that underlying the claims in the settled

25   class action even though the claim was not presented <u>and might not have been presentable in the</u>

26   <u>class action</u>.'") (quoting *TBK Partners, Ltd. v. W. Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)

27   (emphasis in original)).

28

1   Numerous recent decisions have recognized that the issue of whether Plaintiffs may be

2   allowed to present claims on behalf of purchasers of products that they did not, themselves,

3   purchase, should be analyzed under Rule 23's typicality and adequacy requirements. *See Forcellati*

4   *v. Hyland's, Inc.*, No. CV 12–1983–GHK (MEWx), 2012 U.S. Dist. LEXIS 91393, at *13-15 (C.D.

5   Cal. June 1, 2012); *Bruno v. Quten Research Ins., LLC*, 280 F.R.D. 524, 530 (C.D. Cal. Nov. 14,

6   2011). Here, the Court has determined that "[t]he Plaintiffs' claims are typical of, indeed identical,

7   to those of the Class, as the Plaintiffs were exposed to Boiron's claims and purchased the Products

8   in reliance on those claims." PA Order at iii. Accordingly, the Settlement Agreement properly

9   releases claims relating to all of Boiron's homeopathic products.[24] The NTG Objectors' reliance on

10  *National Super Spuds, Inc. v. New York Mercantile Exchange*, 660 F.2d 9 (2d Cir. 1981), is

11  misplaced. That case concerned liquidated and unliquidated contracts for potato futures, and has

12  been held not to apply to classes where, as here, "the lead plaintiffs are necessarily a part of" the

13  settlement class and their interests are "aligned with the interests of" the class. *See Wal-Mart Stores,*

14  *Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 111 (2d Cir. 2005).

15  The NTG Objectors' assertion that the Release is impermissibly broad because it applies to

16  claims "that have been brought, could have been brought, or are currently pending . . . by any Class

17  Member," is without merit. *See, e.g., In re HP Inkjet Printer Litig.*, No. 05-cv-3580 JF, Dkt. 286,

18  slip op. at 9-12 (N.D. Cal. Mar. 29, 2011);[25] *In re Dry Max Pampers Litig.*, 10-cv-00301-TSB, Dkt.

19  73, slip op. at 7 (S.D. Ohio Sept. 28, 2011);[26] *Gemelas v. The Dannon Co., Inc.*, No. 08-cv-00236-

20  _____

21  [24] Notably, many of these products are highly-specialized with such infinitesimally small sales

22  figures that they could not present a compelling case for bringing an independent class action, even
    if a volunteer class representative could be found. For purchasers of these products, this Settlement

23  presents the only realistic chance of recovery.

    [25] In *In re HP Inkjet Printer Litigation,* the district court granted final approval of settlement in

24  which the parties released "any and all claims, demands, rights, damages, obligations, suits, debts,

25  liens, and causes of action of every nature and description whatsoever, ascertained or unascertained,
    suspected or unsuspected, existing or claimed to exist, including unknown claims" and defined

26  effective date as "the Final Order and Judgment is no longer subject to judicial review," including
    after all appeals. *See* Dkt. 253-2, Settlement Agreement at ¶ 9 (Aug. 26, 2010).

27  [26] In *In re Dry Max Pampers Litigation.,* the district court granted final approval of a settlement in
    which "the Releasing Parties forever release and discharge all equitable Claims that have been

28  brought, could have been brought, are currently pending, or are ever brought in the future, by any

1   DAP, Dkt. 71, slip op. at 5 (N.D. Ohio June 24, 2010).[27] Many of the claims the NTG Objectors

2   complain would be released, clearly would not be released, since they were not brought, could not

3   have been brought, and are not currently pending. *See* Dkt. 96 at 19. The purchase of a contaminated

4   product, for example, would likely be an unreleased personal injury claim, not a labeling claim. The

5   Court thus should overrule this objection.

6        Finally, the NTG Objectors challenge the Release's duration through the "Effective Date" of

7   the Settlement Agreement (noting that an appeal could hold up final judgment), rather than "the last

8   day for class members to submit claims, exclude themselves from the class, or object to the

9   settlement," which the they claim is required in a class action. Dkt. 96 at 20. They provide no

10   authority for this proposition, however, nor any explanation how the Release in this respect

11   detriments the Class.

12 **VII.   THE COURT SHOULD REAFFIRM ITS ORDER THAT RULE 23(A) IS SATISFIED**

13     **A.   Typicality**

14        The NTG Objectors challenge whether Rule 23(a)(3)'s typicality requirement is satisfied.

15   Dkt. 96 at 20-21. This objection is similar to its argument that the Release is overbroad because it

16   concerns products that Plaintiffs may not have purchased, and the parties' response is the same.

17   Further, typicality is a "permissive" standard under which "representative claims are 'typical' if they

18   are reasonably co-extensive with those of absent class members; they need not be substantially

19   identical." *Hanlon*, 150 F.3d at 1020 (affirming typicality of representative plaintiffs in class action

20   settlement). The fact that some products "contain[] a distinct formulation, [are] sold utilizing distinct

21   representations, and [] marketed to treat distinct medical issues," Dkt 96. at 21, is irrelevant, where

22   Plaintiffs alleged that the extreme dilutions used in homeopathy rendered each Product's claims of

23   efficacy false and misleading regardless of precise substance used or symptom addressed. Further at

24

25 Settlement Class Member against Released Parties, in any forum in the United States. . . ." Dkt. 54-2, Settlement Agreement at 23-24 (May 27, 2011).

26 [27] In *Gemelas*, the district court granted final approval of a settlement releasing "any known or

27 unknown, suspected or unsuspected, contingent or noncontingent claim . . . without regard to subsequent discovery or existence of different or additional facts." *See* Dkt. 42, Settlement

28 Agreement at 20 (Jun. 1, 2010).

1    issue was whether an average consumer would understand the ultra-high level of dilution in

2    Boiron's Products, or that the FDA does not review or approve Boiron's labeling. Since dilution is

3    noted by the same C, K, CK, and X symbols on all the Products, and the lack of FDA approval

4    applies to all of the Products generally, each of these deceptive labeling issues can be resolved

5    across all of the Products.

6        **B.      Adequacy**

7        The NTG Objectors argue that Rule 23(a)(4)'s adequacy requirement is unsatisfied because

8    "class counsel have demonstrated they are not qualified, experienced, or generally able to conduct

9    this litigation." Dkt. 96 at 21. Specifically, they contend that Class Counsel has "been criticized by

10   numerous courts for their inability to adequately represent class members," that "there is

11   considerable evidence of collusion in the settlement," and that Class Counsel's fee request

12   undermines its adequacy. *Id.* at 21-23.  These assertions are wholly unfounded.

13       Class Co-Counsel previously addressed the first assertion. *See* Dkt. Nos. 44 at 9-10, 44-2.

14   Considering the same information provided to this Court, the Central District of California's

15   Honorable George H. Wu—who issued the *Red* decision that the NTG Objectors rely upon, Dkt. 96

16   at 22—recently wrote:

17       [W]hile considering Plaintiffs' previous class certification motion, the Court found that it

18       "would have an obligation to the putative class to fully investigate" allegations launched
         by former co-counsel Beck & Lee of impropriety on the part of the Weston firm. The

19       Court has now considered the detailed description of the Beck & Lee/Weston Firm
         dispute provided in Gregory Weston's declaration, and is inclined to find the accusations

20       sufficiently groundless, and would not preclude the appointment of the Weston Firm as
         class counsel. Other courts have similar considered such accusations sufficiently baseless

21       so as not to preclude appointing the Weston Firm as class counsel.

22   *Red v. Kraft Foods, Inc.*, No. 10-cv-1028-GW, Dkt. 212, slip op. at 16-17 (C.D. Cal.). Class Counsel

23   has demonstrated its adequacy on a number of occasions, to this Court and others, which has been

24   repeatedly upheld. Further, the Settlement Agreement itself, and Class Counsel's navigation through

25   the murky waters of NTG's unending attacks in this case, demonstrates their adequacy.

26       Finally, the parties have already addressed the NTG Objectors' erroneous assertion that the

27   Settlement involves collusion; their assertion that the fee request is "unreasonable and antagonistic

28

1  to the interest of the class" is conclusory and contradicted by the arguments presented in Class

2  Counsel's fee motion.

3  **VIII.    THE REQUIREMENTS FOR OBJECTING DO NOT VIOLATE RULE 23**

4        The Carapia Objectors challenge the requirements in the Settlement Agreement and

5  Preliminary Approval Order for objectors, characterizing them as "procedural hurdles . . . which are

6  in themselves patently objectionable." Dkt. 97 at 9. They specifically object to the requirements that

7  objectors disclose whether they or their attorneys have made other objections in the past, and their

8  outcome. *See* PA Order ¶ 7. The Carapia Objectors, however, provide no authority for the

9  proposition that requesting this basic information from objectors limits their input or in in any other

10  way improper. To the contrary, these facts help the parties winnow out objectors, and objections

11  linked to the same attorney (not just attorneys that represent different objectors over time), and that

12  have a pattern or practice of making professional objections, not to enhance the value of the

13  settlement to the class, but for the purpose of seeking fees. These requirements are not onerous, and

14  are actually supported by the case law Objectors cite.

15        For example, *Vollmer v. Selden II* concerned whether a Rule 11 sanction was appropriate

16  when an attorney encouraged an unnamed class member, that was unfamiliar with the class action

17  settlement, to intervene "not to increase the value of the settlement, but in order to get paid to go

18  away." 350 F.3d 656, 660-61 (7th Cir. 2003). While the court, in *dicta*, notes that well-founded

19  objections can be beneficial, *id.* at 660, a proposition the parties do not dispute, the opinion does not

20  hold that requiring objectors to observe moderate formalities and deadlines, or provide such basic

21  information, violates Rule 23. Moreover, while the Carapia Objectors' attorney has not satisfied

22  these requirements, the parties do not assert this as a ground for excluding the Objection, so in any

23  event there is no prejudice (nor have the parties argued that Mr. Palmer's status as a so-called

24  "professional objector," in itself, renders the Carapia Objectors' objections less meritorious).

25        Finally, the Carapia Objectors take issue with the requirement that, if a class member wants

26  to appear at the fairness hearing, notice of intent to appear must have been filed with the Court by

27  July 14, 2012. That date, however, was based on the original Fairness Hearing date, and coincided

28  with the deadline for filing objections. When the Court continued the Fairness Hearing to August 27,

that date, like the Objection and Opt-Out Deadline, moved to July 27. To the extent any objector filed their notice of intent to appear with their objections, and did so in a timely manner (30 days before the Fairness Hearing, as ordered by the Court, PA Order ¶ 21), those objectors will be heard. In any event, the parties have not asserted that any objector who otherwise has standing to object should be precluded from appearing at the Fairness hearing because of a failure to timely file a notice of intent to appear.

## CONCLUSION

The very small number of objections weighs in favor of final approval. *Hartless*, 273 F.R.D. at 641 ("The absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of the settlement are favorable to the class members."). "To hold otherwise would put too much power in the hands of a few persons having no right to a preferred position in settlement, to thwart a result that might be in the best interests of the class." *Boyd*, 485 F. Supp. at 624. Moreover, the objections themselves are without merit. Accordingly, the Court should overrule the objections and grant the Settlement final approval.

Dated: August 13, 2012                    Respectfully Submitted,

                                          /s/ Ronald A. Marron
                                          *ron@consumersadvocates.com*

                                          /s/ Jack Fitzgerald
                                          *jack@westonfirm.com*

                                          ***Class Counsel***

                                          /s/ Christina Sarchio
                                          csarchio@pattonboggs.com

                                          /s/ Vickie S. Turner
                                          *vturner@wilsonturnerkosmo.com*

                                          ***Attorneys for Defendants***

**APPENDIX A**

| Date | Event |
|---|---|
| August 4, 2011 | NTG files *Gonzales* in state court seeking to represent a California-only class against Boiron's Oscillococcinum |
| August 25, 2011 | NTG offers to settle *Gonzales* for $8 million in attorneys' fees, with no discussion of the relief for the proposed class |
| September 2, 2011 | Class Counsel files *Gallucci* in federal court seeking to represent a nationwide class against Boiron's Oscillococcinum and Children's Oscillococcinum |
| September 7, 2011 | Boiron removes *Gonzales* to federal court |
| September 15, 2011 | NTG is invited to participate in *Gallucci* mediation |
| September 15, 2011 | NTG rejects invitation to participate in *Gallucci* mediation |
| September 21, 2011 | *Gallucci* mediation with the Honorable Leo S. Papas (Ret.) commences |
| September 27, 2011 | NTG invites Boiron to mediate *Delarosa* |
| September 30, 2011 | *Gallucci* mediation session with Judge Papas |
| October 11, 2011 | *Gallucci* mediation session with Judge Papas |
| October 28, 2011 | *Gallucci* mediation session with Judge Papas |
| November 4, 2011 | Mediation session in *Delarosa* ends after less than three hours |
| November 10, 2011 | *Gallucci* mediation session with Judge Papas |
| November 15, 2011 | *Gallucci* mediation session with Judge Papas |
| November 16, 2011 | *Gallucci* mediation session with Judge Papas; parties reach agreement in principle and execute MOU |
| November 18, 2011 | *Gallucci* parties file Motion to Stay proceedings pending filing of motion for preliminary settlement approval |
| November 21, 2011 | *Gallucci* mediation session with Judge Papas |
| November 23, 2011 | NTG sends correspondence to *Gallucci* parties threatening that, if the parties did not cooperate with him "before it is too late," it will result in "damage" to Mr. Gallucci's and Boiron's counsel. |

| Date | Event |
|------|-------|
| November 28, 2011 | *Gallucci* parties file MOU, revealing terms of nationwide settlement covering all Boiron products |
| December 2, 2011 | NTG files *Fernandez* action |
| December 13, 2011 | *Gallucci* mediation session with Judge Papas |
| December 15, 2011 | *Gallucci* mediation session with Judge Papas |
| December 21, 2011 | *Gallucci* mediation session with Judge Papas |
| January 20, 2012 | *Gallucci* mediation session with Judge Papas |
| February 6, 2012 | First Amended Complaint filed in *Gallucci*, adding new class representatives and products |
| February 13, 2012 | *Gallucci* mediation session with Judge Papas |
| February 14, 2012 | NTG files *Farley* in state court |
| March 6, 2012 | *Gallucci* parties fully execute Settlement Agreement and file Motion for Preliminary Approval |
| March 6, 2012 | 37 minutes later, NTG notifies counsel of intent to file Motion to Strike, alleging collusion and unethical conduct |
| April 16, 2012 | NTG files purported "Opposition" to Motion for Preliminary Approval in Plaintiff Gonzales's name |
| April 27, 2012 | Henry Gonzales testifies at deposition that he is unaware of *Gallucci* settlement and would be satisfied if he received his money back through that settlement |

*Gallucci v. Boiron, Inc., et al.*, Case No. 11-CV-2039 JAH NLS
JOINT RESPONSE TO OBJECTIONS